**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CECILIA CULVER<br><br>             *Plaintiff*,<br><br>    v.<br><br>ERNST & YOUNG LLP,<br>ERNST & YOUNG U.S. LLP,<br>GEORGE WASHINGTON UNIVERSITY,<br>JASON P. MORRISSEY,<br>ANDREW D. PHILLIPS,<br>ANDREA STEMPEL,<br>ANTHONY JORDAN,<br>ROBERT J. CARROLL,<br>RACHEL C. RIEDNER,<br>KATHLEEN FACKELMANN,<br>ELLEN M. GRANBERG,<br>CHRISTOPHER BRACEY,<br>PAUL J. WAHLBECK,<br>KIMBERLY A. GROSS,<br>GRACE E. SPEIGHTS, and<br>DOES 1-20,<br><br>             *Defendants*. | Case No. 1:26-cv-1290<br><br>JURY TRIAL DEMAND |

**COMPLAINT**

Plaintiff Cecilia R. Culver ("Ms. Culver") files this Complaint against Defendants

Ernst & Young LLP; Ernst & Young U.S. LLP; The George Washington University; Jason

P. Morrissey, in his individual capacity; Andrew D. Phillips, in his individual capacity;

Andrea Stempel, in her individual capacity; Tony Jordan, in his individual capacity; Robert

Carroll, in his individual capacity; Rachel Riedner, in her individual capacity; Kathy Fackelmann, in her individual capacity; Ellen Granberg, in her individual capacity; Chris Bracey, in his individual capacity; Paul Wahlbeck, in his individual capacity; Kim Gross, in her individual capacity; Grace E. Speights, in her individual capacity; and Does 1–20.

## I.    INTRODUCTION

1.    This is a civil rights action brought by Cecilia R. Culver, an economist of extraordinary academic and professional distinction, against two prominent institutions in Washington, D.C. and the individuals within them who coordinated to end her career—without process, without cause, and without conscience. All because she used the platform of her own graduation ceremony to speak a truth that made powerful people uncomfortable.

2.    On May 17, 2025, Ms. Culver stood before nearly 750 graduates, their families, and a livestream audience at the Columbian College of Arts and Sciences Graduation Celebration at the George Washington University. She had earned that platform. The GWU Economics Department had nominated her, and a faculty and administrative committee had selected her from an accomplished cohort of graduating seniors as the CCAS Distinguished Scholar for the 2024–2025 academic year. Ms. Culver was selected in recognition of her perfect 4.0 GPA, her extensive research experience, her Hsieh Prize nomination, and the Excellence Award she had received from the Federal Reserve for her work in the Large Institution Supervision Coordinating Committee's Resolution and Recovery Planning program. GWU's own commendation described her as "in every way a distinguished scholar and deserving of this award." She was, by any measure, exactly the student GWU had chosen to represent her graduating class.

3. In her address, Ms. Culver dedicated a portion of her speech about the humanitarian catastrophe unraveling as the world witnessed the ongoing genocide in Gaza, Palestine. She humanized the Palestinian people, advocated for the rights of Palestinian students who had been displaced, killed, or prevented from continuing their education, and called upon GWU to disclose its financial investments and divest from corporations profiting from genocide. Her speech was met with sustained applause from the crowd. It was also, within hours, met with a coordinated institutional assault on her livelihood and her reputation.

4. By 2:00 p.m. on May 18, 2025—a Sunday and less than twenty-four hours after the address—Ms. Culver's employer, Ernst & Young LLP, had locked her out of her email and workplace accounts and placed her on administrative leave. EY's own written notice admitted the reason: the leave was imposed "in connection with your speech at the George Washington University commencement." No policy violation was identified. No investigation had been conducted. No hearing was offered. The causal connection between Ms. Culver's protected expression and EY's adverse action was not a matter of inference—EY wrote it down.

5. Over the next four days, Ms. Culver did everything right. She requested a meeting. She asked EY in writing to identify what policy she had violated and to provide copies of any relevant guidelines. She invoked her rights. She filed a formal internal complaint of discrimination. EY did not answer a single substantive question she posed. Instead, on May 22, 2025, at 7:55 p.m.—four hours and twelve minutes after Ms. Culver filed her internal discrimination complaint—EY transmitted her termination letter. EY still had not identified a single policy she had violated.

6.      GWU's conduct was no less troubling. At the commencement ceremony itself, GWU's Associate Dean for Undergraduate Studies stepped to the podium to publicly announce that Ms. Culver had "strayed from her prepared remarks" and that her remarks "do not reflect" the University's views.[1] GWU then removed the ceremony's livestream from its YouTube channel, eliminating the public record of Ms. Culver's address. GWU's spokesperson issued public statements characterizing Ms. Culver's speech as "materially different" from her submission and announcing a formal investigation for alleged "policy violations." Of course, GWU never identified what policy Ms. Culver had violated, and it didn't acknowledge that it had reviewed and processed Ms. Culver's draft submissions without objection before the ceremony.

7.      GWU's rationale for its action is that Ms. Culver was somehow dishonest because her delivered address differed from a previously submitted draft. That does not withstand scrutiny. GWU's own speaker materials contained no prohibition on speakers departing from submitted drafts—and in any event, the premise of 'departure' does not survive a comparison of the two texts: the first five paragraphs of Ms. Culver's delivered address are reproduced essentially verbatim from the draft GWU approved without objection. GWU never told Ms. Culver, before or after the ceremony, what rule she had broken.

8.      After EY fired Ms. Culver, the "dishonesty" narrative was constructed to justify a termination decision that had already been made—not based on any legitimate business or policy concern, but in response to an organized external Zionist pressure campaign triggered by an online doxing platform led by an infamous hate merchant, Liora Reznichenko (a/k/a

---

[1] The Associate Dean's declaration that Ms. Culver's remarks "do not reflect" the University's views raises a question GWU has never answered: what, precisely, are the University's views? Ms. Culver's remarks opposed genocide, expressed grief over the annihilation of Palestinian life, humanized displaced and killed students, and a called for institutional transparency and accountability. Does GWU endorse the opposite?

Liora Rez), who affixed a false antisemitism label to Ms. Culver. And within two days of Ms. Culver's address, that campaign of hate generated more than 10,000 communications to EY demanding her firing. When EY faced a choice between its legal obligation to protect its employee from discrimination and its desire to placate an organized campaign targeting her for the identity-based content of her expression, EY chose wrong.

9. The law Ms. Culver invokes in this Complaint was written precisely for moments like this one. Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees because of their association with a protected class and from retaliating against employees who engage in protected activity. Section 1981 of the Civil Rights Act of 1866 protects the right to make and enforce contracts free from racial and ethnic discrimination. Sections 1985 and 1986 reach coordinated conspiracies to deprive persons of their federally protected rights—even when between private actors and across institutional lines. The District of Columbia Human Rights Act extends these protections in the nation's capital. And the common law of the District of Columbia provides remedies for breach of contract, defamation, and the intentional infliction of emotional distress. Taken together, these laws establish liability, with precision, for Defendants did to Ms. Culver.

10. Ms. Culver does not bring this action to relitigate the politics of the genocide in Gaza, or as an extension to a human rights movement. She brings it because she was a twenty-two-year-old economist at the beginning of a distinguished career, who gave a six-minute speech at her own graduation, and who lost her job for it—not because of anything she did wrong, but because who her expression of shared humanity touched and her call for institutional transparency and accountability. The law protects that. This Complaint asks the Court to enforce that protection.

## II.  PARTIES

11.    Plaintiff Cecilia Culver is a citizen of the United States. At all times relevant to this Complaint, she resided in Washington, D.C. Ms. Culver earned a Bachelor of Science in Economics and Statistics from the Columbian College of Arts and Sciences ("CCAS") at George Washington University in Fall 2024, graduating with a 4.0 overall GPA and a 4.0 major GPA. The CCAS selected Ms. Culver as its CCAS Distinguished Scholar for the 2024–2025 academic year and, in that capacity, chose her to deliver the student commencement address at the CCAS Graduation Celebration on Saturday, May 17, 2025, at the Smith Center, Washington, D.C. In her address, Ms. Culver dedicated a portion of her speech to highlight the humanitarian catastrophe resulting from the ongoing genocide in Gaza, advocated for the rights of Palestinian students, and called upon GWU to disclose its financial investments and divest from corporations profiting from genocide. That speech publicly and unmistakably associated Ms. Culver with Palestinians, Arabs, and Muslims as a class—and it is that association, and the advocacy underlying it, that Defendants made the basis for the adverse actions described in this Complaint. Ms. Culver brings her claims on the theory of associational discrimination: she was targeted not because of any characteristic personal to her, but because of the identity of those she publicly grieved and the shared humanity she publicly advanced on their behalf. At all times relevant, Ms. Culver was engaged in activity protected under Title VII of the Civil Rights Act of 1964, the District of Columbia Human Rights Act, and 42 U.S.C. § 1981 by virtue of her association with and advocacy on behalf of persons of Palestinian national origin, Arab ethnicity, and Muslim religious identity. Before and during the events giving rise to this action, Ms. Culver was employed by Ernst & Young LLP as a Staff Assistant in EY's Quantitative Economics and Statistics ("QUEST") practice,

having accepted a full-time offer of employment on August 23, 2024, and commenced full-time employment on January 13, 2025.

## A. ENTITY DEFENDANTS

12.    Defendant Ernst & Young LLP and Defendant Ernst & Young U.S. LLP ("EY") is a limited liability partnership organized and existing under the laws of the United States, with its principal place of business at One Manhattan West, New York, New York 10001. EY operates offices in Washington, D.C. and throughout the United States and is one of the largest professional services firms in the world. EY employed Ms. Culver as a Staff Assistant economist in its QUEST practice from January 13, 2025 until EY unlawfully terminated Ms. Culver's employment on May 22–23, 2025. At all times relevant to this Complaint, EY was Ms. Culver's employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b); the District of Columbia Human Rights Act, D.C. Code § 2-1401.02(10); and 42 U.S.C. § 1981. EY is subject to personal jurisdiction in this Court by virtue of its substantial and continuous business operations in the District of Columbia, and venue is proper in this District because a substantial part of the events giving rise to Ms. Culver's claims occurred here.

13.    Defendant George Washington University ("GWU" or "the University") is a private nonprofit university chartered and operating under the laws of the District of Columbia, with its principal place of business at 1918 F Street, N.W., Washington, D.C. 20052. GWU operated the CCAS Distinguished Scholar speaker program under which Ms. Culver was selected, designated, and prepared to deliver the student commencement address at the May 17, 2025 CCAS Graduation Celebration. Through that program, GWU reviewed and processed successive drafts of Ms. Culver's speech, provided written speaker

requirements and guidelines to Ms. Culver, received and approved Ms. Culver's final submitted draft, and conferred upon Ms. Culver the platform of distinguished speaker on behalf of the graduating class. Following Ms. Culver's address, GWU initiated a public and institutional response—including a public characterization of Ms. Culver's speech as "materially different" from her submitted draft, an announcement of a formal investigation of Ms. Culver for alleged violations of unnamed policies, and the publication of statements that foreseeably facilitated and amplified Ms. Culver's termination by EY. GWU is subject to personal jurisdiction in this Court by virtue of its domicile and principal place of business in the District of Columbia.

### B. INDIVIDUAL DEFENDANTS – EY

14.     Defendant Jason P. Morrissey is employed by EY as Director and Deputy Talent Leader—Tax, Americas Talent Team, Ernst & Young LLP, with an office address at 1828 Walnut Street, Suite 04-100, Kansas City, Missouri 64108. Morrissey served as EY's primary point of contact with Ms. Culver following her May 17, 2025 commencement address. On May 18, 2025, Morrissey emailed EY's administrative leave notice to Ms. Culver, stating that EY was placing her on administrative leave "in connection with [her] speech at the George Washington University commencement" and deactivating her systems and premises access effective immediately. On May 22, 2025, at 7:55 p.m. Eastern, Morrissey emailed EY's termination letter—less than five hours after Ms. Culver filed her internal discrimination complaint with EY's employment law counsel. Morrissey was also present on the May 19, 2025 QUEST team meeting convened jointly by Defendants Phillips and Carroll, at which Ms. Culver's administrative leave was announced to her colleagues; at the close of that meeting, Morrissey explicitly offered himself as the talent point of contact for any team

members with questions regarding Ms. Culver's status. At all relevant times, Morrissey acted within the scope of his authority as EY's Deputy Talent Leader and as an agent of EY. Morrissey is sued in his individual capacity.

15. Defendant Andrew D. Phillips is employed by EY as Partner and Principal in EY's QUEST practice, New York. Phillips served as Ms. Culver's supervising team leader and principal supervisor within the QUEST practice from the commencement of Ms. Culver's full-time employment through the date of her termination. Phillips was copied on EY's May 18, 2025 administrative leave notice. On May 19, 2025, Phillips convened a meeting of the full QUEST team at which he read a prepared statement announcing Ms. Culver's leave. At all relevant times, Phillips acted within the scope of his authority as a Partner and Principal of EY and as an agent of EY. Phillips is sued in his individual capacity.

16. Defendant Andrea Stempel is employed by EY as Associate General Counsel and Head of Employment Law, Ernst & Young LLP, New York. On May 22, 2025, at 3:43 p.m. Eastern, Stempel received Ms. Culver's formal internal complaint of discrimination. Despite her authority and professional responsibility as EY's Head of Employment Law to ensure compliance with Title VII's anti-retaliation provisions and to halt pending adverse employment action pending investigation of Ms. Culver's complaint, Stempel took no action sufficient to prevent the termination letter transmitted at 7:55 p.m. the same day. On May 25, 2025, Stempel confirmed receipt of Ms. Culver's complaint and inquired only whether Ms. Culver would be represented by counsel. At all relevant times, Stempel acted within the scope of her authority as EY's Head of Employment Law and as an agent of EY. Stempel is sued in her individual capacity.

17.     Defendant Anthony ("Tony") Jordan is employed by EY as Chief Ethics and Compliance Officer for EY US and Americas, based in Boston, Massachusetts. Jordan held supervisory authority over EY's compliance with its Global Code of Conduct, its ADR Program, and applicable federal and District of Columbia civil rights laws, including EY's express prohibitions on discrimination based on race, national origin, and religion and on retaliation for protected activity. At all times relevant to this Complaint, Jordan possessed authority to direct investigation, corrective action, and policy enforcement sufficient to have prevented or remedied the discriminatory termination of Ms. Culver's employment and the subsequent dissemination of the pretextual "dishonesty" rationale. On May 22, 2025, Jordan personally initiated contact with Ms. Culver, requesting a same-day meeting, and when Ms. Culver requested basic procedural information—the subjects to be addressed, relevant policies, and the identity of all attendees—Jordan refused to provide it, confirming only that no policies would be discussed and that an unidentified EY employee would attend. He did not respond to Ms. Culver's subsequent written request for documentation and a reasonable opportunity to consult counsel before the meeting. Jordan's conduct on May 22 was not passive inaction; it was the active conduct of an officer responsible for ethics and compliance who personally managed a process that was procedurally deficient on its face and who did nothing to remedy it. Jordan is sued in his individual capacity.

18.     Defendant Robert Carroll is employed by EY as Partner and Principal in EY's QUEST practice, based in Washington, D.C. Carroll served as co-leader of the QUEST practice alongside Defendant Phillips and had supervisory authority over Plaintiff's team and work. On May 19, 2025, Carroll jointly convened with Defendant Phillips the QUEST team meeting at which Ms. Culver's administrative leave was announced to her colleagues. That

meeting was not a spontaneous or reactive response: it had been scheduled in advance, jointly, by both QUEST principals, and Phillips delivered a prepared statement—demonstrating that EY's management had aligned on both the decision and its internal messaging before a single question had been posed to Ms. Culver. Phillips opened the call by stating: "Bob and I wanted to schedule this meeting to discuss an important update related to Cecilia Culver." Carroll was thus not merely a passive observer of Plaintiff's adverse employment action but an active and co-equal participant in broadcasting that action to her professional peers, without her knowledge, consent, or opportunity to respond. At all times relevant to this Complaint, Carroll possessed authority as a QUEST principal to object to, delay, or seek review of the decision to place Plaintiff on leave and to terminate her employment, and did not do so. Carroll is sued in his individual capacity.

C. INDIVIDUAL DEFENDANTS – GWU

19.    Defendant Rachel Riedner is employed by GWU as Associate Dean for Undergraduate Studies, CCAS, Washington, D.C. Riedner was present on the dais at the May 17, 2025 CCAS Commencement Ceremony and heard Ms. Culver's address in its entirety. Immediately following Ms. Culver's address, Riedner used her own podium time during the ceremony to publicly state that Ms. Culver "strayed from her prepared remarks" and that the remarks "do not reflect" GWU's views, before being interrupted by the disapproving crowd. That statement was false: the opening five paragraphs of Ms. Culver's delivered address—constituting the majority of the speech—were reproduced essentially verbatim from the draft GWU had received and processed without objection. At all relevant times, Riedner acted within the scope of her authority as Associate Dean for Undergraduate Studies and as an agent of GWU. Riedner is sued in her individual capacity.

20.    Defendant Kathy Fackelmann is employed by GWU as University Spokesperson, Washington, D.C. On May 17–19, 2025, Fackelmann issued one or more written institutional statements to the media characterizing Ms. Culver's commencement address as "materially different than the speech she submitted ahead of the ceremony"—a characterization that was false: the majority of the delivered address was reproduced verbatim from that submission, announced a formal investigation of Ms. Culver, and stated that GWU "apologize[d] to the graduates and families in attendance that their time of special celebration [was] being disrupted"—attributing the disruption to Ms. Culver's speech. These statements were published and disseminated to the public, to media outlets, and, on information and belief, to EY and its leadership. At all relevant times, Fackelmann acted within the scope of her authority as University Spokesperson and as an agent of GWU. Fackelmann is sued in her individual capacity.

21.    Defendant Ellen Granberg is the President of George Washington University in Washington, D.C. As GWU's chief executive, Granberg held ultimate authority over the University's institutional response to Ms. Culver's commencement address, including the decision to investigate Ms. Culver, the content of GWU's public statements, and the coordination or communications between GWU and third parties, including EY, regarding that response. No later than May 18–19, 2025, Granberg was publicly called upon—in the Change.org petition and in communications from GWU Faculty and Staff for Justice in Palestine addressed to the President by name—to protect Ms. Culver's right to speak about Palestine without retribution. No later than May 27, 2025, Granberg received the JVP Academic Council letter, addressed to her by name alongside Provost Bracey, Dean

Wahlbeck, and Board Chair Speights, placing her on formal written notice that GWU's conduct was unlawful and causing ongoing harm. Granberg is sued in her individual capacity.

22.     Defendant Chris Bracey is a the Provost of George Washington University in Washington, D.C. As GWU's chief academic officer, Bracey held authority over academic policy, student rights, and the University's conduct processes sufficient to direct or halt the investigation of Ms. Culver. No later than May 18–19, 2025, Bracey was publicly called upon by GWU Faculty and Staff for Justice in Palestine ('FSJP")—in an open communication addressed to the Provost by name—to protect Ms. Culver's rights. No later than May 27, 2025, Bracey received the JVP Academic Council letter addressed to him by name alongside President Granberg, Dean Wahlbeck, and Board Chair Speights—placing him on the same formal written notice. Despite this direct and public notice, Bracey did not exercise his authority to prevent the wrongful acts described in this Complaint. Bracey is sued in his individual capacity.

23.     Defendant Paul Wahlbeck is the Dean of the Columbian College of Arts and Sciences at George Washington University in Washington, D.C. As Dean of CCAS, Wahlbeck held direct supervisory authority over the Distinguished Scholar speaker program under which Ms. Culver was selected, designated, and prepared to deliver the student commencement address at the May 17, 2025 CCAS Graduation Celebration. That authority encompassed direct institutional responsibility for the policies and procedures governing Ms. Culver's participation as a CCAS student speaker and for the investigation that GWU publicly announced following her address. No later than May 18–19, 2025, Wahlbeck was publicly called upon by GWU Faculty and Staff for Justice in Palestine—in an open communication demanding that GWU protect Ms. Culver's right to speak about Palestine without

retribution—and was named and addressed directly in the Change.org petition published at the same time, which demanded that GWU drop its investigation. No later than May 27, 2025, Wahlbeck received the JVP Academic Council letter addressed to him by name and title, placing him on formal written notice of the harm being inflicted on Ms. Culver and demanding that GWU protect her rights. Wahlbeck was also identified by name and institutional email address in FSJP's public social media campaign. Despite receiving direct, written, and repeated demands that he exercise his authority as Dean of CCAS to halt the investigation over which he had supervisory responsibility, Wahlbeck did not do so. At all relevant times, Wahlbeck acted within the scope of his authority as Dean of CCAS and as an agent of GWU. Wahlbeck is sued in his individual capacity.

24.     Defendant Kim Gross is the Dean at George Washington University in Washington, D.C. Gross was a direct and named recipient of the Change.org petition published no later than May 18–19, 2025, which was addressed to her by name and demanded that GWU administrators drop the investigation into Ms. Culver and protect her rights. Gross was also identified by name and by institutional email address in FSJP's public social media campaign urging GWU administrators to protect Ms. Culver's right to speak about Palestine without retribution. Despite receiving direct and public notice that GWU's institutional conduct was causing ongoing harm to Ms. Culver, Gross did not exercise whatever authority she possessed to prevent or remedy that harm. At all relevant times, Gross acted within the scope of her authority as a Dean of GWU and as an agent of GWU. Gross is sued in her individual capacity.

25.     Defendant Grace E. Speights is the President of the Board of Trustees of George Washington University. As Chair of GWU's Board of Trustees, Speights held

ultimate fiduciary and governance authority over the University, including over the institutional decisions, public statements, and conduct of GWU's officers in responding to Ms. Culver's commencement address. No later than May 27, 2025, Speights received direct written notice—via the JVP Academic Council letter, addressed to her by name and title alongside President Granberg, Provost Bracey, and Dean Wahlbeck—of the harm being inflicted on Ms. Culver, of GWU's obligation to protect her rights, and of the demands of scholars and civil rights advocates that GWU halt its investigation and correct the false public record it had generated. Board-level notice no later than May 27, 2025, placed the full GWU governance structure on formal and documented alert that the University's response to Ms. Culver was unlawful and was causing ongoing harm. Despite that direct and documented notice, Speights did not exercise her authority as Board Chair to direct remedial action, halt the investigation, or prevent the foreseeable continuation of the wrongful acts described in this Complaint. Speights is sued in her individual capacity.

### D. Doe Defendants

26.    Defendants Does 1 through 10 are individuals employed by or affiliated with Ernst & Young LLP—including but not limited to supervisors, partners, human resources professionals, communications personnel, general counsel personnel, and compliance officers—whose true names and capacities are presently unknown to Ms. Culver but will be ascertained through discovery. At times relevant to this Complaint, each of Does 1 through 10 had actual or constructive knowledge that the wrongs described in this Complaint were about to be or were being committed, possessed power to prevent or aid in preventing the commission of those wrongs, and neglected or refused to exercise that power. Ms. Culver will

seek leave to amend this Complaint to substitute the true names and capacities of Does 1 through 10 upon their ascertainment.

27. Defendants Does 11 through 20 are individuals employed by or affiliated with George Washington University—including but not limited to administrators, deans, faculty members, communications personnel, legal counsel, and student conduct officials—whose true names and capacities are presently unknown to Ms. Culver but will be ascertained through discovery. At times relevant to this Complaint, each of Does 11 through 20 had actual or constructive knowledge that the wrongs described in this Complaint were about to be or were being committed, possessed power to prevent or aid in preventing the commission of those wrongs, and neglected or refused to exercise that power. Ms. Culver will seek leave to amend this Complaint to substitute the true names and capacities of Does 11 through 20 upon their ascertainment.

28. Wherever this Complaint refers to any act, omission, conduct, or obligation of "Defendants," such reference is intended to encompass each named Defendant and each of Does 1 through 20, individually and collectively, to the extent consistent with the specific allegations in this Complaint.

## III. JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction over Ms. Culver's federal claims under 28 U.S.C. § 1331 (federal question jurisdiction), as this action arises under the laws of the United States, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; 42 U.S.C. § 1985(2); 42 U.S.C. § 1985(3); and 42 U.S.C. § 1986.

30. This Court also has subject matter jurisdiction over Ms. Culver's federal civil rights claims under 28 U.S.C. § 1343(a)(3) and (a)(4), which confer jurisdiction upon district

courts to redress the deprivation, under color of any statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution or laws of the United States, and to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

31.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Ms. Culver's District of Columbia statutory and common law claims—including claims arising under the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.*, and Ms. Culver's common law claims for breach of contract, promissory estoppel, breach of confidential relationship, tortious interference with contract, defamation, intentional infliction of emotional distress, and false light invasion of privacy. Those statutory and common law claims are so related to Ms. Culver's federal claims that they form part of the same case or controversy under Article III of the United States Constitution. All of Ms. Culver's claims arise from a common nucleus of operative fact: the coordinated institutional response by Defendants EY and GWU to Ms. Culver's May 17, 2025 commencement address, resulting in the unlawful termination of Ms. Culver's employment, the damage to Ms. Culver's professional reputation, and the suppression of Ms. Culver's constitutionally and statutorily protected expression.

32.    Venue is proper in the United States District Court for the District of Columbia under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Ms. Culver's claims occurred in this District, including: Ms. Culver's commencement address at GWU's Smith Center in Washington, D.C., on May 17, 2025; GWU's announcement of its investigation of Ms. Culver and GWU's issuance of public statements regarding Ms. Culver's address, made from GWU's principal place of business in Washington, D.C.; Ms. Culver's receipt of EY's administrative leave notice and termination

letter in Washington, D.C.; Ms. Culver's employment by EY in EY's Washington, D.C. office as a member of the QUEST practice and the work she performed in that office before her termination; Ms. Culver's filing of her internal EY discrimination complaint, transmitted from Washington, D.C. on May 22, 2025; and the harm to Ms. Culver's reputation, employment prospects, and economic wellbeing suffered by Ms. Culver in Washington, D.C. and nationwide following her termination.

33.     Venue is also independently proper in this District under 42 U.S.C. § 2000e-5(f)(3), which provides that a Title VII action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice. Ms. Culver worked in EY's Washington, D.C. office and, but for the unlawful termination of her employment, would have continued to work in that office.

## IV.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

34.     Ms. Culver has fully exhausted her administrative remedies with respect to her Title VII claims. On November 18, 2025, Ms. Culver timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination and retaliation based on race, national origin, and religion in violation of Title VII of the Civil Rights Act of 1964. The EEOC issued a Notice of Rights (commonly referred to as a "Right to Sue" letter) dated January 15, 2026. Ms. Culver received that Notice of Rights on or about January 15, 2026. This Complaint is filed within ninety (90) days of Ms. Culver's receipt of

the EEOC's Notice of Rights, and Ms. Culver's Title VII claims are therefore timely under 42 U.S.C. § 2000e-5(f)(1).

35.    Ms. Culver's claims under 42 U.S.C. §§ 1981, 1985(2), 1985(3), and 1986 do not require administrative exhaustion and are brought directly in this Court.

36.    Ms. Culver's claims under the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.*, are brought in this Court under 28 U.S.C. § 1367. Under D.C. Code § 2-1403.16(a), a complainant may elect to file a civil action in any court of competent jurisdiction in lieu of, or in addition to, filing a complaint with OHR. This election is timely under applicable limitations periods.

37.    On May 22, 2025, Ms. Culver filed an internal discrimination complaint to Andrea Stempel, Associate General Counsel and Head of Employment Law.

38.    In retaliation, EY terminated Ms. Culver later that same day and did not follow the required process under its own policies before doing so.

## V.   ARBITRATION ALLEGATIONS

39.    EY's offer letter referenced an arbitration program and required disputes to be submitted first to mediation and then, if unresolved, to arbitration.

40.    But EY materially breached, repudiated, and prevented performance of the very dispute-resolution process on which it is expected to rely, including by terminating Ms. Culver hours after receipt of her internal discrimination complaint and failing to furnish the requested policy grounds, evidence, and communications necessary for any meaningful process.

41.    And any purported amendment to EY's ADR Program effective April 14, 2025 is unenforceable against Ms. Culver because she did not receive sufficient notice and assent before EY locked Ms. Culver out of its systems on May 18, 2025.

42.    Ms. Culver pleads these allegations to preserve her right to contest any motion to compel arbitration and, in the alternative, to seek declaratory and injunctive relief necessary to prevent forfeiture of her federal claims while that issue is litigated.

## VI.  FACTUAL ALLEGATIONS

### A. MS. CULVER'S EXCELLENCE AND PROMISE

43.    Ms. Culver is a scholar of exceptional academic distinction. She earned a Bachelor of Science degree in Economics and Statistics from the Columbian College of Arts and Sciences at George Washington University in Fall 2024, graduating with a 4.0 overall GPA and a 4.0 major GPA—a perfect academic record across both her overall coursework and her chosen fields of study.

44.    Ms. Culver's academic achievement was recognized at the highest level available to a graduating senior at CCAS. The GWU Economics Department selected Ms. Culver as the CCAS Distinguished Scholar for the 2024–2025 academic year—an honor bestowed upon her because, in the Department's own words, Ms. Culver's "extensive academic research experience outside of GW" made her "st[an]d out." The Economics Department's formal commendation of Ms. Culver noted that, while "the Economics Department has an accomplished group of graduating seniors this academic year," Ms. Culver's "talent and hard work" distinguished her from her peers. The commendation further noted that Ms. Culver's proseminar paper was nominated for the Hsieh Prize during the

2023–2024 academic year—one of the most prestigious recognitions available to an undergraduate economist at GWU.

45.    Ms. Culver's distinction was not limited to her academic coursework. During an internship with the Federal Reserve System's Large Institution Supervision Coordinating Committee ("LISCC") Resolution and Recovery Planning program, Ms. Culver was commended by Federal Reserve researchers and received the Excellence Award from the Federal Reserve for the quality of her work—a recognition of professional-grade performance in one of the most demanding supervisory environments in American financial regulation.

46.    As the CCAS Distinguished Scholar, Ms. Culver was designated by the University to represent the graduating class as the student speaker at the CCAS Graduation Celebration, to be held on Saturday, May 17, 2025, at the Smith Center, Washington, D.C. The University's own commendation of Ms. Culver, issued in connection with the award, described her as "in every way a distinguished scholar and deserving of this award."

## B.  MS. CULVER'S EMPLOYMENT AT EY

47.    On October 23, 2023, Ms. Culver received and signed an official offer letter for an internship with Ernst & Young LLP in EY's Quantitative Economics and Statistics ("QUEST") practice. Ms. Culver's internship commenced on June 10, 2024, and concluded on August 2, 2024. Ms. Culver performed her internship work at EY's Washington, D.C. offices.

48.    On August 22, 2024, EY extended to Ms. Culver an official offer letter for a full-time Staff Assistant position in the QUEST practice. Ms. Culver accepted the offer on August 23, 2024. Ms. Culver's full-time employment with EY commenced on January 13, 2025.

49.    At all times during her employment at EY, Ms. Culver performed her duties with the same commitment, skill, and professionalism that had earned her recognition at GWU and at the Federal Reserve. Ms. Culver's colleagues and supervisors within the QUEST practice—including senior managers, partners, and other team members—expressed consistent admiration for Ms. Culver's work ethic and professional capabilities. He also awarded Ms. Culver a monetary "Bravo Award" in recognition of her work on policy analyses under significant time pressure. Defendant Ryan Petska, Partner and head of EY's sampling group, repeatedly told Ms. Culver he loved working with her. He went out of his way to secure Ms. Culver's time for his projects—proactively contacting other managers and partners to limit competing demands on her schedule—a step outside the ordinary scope of a partner's responsibilities that reflected how highly he valued her work.

50.    Weeks before her termination, Senior Manager Menuka Ban completed Ms. Culver's formal FY25 performance evaluation under EY's LEAD feedback system, rating her 'Significantly exceeded expectations' in all four evaluated competency areas—technical skills, business skills, leadership skills, and quality and risk management—and writing that Ms. Culver 'consistently delivers high-quality work,' 'already takes a lot of initiative on projects and does things without being told,' and that the QUEST practice needed 'team members like Cecilia in policy projects, who not only bring technical skills but also see the big picture and help the team excel in complex projects.' The quality and risk management category rated 'Significantly exceeded expectations' by Ban explicitly encompasses, as one of its defined evaluation criteria, whether an employee 'upholds the principles of the global Code of Conduct'—the same instrument EY would invoke, without identifying any specific provision, to justify Ms. Culver's termination weeks later.

51.     At no point before May 17, 2025 was Ms. Culver subjected to any disciplinary action, performance improvement plan, or adverse employment action of any kind.

52.     EY's offer letters and employment materials incorporated by reference EY's Alternative Dispute Resolution ("ADR") Program. EY's ADR Program, the 2020 version operative during Ms. Culver's employment, purported to establish a multi-step dispute resolution process before termination, including specific procedures for the investigation and resolution of workplace disputes. EY did not follow any step of its own ADR Program in connection with Ms. Culver's internal complaint or termination. EY did not address her internal complaint. EY did not conduct an investigation. EY did not provide Ms. Culver with a pre-termination hearing. EY did not identify any policy Ms. Culver had violated. EY did not provide Ms. Culver with copies of any policies she was alleged to have breached, despite Ms. Culver's explicit written request that it do so.

53.     When Defendant Jordan—EY's Chief Ethics and Compliance Officer— personally initiated contact with Ms. Culver on May 22, 2025, he declined to provide the topics to be discussed, declined to identify any applicable policies, and did not respond to Ms. Culver's written request for documentation, a reasonable delay, and an opportunity to consult counsel. That conduct, by the officer responsible for EY's compliance with its own ADR Program, confirms that EY's failure to afford Ms. Culver any process was not inadvertent or administrative—it was the deliberate choice of the officer responsible for ensuring that process was afforded.

54.     EY's Global Code of Conduct, applicable to all EY personnel worldwide, expressly prohibits discrimination based on race, national origin, and religion and expressly prohibits retaliation against any employee for engaging in protected activity. EY's Code of

Conduct committed EY to acting with integrity, treating all people with respect, and ensuring that EY's actions are consistent with its stated values of diversity and inclusion. EY violated each of these commitments in its treatment of Ms. Culver.

### C. GWU'S SPEAKER PROGRAM AND MS. CULVER'S PREPARATION OF HER ADDRESS

55.    In connection with her designation as CCAS Distinguished Scholar and student commencement speaker, GWU established a formal speaker preparation process. On February 22, 2025, GWU provided Ms. Culver with initial written speaker requirements governing the content, length, and submission of her commencement address. On March 22, 2025, GWU provided Ms. Culver with additional or updated draft speech requirements.

56.    Per GWU's speaker program requirements, Ms. Culver prepared her commencement address through an iterative drafting process and submitted successive drafts to GWU for review. GWU communicated to Ms. Culver that the purpose of the drafting process was to help speakers refine their ideas, practice delivering their address, and conform to the time limit, and that the submitted draft would be used to generate a transcript for the sign language interpreters and to provide reference material at the podium. GWU did not represent—in writing or otherwise—that the submitted draft would constitute the exclusive and binding text of the delivered address, and at no point identified any subject matter as off-limits. GWU reviewed and processed Ms. Culver's drafts, including a draft containing an explicit call for students to "speak out against injustices small and large in our communities, our country, and around the world," without objection.

57.    On or about May 1, 2025, GWU received Ms. Culver's final submitted draft. The address Ms. Culver delivered on May 17, 2025 was substantially the same. Its first five paragraphs—the opening expression of gratitude, the passages on community and radical

optimism, and the call to speak out against injustice—were reproduced essentially verbatim from the submitted draft. Ms. Culver replaced only the submitted draft's abstract closing paragraphs with a new section introduced by a transition sentence directly connecting the addition to the preceding material: "And by saying so, I cannot stand here today without pushing for change within George Washington University." That section applied, through a concrete example, the same call to action already present in the draft GWU had approved. Ms. Culver drafted those revisions independently, on her own time. At no point prior to the ceremony did GWU notify Ms. Culver that her final submitted draft was impermissible, that any revision to it would constitute a policy violation, or that she was required to deliver it word for word.

58.    By reviewing Ms. Culver's draft submissions, retaining those drafts in its institutional files, and conferring upon Ms. Culver the role of Distinguished Scholar and student speaker, GWU entered into an implied contractual relationship with Ms. Culver governing the speaker preparation process. That relationship carried with it obligations of confidentiality and good faith with respect to the content of Ms. Culver's drafts, and a reasonable expectation on Ms. Culver's part that draft materials submitted to GWU in confidence as part of the speaker preparation process would not be used against her—publicly or institutionally—as a basis for discipline, investigation, or reputational harm.

### D. THE MAY 17, 2025 COMMENCEMENT ADDRESS

59.    On Saturday, May 17, 2025, Ms. Culver delivered her commencement address to the assembled graduates, faculty, family members, and guests at the CCAS Graduation Celebration at the Smith Center, Washington, D.C. Ms. Culver's address was also

livestreamed on GWU's official YouTube channel and CCAS Commencement Ceremony website.

60.    Ms. Culver concluded her remarks by invoking the ongoing genocide in Gaza and how GWU's refusal to divest from companies with ties to the occupation, apartheid, and genocide in Palestine was inconsistent with the University's stated values. Ms. Culver called upon her fellow graduates to withhold donations from GWU until the University disclosed its financial investments and divested from corporations profiteering off genocide. Ms. Culver expressed grief and moral concern about the unprecedented humanitarian catastrophe in Gaza, including the impact of the genocide on Palestinian students who had been displaced, killed, or prevented from continuing their education. Ms. Culver criticized GWU's suppression of conscientious voices on the human rights of Palestinians and community expressions of shared humanity on campus.

61.    Ms. Culver does not use the term "genocide" as a rhetorical device, but as a concrete legal prohibition that exists in federal and international law. *See* 18 U.S.C § 1091 (implementing the Genocide Convention).[2] The Zionist occupation's genocidal campaign in

---

[2] The crime of genocide occurs when someone "whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such—(1) kills members of that group; (2) causes serious bodily injury to members of that group; (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques; (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; (5) imposes measures intended to prevent births within the group; or (6) transfers by force children of the group to another group." 18 U.S.C. § 1091; *see also* Convention on the Prevention and Punishment of the Crime of Genocide, December 9, 1948, General Assembly Resolution 260, entered into force on January 12, 1951, ("The Genocide Convention"), Article II.

Palestine has been recognized by international courts,[3] United Nations experts,[4] genocide scholars,[5] leading medical professionals,[6] and even U.S. courts,[7] among others. Demanding an end to this genocide and justice for the people being annihilated is not only lawful and constitutionally protected, but also a legal imperative upon all nations under the Genocide Convention.[8]

62.    Ms. Culver's address was met with sustained cheers and applause from the crowd of graduates and attendees. CCAS administrators, faculty, and other guests on the dais

---

[3] *See* International Court of Justice, Dkt. No. 87, ICJ opinion dated January 26, 2024, at ¶ 30.

[4] *See, e.g.,* United Nations, "Anatomy of a Genocide, Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, Francesca Albanese," A/HRC/55/73 (March 25, 2024), https://perma.cc/9GRF-XR7K; United Nations, "Gaza: UN Human Rights Experts Call on International Community to Prevent Genocide Against the Palestinian People—OHCHR Press Release" (November 16, 2023), https://perma.cc/XDS8-PJF2.

[5] *See, e.g.,* "Declaration of William A. Schabas in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-5 (November 16, 2023), https://perma.cc/4MH2-ENU5; *see also* "Declaration of Dr. John Cox, Dr. Victoria Sanford and Dr. Barry Trachtenberg in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-6 (November 16, 2023), https://perma.cc/3RPE-F6AN.

[6] *See, e.g.,* "[Proposed] Brief of Amici Curiae Medical Doctors in Support of Plaintiffs' Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss," 4:23-cv-05829-JSW, Document 52-1 (December 30, 2023), https://perma.cc/A68V-DU4C.

[7] In his decision in *Defense for Children International-Palestine v. Biden*, Judge Jeffrey S. White noted that "the undisputed evidence before this Court comports with the finding of the ICJ and indicates that the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law. Both the uncontroverted testimony of the Plaintiffs and the expert opinion proffered at the hearing on these motions as well as statements made by various officers of the Israeli government indicate that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide." 714 F.Supp.3d 1160, 1163 (N.D. Cal. 2024). (Because the Judge granted Defendants' Motion to Dismiss based on the political question doctrine, this section of the opinion does not have legal force as a factual finding).

[8] The Genocide Convention, supra note 1, Article I; *see also* Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro), Judgment, 2007 I.C.J. 43, 221, ¶ 430.

behind Ms. Culver either applauded in response to her comments, began whispering to each other, or did not react.

63.    Ms. Culver's address constituted protected expression under federal and District of Columbia civil rights law. The humanity Ms. Culver exhibited—including her opposition to the genocide, her humanization the Palestinians, and her call for GWU divestment—publicly and unmistakably associated her with Palestinians, Arabs, and Muslims as a class. The connection between Ms. Culver's speech and her association with these protected characteristics was self-evident and was known to Defendants. That association was the proximate cause of Defendants' adverse actions. Title VII and the DCHRA prohibit discrimination based not only on an employee's own protected characteristics, but also on an employee's known or perceived association with individuals or groups defined by race, national origin, or religion—including those who are or are perceived to be Palestinian, Arab, or Muslim. Ms. Culver's speech placed her in that category in the eyes of Defendants, and it was in that capacity—as a graduate/employee who had publicly and unambiguously aligned herself with a disfavored class—that Defendants moved against her. No similarly situated employee or speaker who delivered a commencement address expressing political or moral views, and whose speech did not associate them with Palestinians, Arabs, or Muslims as a class, was subjected to the adverse actions described in this Complaint. As set forth later in this Complaint, multiple EY employees in positions comparable to Ms. Culver's made extensive public political and amoral statements about the Zionist-led genocide in Palestine—under their EY-affiliated professional identities, and during EY employment—without association with Palestinians, Arabs, or Muslims, and faced no adverse employment consequence of any kind.

**E. STOPANTISEMITISM.ORG'S DANGEROUS, THREATENING, AND RACIST WEB OF HATE, INTIMIDATION, AND PERSECUTION**

64.     StopAntisemitism.org, masquerading as a watchdog against antisemitism, operates as a coordinated instrument of racist harassment and ideological suppression, systematically targeting Palestinian, Arab, Muslim, and Jewish advocates of Palestinian human rights along with other anti-Zionist voices under the guise of combating hate. Its tactics—doxing, defamation, misinformation campaigns, institutional intimidation, and collaboration with extremist far-right groups—reflect a deliberate strategy to chill free speech and perpetuate anti-Palestinian racism.[9]

65.     That strategy begins with its name: StopAntisemitism.org appropriates the language of a legitimate civil rights cause as operational cover, ensuring that the very act of identifying it as the source of harm against any target can be weaponized as further evidence of the false antisemitism label it affixes to that target. The name is not incidental. It is the mechanism.

66.     StopAntisemitism.org is not merely an organization but a pseudonym for Liora Reznichenko (also known as Liora Rez), its founder, executive director, and sole public face. Reznichenko, a Ukrainian-born aspiring social media influencer, created the doxing platform in 2018 to amplify her personal crusade against perceived antisemitism, weaponizing the platform to silence Palestinians, anti-Zionists, and critics of the Zionist Occupation. Her dominance over the operation is absolute: she controls its messaging, funding, and operations, leveraging her media presence to leverage her social media followers and relations with other hate merchants into a coordinated harassment machine. Reznichenko is the group's sole

---

[9] Viki Auslender, *Doxing: A Legitimate Tool in the Fight Against Anti-Semitism?*, CALCALISTECH (Nov. 23, 2023), https://www.calcalistech.com/ctechnews/article/y4r9y3tyc.

spokesperson, appearing on Fox News, testifying before Congress, and penning articles for outlets like *The Jerusalem Post*.

67.     StopAntisemitism.org functions as a digital mob, soliciting followers to report criticism of the Zionist Occupation or solidarity with Palestinians as "antisemitic incidents." These reports are framed with inflammatory language, conflating anti-Zionism with antisemitism and equating protected speech with terrorism. The group then publishes targets' personal information, urging followers to bombard employers, schools, and licensing boards with demands for investigations, suspensions, terminations, and expulsions—denying due process and factual scrutiny.[10]

68.     StopAntisemitism.org's campaigns disproportionately target Muslims, Palestinians, and people of color, weaponizing antisemitism accusations to suppress advocacy for Palestinian rights. The group perpetuates anti-Muslim tropes, falsely labeling figures like Congresswoman Rashida Tlaib and journalist Mehdi Hasan as "terrorist sympathizers" for condemning the Zionist Occupation's policies.[11]

69.     For example, StopAntisemitism.org associated a Delta Airlines employee with "violence against Jews" for wearing a kufiyyeh,[12] joined a smear campaign against United Airlines flight attendants wearing Palestinian flag pins, maligning them as "Hamas badges,"[13]

---

[10] Pranshu Verma, *They Criticized Israel. This Twitter Account Upended Their Lives*, WASH. POST (Apr. 16, 2024), https://www.washingtonpost.com/technology/2024/04/16/stop-antisemitism-twitter-zionism-israel/.
[11] Islamophobia.org, *StopAntisemitism.org*, ISLAMOPHOBIA.ORG (Mar. 21, 2022), https://islamophobia.org/islamophobic-organizations/stopantisemitism-org/.
[12] StopAntisemitism (@StopAntisemites), *"A Delta passenger at JFK Airport was horrified to see a grounds crew member wearing a kefiyyeh-a symbol that has been appropriated and associated with violence against Jews. How unsettling to witness this moments before boarding a plane. This poses a safety concern for all passengers, @JFKairport!" [Photo Post]*, X (Jan. 14, 2025), https://x.com/StopAntisemites/status/1879273164410093902.
[13] Carl Campanile, *United Airlines Staffer's Palestinian-Flag Pin Sparks Furor - But Company Stands by Policy Allowing Displays of "Pride"*, N.Y. POST (Aug. 27, 2024), https://nypost.com/2024/08/27/us-news/united-airlines-staffers-palestinian-flag-pin-sparks-furor-but-company-stands-by-policy-allowing-displays-of-pride/; *see also* StopAntisemitism (@StopAntisemites), *"Pride" Really @united ?? [Photo Post]*, X (Aug. 27, 2024), https://x.com/StopAntisemites/status/1828568180639547584.

and disavowed the Jewish identity of J Street staffers opposing the Zionist Occupation's settlements, declaring one a "Christian" for criticizing illegal occupation and settlement of Palestine's West Bank.[14]

70.     This pattern extends to non-political figures. In April 2025, StopAntisemitism.org targeted Rachel Griffin Accurso ("Ms. Rachel"), a children's YouTube educator with 14 million subscribers, after she shared posts amplifying the suffering of Palestinian children. The cyberstalking group declared Ms. Rachel's expression of empathy towards Palestine's children as spreading "Hamas propaganda." Not only that, but Reznichenko through StopAntisemitism.org urged Florida's Attorney General to investigate Ms. Rachel under the Foreign Agents Registration Act (FARA), despite her apolitical humanitarian messaging.[15]

71.     Meanwhile, StopAntisemitism.org ignores blatant antisemitism from far-right figures. Donald Trump repeatedly invoked antisemitic tropes, claiming Jewish Democrats exhibit "disloyalty" and warning that the Zionist Occupation faces "annihilation" if he loses the 2024 election.[16] Elon Musk endorsed a post accusing Jewish communities of "hatred against whites," prompting a surge in antisemitic harassment on X.[17] StopAntisemitism.org had nothing to say about these virulently antisemitic statements.

---

[14] Joel S. Swanson (@jh_swanson), "@*StopAntisemites is just openly erasing the Jewishness of American Jews they dislike, telling an American Jew who works for J Street that he's now a Christian because of his opposition to West Bank settlements. "Stop Antisemitism" by defining people out of Jewishness, I guess." [Photo Post]*, X (June 25, 2023), https://x.com/jh_swanson/status/1673135767504445440.

[15] Ct Jones, *Ms. Rachel Defends Gaza Fundraiser Posts: 'Our Compassion Doesn't Have Boundaries or Borders'*, ROLLING STONE (May 12, 2025), https://www.rollingstone.com/culture/culture-news/ms-rachel-gaza-fundraising-philanthropy-defense-1235337465/; *see also Hearing on the Weaponization of the Federal Government Before the H. Select Subcomm. on Weaponization of the Fed. Gov't*, 118TH CONG. (Feb. 6, 2024), https://www.congress.gov/event/118th-congress/house-event/116793/text.

[16] Associated Press, *US Jews Upset with Trump's Latest Rhetoric Say He Doesn't Get to Tell Them How to Be Jewish*, AP NEWS (Mar. 25, 2024), https://apnews.com/article/trump-jewish-voters-democrats-antisemitism-a43bf6f6266d9c6a4b761b82281aa512; *see also*

[17] Ryan Mac, *X Races to Contain Damage After Elon Musk Endorses Antisemitic Post*, N.Y. TIMES (Nov. 16, 2023), https://www.nytimes.com/2023/11/16/technology/elon-musk-endorses-antisemitic-post-ibm.html.

72.    By silencing Palestinian solidarity while excusing far-right hate, StopAntisemitism.org exposes its true objective: enforcing ideological Zionist conformity under the guise of combating antisemitism.

73.    StopAntisemitism.org also has ties to a broader Zionist influence apparatus aimed at shaping U.S. discourse. Leaked documents reveal coordination with the Zionist Apartheid's Ministry of Strategic Affairs and the "Voices for Israel" initiative, which funnels millions into silencing Palestinian advocacy through lawfare and disinformation.[18] This network includes Canary Mission, a blacklist database targeting students and professors; Zachor Legal Institute, which files amicus briefs supporting state anti-BDS laws against individuals who seek to boycott, divest, and sanction the occupation, apartheid, and genocide of Palestine by the Zionist regime; and the Milstein Family Foundation, which funds StopAntisemitism.org, Canary Mission, and other groups promoting White Supremacy, dehumanizing Palestinians, and narratives that erase Palestinians.[19]

74.    Lara Friedman of the Foundation for Middle East Peace notes that StopAntisemitism.org's goal is to "punish and deter" anti-Zionists and critics of the Zionist Occupation, creating a climate where advocacy for Palestinian rights risks "life-changing consequences."[20] StopAntisemitism.org's targets face death threats, PTSD, and career

---

[18] Lee Fang, *Inside the Pro-Israel Information War*, SUBSTACK (Dec. 8, 2023), https://www.leefang.com/p/inside-the-pro-israel-information.

[19] Lee Fang & Jack Poulson, *Israel Feared Legal Trouble Over US Advocacy Efforts, Leaked Files Suggest*, THE GUARDIAN (Aug. 17, 2024), https://www.theguardian.com/world/article/2024/aug/17/israel-foreign-agent-law-leaked-documents.

[20] Pranshu Verma, *They Criticized Israel. This Twitter Account Upended Their Lives*, WASH. POST (Apr. 16, 2024), https://www.washingtonpost.com/technology/2024/04/16/stop-antisemitism-twitter-zionism-israel/.

destruction—a tactic Reznichenko openly celebrates, stating, "If I was working with somebody who wanted my demise . . . I wouldn't want to be working with them."[21]

75.    The group employs coded language that invokes historic antisemitic conspiracies while accusing others of bigotry. Terms like "globalists" and "foreign nationals" are deployed to frame critiques of Zionist Occupation policies as existential threats to Jewish safety, echoing Nazi-era tropes about Jewish dual loyalty and global domination. This rhetorical strategy deliberately conflates anti-Zionism with antisemitism, erasing distinctions between state criticism and religious hatred. By labeling phrases like "Free Palestine" as inherently antisemitic, StopAntisemitism stifles protected political speech while amplifying the very stereotypes it claims to oppose.

76.    StopAntisemitism coordinates with government agents, university administrators, and employers to punish targeted individuals. Internal emails and public records reveal campaigns to revoke visas, terminate employment, and blacklist activists. For instance, the group pressured New York University to investigate Professor Amin Husain for organizing pro-Palestinian teach-ins, citing fabricated "security concerns." Such actions institutionalize discrimination by treating Palestinian advocacy as a disciplinary offense, violating Title VI protections against national origin discrimination and academic freedom principles.

77.    Prominent Jewish voices, including Rabbi David Mivasair and Jewish Voice for Peace, condemn StopAntisemitism's tactics as counterproductive. They argue that equating Jewish safety with unwavering support for the Zionist Occupation fuels actual

---

[21] Nikolas Lanum, *Antisemitism Watchdog Accuses Washington Post of 'Smear' Piece, Sympathizing with Anti-Israel Figures*, FOX NEWS (Apr. 18, 2024), https://www.foxnews.com/media/antisemitism-watchdog-accuses-washington-post-smear-piece-sympathizing-anti-israel-figures.

antisemitism by reinforcing harmful stereotypes. As Mivasair stated, "This group doesn't protect Jews—it weaponizes Jewish trauma to legitimize apartheid." These critiques underscore how StopAntisemitism's actions alienate allies, fracture coalitions, and ultimately endanger marginalized communities under the pretense of safeguarding them.

78.    StopAntisemitism.org epitomizes the weaponization of antisemitism to advance a racist campaign of dehumanizing Palestinians. Its collaboration with state and non-state actors to silence dissent exposes a systemic effort to erase Palestinian narratives and legitimize occupation, apartheid, and genocide.

## F. STRATEGIC USE OF ANTISEMITISM ACCUSATIONS AS POLITICAL DOG WHISTLES IN ZIONIST INFLUENCE CAMPAIGNS

79.    StopAntiSemitism.org is part of a vast network of online operations and individuals who have systematically weaponized accusations of antisemitism to suppress advocacy for Palestinian rights in the United States. Groups like the Merona Leadership Foundation and the Adam and Gila Milstein Family Foundation (MFF) employ tactics ranging from doxing and blacklisting to funding campus initiatives that conflate criticism of Zionist with antisemitism. These efforts align with broader Zionist Occupation objectives to erase Palestinian narratives and punish dissent, often under the guise of combating hate.

80.    The Adam and Gila Milstein Family Foundation (MFF) funds campus groups that conflate anti-Zionism with antisemitism while marginalizing Palestinian perspectives. MFF grants support "cultural events" hosting speakers who equate criticism of the Zionist Occupation with hate speech and collaborate with the American-Israeli Political Action Committee (AIPAC) to lobby for legislation focused on supporting the Zionist occupation, apartheid, and genocide of Palestine and Palestinians. In 2023, MFF directed funds to influence UCLA's student government against Palestinian solidarity resolutions,

undermining campus democracy. The foundation also promotes anti-BDS laws that penalize advocacy for Palestinian rights, framing boycott efforts as antisemitic.

81.    The MFF also funds Canary Mission through Megamot Shalom, a Zionist front organization in Occupied Palestine, as documented in *The Nation*'s investigative report (Dec. 22, 2023). Internal footage from Al Jazeera's *The Lobby – USA* captured Eric Gallagher, a Jewish Zionist operative, stating: "Adam Milstein's the guy who funds" while discussing coordination with Milstein about launching "name-and-shame" campaigns.[22] Though Milstein publicly denied funding Canary Mission,[23] the Al Jazeera footage and financial records from the Jewish Community Federation of San Francisco confirm his foundation's role in channeling funds through Megamot Shalom to sustain Canary Mission's criminal enterprise.[24]

82.    Milstein's foundation collaborated with the Zionist Apartheid's Ministry of Strategic Affairs—a government body tasked with suppressing Palestinian advocacy globally—to weaponize Canary Mission and StopAntiSemitism.org's cyberstalking operations. As reported by *The Forward* (Oct. 3, 2018), the Ministry used Canary Mission profiles to detain and deport Palestinian Americans like Lara Alqasem at Ben Gurion Airport, demonstrating institutional coordination.[25] This partnership aligns with the Ministry's admitted strategy of "countering delegitimization" through covert operations targeting U.S. campuses, as detailed in James Bamford's *Democracy Now!* interview (Dec. 27, 2023).[26]

---

[22] James Bamford, *Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti-Zionist Students and Professors*, The Nation (Dec. 22, 2023).
[23] Josh Nathan-Kazis, *Pro-Israel Donor Adam Milstein Denies Report That He Funds Canary Mission*, Times of Israel (Jan. 4, 2019).
[24] Nora Barrows-Friedman, *Jewish Community Federation Admits It Secretly Funded Canary Mission*, Electronic Intifada (Apr. 9, 2019).
[25] Josh Nathan-Kazis, *Israel Uses Canary Mission Blacklist Info to Bar Activists*, The Forward (Oct. 4, 2018).
[26] *Who Funds Canary Mission? James Bamford on Group That Doxxes Students & Profs for Palestine Activism*, Democracy Now! (Dec. 27, 2023).

83.     As of December 14, 2025, Reznichenko bragged of targeting 1,000 voices affirming the human rights of Palestinians, succeeding in the "firing, suspensions, and expulsions" of more than 400 and more than 300 others "remain in an active investigatory state."[27]

### G.  COORDINATED ZIONIST CAMPAIGN OF HATE AGAINST MS. CULVER

84.     The campaign against Ms. Culver commenced on May 17, 2025—the day of her address and before any institutional defendant had publicly acted. Its execution followed the operational model described in Paragraphs 64 through 78: identify a target, broadcast her employer's identity, directly contact that employer, and mobilize a follower base to demand termination. The selection of Ms. Culver as a target was not predicated on any antisemitic act—she committed none. It was predicated on the content of her speech: brief remarks at the end of a six-minute speech in she publicly associated with Palestinians, Arabs, and Muslims as a class.

85.     On May 17, 2025, the account @CampusJewHate published a post on X/Twitter identifying Ms. Culver by name, tagging both @GWtweets and @EY_US, explicitly identifying her as a current EY employee, and directing EY to "take note of the employee on your payroll."[28] That post—transmitted before EY had indicated any intention to act—was a direct, public demand for adverse employment action, aimed at EY's official account and disseminated to thousands of followers within hours of the ceremony's close. On the same day, @StopAntisemites published a post characterizing Ms. Culver's address as

---

[27] https://youtu.be/nF1jxn4BMHM?t=69
[28] https://x.com/CampusJewHate/status/1923832851499450397?s=20

"propaganda" and describing her as having "hijacked" the graduation, rather than having delivered a legitimate commencement speech.[29]

86.    Also on May 17, 2025, the account @melamedtattele published a post on X/Twitter announcing the circulation of two coordinated form letters: one to GWU administrators demanding the rescission of Ms. Culver's diploma and CCAS Distinguished Scholar Award, and a second to EY leadership demanding her "immediate dismissal."[30]

87.    The post directed EY employees to "get these letters in front of your company heads," and included the following parenthetical about Ms. Culver: "Perhaps they can relocate her to Gaza. Indefinitely"—an explicit expression, by a participant in the campaign against her, of a wish for her displacement or death in connection with her expression of solidarity with Palestinians. The post publicly listed the EY email addresses to which the termination demand was transmitted. Those addresses included Janet.Truncale@ey.com—EY's Global Chair and CEO—and tony.jordan@ey.com: the direct EY email address of Defendant Tony Jordan, Chief Ethics and Compliance Officer for EY US and Americas.

88.    The termination demand was also carbon-copied to Christians United for Israel. Defendant Jordan—responsible under EY's Global Code of Conduct for ensuring EY's compliance with applicable civil rights laws and its own anti-discrimination commitments—thus received directly, through his publicly listed EY address, an organized external demand for Ms. Culver's termination premised on the false antisemitism characterizations described above. His failure to exercise his authority to halt the adverse employment action that followed within hours is, at minimum, deliberate indifference to the discriminatory campaign that demand represented.

---

[29] https://x.com/StopAntisemites/status/1924445800416825407
[30] https://x.com/melamedtattele/status/1924107597604344229

89.     The campaign was broader than any single account. @sabrinasoff organized a separate coordinated letter to GWU administrators bearing over 650 signatures collected within fewer than twenty-four hours of the address, characterizing Ms. Culver's speech as "antisemitic commentary," demanding diploma revocation, and carbon-copying the demand to, among others, Leo Terrell (then-Senior Counsel in the DOJ Civil Rights Division), Harmeet Dhillon (then-Assistant Attorney General for Civil Rights), the House Education and Workforce Committee, and the Israeli Embassy in Washington, D.C.[31]

90.     Canary Mission—the doxing organization that exists within a broader Zionist influence apparatus—published a post on Instagram identifying Ms. Culver by name, tagging @ey_global, and characterizing her speech as "demoniz[ation]" and "lying about Israel." CanaryMission's post was not commentary. It was a targeted broadcast of Ms. Culver's professional identity to an audience conditioned to direct employment-pressure demands at those it profiles.[32]

91.     The harm of this campaign was not confined to the content of the posts themselves. Each major post—from @CampusJewHate, @StopAntisemites, @melamedtattele, and Canary Mission—generated comment sections that functioned as secondary amplification engines. Those comment sections were populated with users tagging @EY_US, @ey_global, and @GWtweets directly, adding individual voices to the institutional pressure already being applied by the original posts and coordinated letters. Ms. Culver's employer and her university were thus subjected to rolling, real-time, crowd-sourced demands for adverse action—not merely the initial broadcast, but a continuous cascade of tagged institutional contact sustained over hours and days. The comment sections also served

---

[31] https://x.com/sabrinasoff/status/1924808967718318464
[32] https://www.instagram.com/reel/DJ2DM-1MYEu/

a second function: the production and dissemination of false factual claims about Ms. Culver and her speech, and explicit threats directed at her personally. Users falsely characterized her remarks as calls for violence against Jewish people, fabricated statements she had not made, and—in patterns consistent with the operational model of StopAntisemitism.org—attached those fabrications to her name in ways calculated to generate a permanent searchable record. Other commenters directed at Ms. Culver explicit threats of physical harm. EY, which received institutional tags across this comment activity through its official accounts, was on constructive notice—at minimum—that the campaign was not a good-faith antisemitism concern but a coordinated mob action accompanied by threats and demonstrably false factual claims. Its decision to terminate Ms. Culver was made in that environment, against that backdrop, and without investigating a single factual predicate the campaign had advanced.

92.    Not one of these communications had any factual basis for the antisemitism label it attached to Ms. Culver's speech. Nor did Ms. Culver endorse violence. She expressed grief over Palestinian civilian casualties, humanized displaced Palestinian students, and called for institutional accountability in GWU's investment portfolio. The antisemitism characterization was not a factual description of her address; it was the campaign's operative instrument—a label applied to speech associated with Palestinians, Arabs, and Muslims, deployed to trigger institutional consequences without factual warrant. Within approximately twenty hours of @CampusJewHate's direct employer tag and @melamedtattele's public distribution of Defendant Jordan's email address to thousands of followers, EY locked Ms. Culver out of her accounts.

## H.  GWU'S IMMEDIATE RETALIATORY INSTITUTIONAL RESPONSE

93.    Even before Ms. Culver had left the stage, GWU's institutional response to her address had begun. Immediately following Ms. Culver's remarks, Defendant Rachel Riedner, Associate Dean for Undergraduate Studies, CCAS, used her own allotted podium time during the ceremony to publicly state in repudiation that Ms. Culver "strayed from her prepared remarks" and that the remarks "do not reflect" GWU's views,[33] before being interrupted by a disapproving crowd. Riedner's statement was made in real time, before hundreds of graduates, their families, and a livestream audience, and constituted GWU's first public act of institutional retaliation against Ms. Culver.

94.    GWU subsequently removed the livestream of the May 17, 2025 ceremony from its official YouTube channel and CCAS Commencement Ceremony website, eliminating the publicly accessible record of Ms. Culver's address.

95.    On May 17-19, 2025, Defendant Kathy Fackelmann, GWU's University Spokesperson, issued one or more public statements to media outlets—including the *GW Hatchet*—in which she stated that Ms. Culver's remarks were "materially different than the speech she submitted ahead of the ceremony," announced that GWU was "investigating whether Culver violated the University's events protocol or Student Code of Conduct," and stated that the University "apologize[d] to the graduates and families in attendance that their time of special celebration [was] being disrupted." These statements were published, disseminated widely, and foreseeably communicated to EY and its leadership. The characterization of Ms. Culver's speech as 'materially different' from her submission was

---

[33] One wonders whether GWU's Associate Dean would have stepped to the podium to repudiate a student speaker who expressed the same grief about the Rwandan genocide, the Bosnian genocide, the Darfur genocide, or the Rohingya genocide. If the answer is no—if GWU's Associate Dean would have remained silent at the podium for any of those expressions of conscience—then the University's decision to speak up only when a Palestinian's life was the subject tells us everything about whose humanity GWU considers a matter of institutional controversy, and whose it does not.

false: the majority of the delivered address—its first five paragraphs—was reproduced verbatim from the final draft GWU had received and approved without objection. The only addition was new closing paragraphs that applied, through a concrete example, the identical call to action the approved draft had already articulated. GWU reviewed and accepted a draft explicitly calling upon graduates to 'speak out against injustices small and large in our communities, our country, and around the world'—and then characterized the execution of that call as a policy violation. The characterization of Ms. Culver's address as a "disruption" to the ceremony was false and defamatory.

96.    On or about May 19, 2025, GWU issued a second public institutional statement regarding Plaintiff's address—two days after the initial ceremony response—in which GWU characterized Plaintiff's conduct as "inappropriate and dishonest," announced that Plaintiff had been "barred from all campuses and related events," and stated that Plaintiff would face "appropriate accountability measures." This second statement went materially beyond the initial disavowal: it imposed a formal exclusion from GWU's physical campus, branded Ms. Culver as dishonest by name in a public institutional statement, and announced pending punitive consequences—all without identifying a single rule Ms. Culver had violated, without affording her notice or an opportunity to respond, and while GWU's own speaker materials contained no prohibition on departing from submitted drafts.

97.    On information and belief, Defendants Ellen Granberg, President, and Chris Bracey, Provost, were notified of the substance of Ms. Culver's address and GWU's institutional response no later than the evening of May 17, 2025, and approved or ratified GWU's decision to investigate Ms. Culver and the substance of GWU's public statements. No later than May 18-19, 2025, GWU Faculty and Staff for Justice in Palestine published an

open call publicly addressed to President Granberg and Provost Bracey by name, urging them to protect Ms. Culver's right to speak without retribution. Neither Defendant Granberg nor Defendant Bracey took any action in response.

98.    GWU's public characterization of Ms. Culver's address as a "policy violation" meriting formal investigation, combined with Defendant Riedner's real-time public repudiation of the speech from the same podium and the removal of the ceremony's livestream, served a dual purpose: it signaled GWU's institutional dissociation from Ms. Culver's protected expression and communicated to third parties—including EY—that GWU regarded Ms. Culver's conduct as a disciplinary matter warranting adverse consequences.

## I.    EY'S IMMEDIATE RETALIATORY ADVERSE EMPLOYMENT ACTION

99.    Within hours of Ms. Culver's May 17, 2025 commencement address, EY moved to terminate Ms. Culver's employment. On the morning of May 18, 2025, Ms. Culver attempted to access her EY email and Microsoft Teams accounts and discovered she had been locked out of both systems at approximately 11:00 a.m. Ms. Culver called EY's technical support line and emailed her primary project manager, Menuka Ban, to alert them to the access issue.

100.    At approximately 2:00 p.m. on May 18, 2025, a Sunday, Ms. Culver received formal written notification from Defendant Jason P. Morrissey, EY's Deputy Talent Leader–Tax, that EY was placing her on administrative leave effective immediately. Morrissey's notification stated, in unambiguous terms, that EY was placing Ms. Culver on leave "in connection with [her] speech at the George Washington University commencement" and that EY was "deactivating [her] systems and premises access during this time." The causal nexus between Ms. Culver's protected speech and EY's adverse employment action was thus

admitted, in writing, in EY's own words, in the very instrument of the adverse action. Defendant Andrew Phillips was copied on the leave notice.

101.    The same day, Morrissey separately notified Ms. Culver that he and Phillips planned to call her on Monday, May 19, 2025, to discuss the matter. EY did not identify any policy Ms. Culver had violated, did not provide any factual basis for the leave other than the speech itself, and did not indicate what standard or process would govern the review.

102.    On May 19, 2025, Defendants Andrew D. Phillips and Robert Carroll jointly convened a meeting of the full QUEST team to address Plaintiff's administrative leave. Phillips opened the meeting by stating: "Bob and I wanted to schedule this meeting to discuss an important update related to Cecilia Culver." Phillips then announced to the assembled team that Plaintiff had delivered "a speech at her graduation ceremony at George Washington University, which addressed a controversial issue in which we understand deviated from the speech she had submitted to the university for approval," and that "the firm has placed Cecilia on administrative leave, while leadership evaluates the situation." That framing was inaccurate: the majority of the delivered address was reproduced verbatim from the submission Ms. Culver had made to GWU. The deviation Phillips described did not exist in the form his statement implied. Phillips further instructed all team members: "If you are in contact with her, please avoid discussing any firm matters or client work." Phillips acknowledged he was "likely not able to answer" questions about the situation. At least one QUEST team member asked at the meeting whether there was a timeline for Ms. Culver's return, noting that Ms. Culver was working on active projects.

103.    This announcement was made to Plaintiff's professional colleagues without her knowledge, consent, or opportunity to respond; branded her publicly within her own

workplace as the subject of a disciplinary action; advanced EY's pretextual "deviation" narrative to her peers before any investigation had been conducted; and effectively isolated Ms. Culver from her colleagues and professional network at EY by directing team members to avoid contact with her.

104.   On May 19, 2025, Ms. Culver sent Morrissey a written request for a meeting, asking that EY: (a) delay any call until Tuesday; (b) provide a specific time, format, and agenda for the meeting; (c) identify all topics to be discussed and questions EY had for her; (d) identify any EY policy or guideline Ms. Culver was alleged to have violated; and (e) provide copies of any such policies. Ms. Culver's written request was entirely reasonable, consistent with EY's own ADR Program, and consistent with basic principles of procedural fairness.

105.   Morrissey responded to Ms. Culver's May 19, 2025 request by agreeing to postpone the call and providing a link to EY's employee mental health resources—but did not answer a single substantive question Ms. Culver had posed. EY never identified any policy Ms. Culver had violated. EY never provided an agenda, format, or participant list for any meeting. EY never engaged with the substance of Ms. Culver's requests.

106.   On May 21, 2025, having received no further substantive communication from EY, Ms. Culver followed up in writing, asking Morrissey and Phillips to confirm receipt of her May 19 requests and to respond. EY did not respond.

107.   On May 22, 2025, at approximately 10:00 a.m., Defendant Tony Jordan—EY's Chief Ethics and Compliance Officer—emailed Ms. Culver requesting a meeting later that same day. At approximately 11:00 a.m., Ms. Culver responded in writing, requesting that Jordan identify the specific topics to be covered, any policies relevant to the discussion, and

the names of all participants. At approximately 11:30 a.m., Jordan replied, stating that he would not provide any questions or topics in advance, that no policies would be discussed at the meeting, and that an EY employee identified as Tim Henseler would be attending. At approximately 2:30 p.m., Ms. Culver responded in writing with a formal written request for basic procedural safeguards: identification of the specific nature of the issue and any relevant policies or guidelines; copies of all communications, complaints, or documentation underlying the administrative leave; a reasonable delay to consult legal counsel before any meeting took place; postponement of the meeting to one week after EY provided the requested materials; and written confirmation of the terms of her administrative leave, including whether it was paid or unpaid, its anticipated duration, and any restrictions on her EY benefits. Jordan did not respond to this request. None of the requested information was provided. Less than ninety minutes after Ms. Culver transmitted that written request, she filed her formal discrimination complaint with Defendant Stempel.

108.    On May 22, 2025, at 3:43 p.m. Eastern, Ms. Culver filed a formal internal EY complaint of discrimination with Defendant Andrea Stempel, EY's Associate General Counsel and Head of Employment Law. Ms. Culver's complaint alleged that EY's placement of her on administrative leave was discriminatory and retaliatory in violation of EY's own Code of Conduct and applicable law.

109.    On May 22, 2025, at 7:55 p.m. Eastern—four hours and twelve minutes after Ms. Culver filed her discrimination complaint, and without any investigation, hearing, or meaningful process—Defendant Jason Morrissey emailed EY's termination letter to Ms. Culver. The termination letter did not cite any provision of EY policy that Ms. Culver had violated. The termination letter did not describe any factual basis for termination beyond the

circumstances in the leave notice—Ms. Culver's commencement address. The speed and timing of EY's termination—occurring within hours of Ms. Culver's formal invocation of her civil rights—is itself direct evidence of discriminatory and retaliatory intent.

110.    On May 23, 2025, EY transmitted a separation package to Ms. Culver detailing next steps regarding the end of her employment, including the terms of any separation and information regarding benefits continuation.

111.    On May 25, 2025, Defendant Andrea Stempel confirmed receipt of Ms. Culver's internal discrimination complaint. Stempel's only action was to inquire whether Ms. Culver would be represented by counsel. Stempel took no corrective action, did not order reinstatement, did not direct a formal investigation of Ms. Culver's complaint, and did not take any step to remedy or acknowledge the discriminatory nature of the termination.

### J.   EXTERNAL PRESSURE, COORDINATION, AND THE CONSPIRACY

112.    In July 2025, Ms. Culver met with a senior EY Partner who informed Ms. Culver that within two days of her May 17, 2025 commencement address, EY had received more than 10,000 external communications—emails and other messages—demanding her termination. That same Partner further informed Ms. Culver that at least a dozen EY partners had internally objected to the termination decision and had advocated for her reinstatement. These facts establish that EY's decision to terminate Ms. Culver was made not on the basis of any legitimate business or policy justification, but in accession to an organized external campaign of hate—the volume and content of which EY tracked in real time—targeting Ms. Culver because of her association with Palestinians, Arabs, and Muslims as a class and the content of speech that those behind the Zionist campaign sought to punish precisely because of that association.

113.    On information and belief, EY leadership, including the named EY Defendants, was fully aware of the organized nature of the external pressure campaign of hate, knew that the campaign was directed at Ms. Culver because of her public association with Palestinians, Arabs, and Muslims as a class, and chose to accede to the demands of discrimination rather than exercise its legal and ethical obligation to protect Ms. Culver from discrimination and retaliation. This accession—choosing the demands of external hate merchants who sought to punish Ms. Culver for publicly associating herself with a disfavored class over the rights of its own employee—constitutes direct evidence of discriminatory animus and of EY's conscious participation in the conspiracy described in this Complaint.

114.    On information and belief, EY and GWU were in communication with each other regarding Ms. Culver's address and the institutional response to it in the period between May 17, 2025 and May 23, 2025. The near-simultaneous nature of GWU's public investigation announcement and EY's administrative leave notice—both occurring on May 17–18, 2025, within hours of the address—supports a plausible inference of coordination between the two institutions. GWU's public characterization of Ms. Culver's speech as a "policy violation" and EY's placement of Ms. Culver on leave "in connection with" the speech on the same factual premise reflect a shared institutional narrative that could not have been independently developed so quickly without coordination, communication, or a common source of direction.

115.    On information and belief, Defendants were also aware of and influenced by the public statement of "GW for Israel," published on Instagram on May 17, 2025, calling for the University to "take action" against Ms. Culver and characterizing her speech as "hateful lies about Israel" that had "deprived Jewish students of the opportunity to celebrate their

graduation."[34] This public demand, made by an organized third-party actor on the same day as the address and directed at both GWU and, by implication, EY, was communicated to Defendants and foreseeably influenced their coordinated institutional response.

### K. HARM TO MS. CULVER'S EMPLOYMENT PROSPECTS AND REPUTATION

116.    The combined effect of EY's termination and GWU's public investigation announcement—particularly GWU's characterization of Ms. Culver's speech as "materially different" from what she submitted, implying deception, and EY's termination of Ms. Culver's employment within days of the address—created a powerful and false public narrative that Ms. Culver had engaged in dishonesty and had been appropriately disciplined for it. This narrative has been disseminated widely and has materially impaired Ms. Culver's ability to obtain equivalent employment.

117.    Following her termination, Ms. Culver applied for positions commensurate with her qualifications and experience. Among those applications, Ms. Culver advanced to final-round consideration for two positions: a quantitative risk analysis role at a federally chartered financial institution—one of the primary government-sponsored enterprises in the United States secondary mortgage market—where she completed an HR screening and a hiring manager interview before being rejected; and a research assistant role at a prominent Washington, D.C.-based nonpartisan policy research organization—one of the largest and most respected social and economic policy institutes in the country—where she completed multiple rounds of panel interviews and sample analytical tasks before being rejected.

118.    In both instances, Ms. Culver progressed through substantive stages of competitive hiring processes for roles squarely within her demonstrated expertise in

---

[34] https://www.instagram.com/p/DJxuqivJ_kb/

quantitative economics, statistics, and policy research—reflecting the caliber of her pre-termination credentials—before ultimately being turned away in circumstances consistent with the ongoing reputational harm caused by the coordinated external doxing campaign described above. That campaign—orchestrated by Liora Reznichenko— was amplified across social media and deliberately designed to attach the "antisemite" label to Ms. Culver's name in perpetuity. It did not end when GWU defamed her or when EY terminated her. It created a searchable, persistent public record associating Ms. Culver's name with manufactured controversy, calculated to follow her into every subsequent professional context. The timing and pattern of Ms. Culver's rejections—advancing through competitive hiring processes only to be turned away at final stages—is consistent with prospective employers encountering that record and making adverse decisions on the basis of it. Ms. Culver's damages are therefore not limited to the loss of her EY employment; they extend to the ongoing and continuing destruction of her professional reputation and future earning capacity, for which Defendants—who set that campaign in motion, amplified it, and declined to correct the false record they helped create—bear joint and several responsibility.

119.    The false and defamatory narrative that Ms. Culver's termination reflected personal misconduct—"dishonesty"—rather than discriminatory and retaliatory suppression of her protected expression has damaged Ms. Culver's professional reputation in the economics and policy community in Washington, D.C. and beyond, in a manner that cannot be fully remedied by damages alone.

## L.  EY'S PRETEXTUAL RATIONALE

120.    To the extent EY, its officers, or its agents have characterized the basis for Ms. Culver's termination as something other than the speech itself—including any

characterization that Ms. Culver was dishonest, that she submitted a final draft that materially differed from her actual address, or that she violated EY's Code of Conduct by failing to disclose what she intended to say—that characterization is pretextual for at least five reasons.

121.    First, EY's own administrative leave notice identified no basis for the leave other than "your speech at the George Washington University commencement." No policy violation was cited. Second, EY never informed Ms. Culver, in writing or otherwise, of any specific policy or Code of Conduct provision she was alleged to have violated, despite Ms. Culver's explicit written request on May 19, 2025 that EY do so.

122.    Third, EY never investigated whether Ms. Culver violated any policy before terminating her. EY terminated Ms. Culver within hours of receiving her discrimination complaint, before any investigation could have been conducted.

123.    Fourth, the "dishonesty" characterization—to the extent it has been advanced—rests entirely on the premise that Ms. Culver submitted one speech to GWU and delivered another. But GWU's own speaker program materials contained no prohibition on speakers delivering an address that differed from a previously submitted draft. GWU's written speaker requirements did not include any provision requiring the submitted draft to be the exclusive and unalterable text of the commencement address, nor did GWU's communications with Ms. Culver include any warning that deviation from a submitted draft would constitute a policy violation or breach. Moreover, the premise that Ms. Culver's delivered address constituted a significant 'departure' from her submission does not withstand scrutiny: the first five paragraphs of her address were reproduced essentially verbatim from the approved draft, and the new material was introduced by a transition sentence directly

connecting it to the call for speaking out against injustice that GWU had already reviewed and approved without objection.

124.    Fifth, the "dishonesty" rationale was not advanced by EY until after—and only after—EY had already terminated Ms. Culver's employment. A rationale fabricated after the fact to justify a predetermined termination decision is the quintessential marker of pretext.

125.    EY received over 10,000 external demands through various Zionist actors, hate merchants, doxing platforms, and harassment operations for Ms. Culver's termination within two days of her speech. The timing, volume, and organized character of this campaign of hate, and EY's accession to it within five days of the speech, compels the inference that the external campaign—not any legitimate assessment of Ms. Culver's conduct—was the true driver of EY's decision.

## M. EY'S RETALIATION WAS DRIVEN BY DISCRIMINATORY ANIMUS TOWARD MS. CULVER'S ASSOCIATION WITH PALESTINIANS, ARABS, AND MUSLIMS

126.    Ms. Culver's public association with Palestinians, Arabs, and Muslims as a class were the motivating factors behind Defendants' actions. Ms. Culver's commencement address was, at its core, an act of association—a deliberate, public alignment with a disfavored group at a moment when that alignment carried professional and institutional risk. Her grief over the annihilation of Palestinian life, her call for GWU to sever its institutional complicity in the genocide, and her call for divestment from corporations profiteering off genocide were expressions that placed her, unmistakably and intentionally, in human solidarity with Palestinians, Arabs, and Muslims as a class. It was that association—not any policy violation, not any act of dishonesty, not any breach of professional obligation—that Defendants made the basis for the actions described in this Complaint.

127.    No EY employee or GWU student speaker who delivered a speech expressing political or moral views, and whose speech did not publicly associate them with Palestinians, Arabs, or Muslims as a class, was subjected to administrative leave, termination, or public investigation for doing so. No EY employee attracted an organized external pressure campaign demanding their discipline for speech that did not associate them with those groups was terminated in response to that campaign. The disparate treatment is not a matter of inference alone: as set forth below, multiple EY employees—including an EY Partner and a Senior Manager—made extensive, publicly visible, politically charged statements about the Zionist genocide in Palestine, under their EY-affiliated identities, without any adverse employment consequence, while EY's Global Code of Conduct applied to them no less than it applied to Ms. Culver.

128.    The political and moral views Ms. Culver expressed—opposition to the genocide in Gaza, humanizing Palestinians, and calling for institutional transparency and accountability—are, in the current political and institutional climate, inextricably and publicly associated with Palestinian national origin, Arab ethnicity, and Muslim religious identity. An employer or institution that punishes an employee for expressing those views, in a context that makes their associational character unmistakable, punishes the association itself. Federal and District of Columbia civil rights law prohibit exactly that. Defendants knew the character of Ms. Culver's expression, knew the association it represented, and acted to suppress and penalize it. That is discrimination.

**N.  INDIVIDUAL DEFENDANTS' PERSONAL PARTICIPATION AND STATE OF MIND**

129.    Each individual Defendant participated personally in one or more of the overt acts described above, with knowledge of Ms. Culver's association with Palestinians, Arabs,

and Muslims and of the connection between Ms. Culver's association with these protected characteristics and the institutional response to her address.

130.    Defendant Morrissey personally drafted and transmitted the leave notice and the termination letter, in each case identifying the commencement address as the basis for EY's action.

131.    On the morning of May 19, 2025, Defendants Phillips and Carroll jointly convened a meeting of the full QUEST team to address Ms. Culver's status. The meeting had been scheduled in advance, and Phillips delivered a prepared statement—confirming that by May 19, EY's leadership had already aligned on both the substance of the adverse action and its internal communications strategy, without conducting any investigation and without hearing from Ms. Culver. Phillips opened the meeting by stating: "Bob and I wanted to schedule this meeting to discuss an important update related to Cecilia Culver." He then stated that "over the weekend, Cecilia delivered a speech at her graduation ceremony at George Washington University, which addressed a controversial issue in which we understand deviated from the speech she had submitted to the university for approval." This framing is telling: Phillips did not describe EY's concern as procedural—i.e., that Ms. Culver had deviated from a submission—but as substantive, characterizing the speech as one that "addressed a controversial issue." That is a characterization of the speech's *content*, not its form, offered before any investigation had been conducted, and it reflects EY's actual basis for its action. Phillips further announced that Ms. Culver had been placed on administrative leave and that, as a result, she would not be "able to access UI Systems or the office" and would "not be available to work on any client engagements." He then instructed her colleagues: "If you are in contact with her, please avoid discussing any firm matters or client

work." That conditional framing—*if* you are in contact with her—conveyed to Ms. Culver's professional peers that they should minimize contact with her altogether, not merely observe a work-topic limitation if contact happened to occur. Phillips closed by stating, "I wish I had had better news for today"—an acknowledgment that what was being communicated was adverse, not routine or procedurally neutral. When team members asked how long the process of review would take, Phillips stated only that he was "not sure" and was "not able to answer" questions; he offered to "pass along" questions to leadership. That blanket refusal to provide any substantive explanation—even to operational colleagues with a direct need to understand Ms. Culver's status—is consistent with a decision that could not withstand scrutiny. Defendant Morrissey was also present on the call, and at its conclusion offered himself as the talent point of contact for any team members with questions, confirming that EY's HR function was integrated into the coordinated messaging effort.

132.    Defendant Stempel personally received Ms. Culver's internal complaint and personally failed to take any action in the four hours between receipt of the complaint and transmission of the termination letter.

133.    Defendant Jordan, as Chief Ethics and Compliance Officer, was responsible for ensuring EY's compliance with its own Code of Conduct and applicable civil rights law, had authority to intervene at any point, and did not do so.

134.    Defendant Carroll's participation in the May 19 QUEST team meeting was not incidental. Carroll was one of two QUEST principals who jointly scheduled and convened the meeting—a step taken before any investigation had been conducted and before Ms. Culver had been given any opportunity to respond to EY's concerns. Phillips' opening words—"Bob and I wanted to schedule this meeting"—confirm that Carroll shared co-equal responsibility

for the decision to announce Ms. Culver's leave to her colleagues on May 19. As co-leader of the QUEST practice, Carroll possessed authority to object to, delay, or escalate for review the decision to put Ms. Culver on leave and, subsequently, to terminate her employment. He did not do so. Instead, he affirmatively participated in the internal broadcast of that action to Ms. Culver's professional peers—without her knowledge, without her consent, and without any process having been afforded her. The deliberate, advance-coordinated nature of the meeting, combined with Carroll's co-equal role in convening it, makes clear that his conduct was neither passive nor inadvertent. Carroll is liable in his individual capacity for his participation in the discriminatory and retaliatory scheme described in this Complaint.

135.    Defendant Riedner personally delivered GWU's first public repudiation of Ms. Culver's address from the ceremony podium, within minutes of the address concluding.

136.    Defendant Fackelmann personally issued the public statements characterizing Ms. Culver's address as "materially different," announcing the investigation, and characterizing the address as a disruption to the ceremony.

137.    Defendants Granberg and Bracey, as President and Provost respectively, were directly and publicly called upon to protect Ms. Culver's rights by name, had the highest institutional authority to do so, and failed to act.

138.    The actions of each individual Defendant were taken with knowledge of the associational character of Plaintiff's address—that is, with knowledge that Plaintiff had publicly and deliberately aligned herself with Palestinians, Arabs, and Muslims as a class, and that the content of her expression would be understood, by all who heard it, as an act of solidarity with those groups. Defendants did not act in ignorance of what Plaintiff's speech represented; they acted because of it. The speed, coordination, and severity of Defendants'

response—sweeping across two major institutions, commencing within hours of the address, and culminating in termination without process, investigation, or identification of a single policy violation—permits the inference, which Ms. Culver affirmatively alleges, that Defendants acted with discriminatory animus toward her by reason of her association with Palestinians, Arabs, and Muslims as a class, and with retaliatory intent by reason of her engagement in the protected oppositional activity that association represents. That inference is reinforced by EY's own internal communications: before any investigation, EY's supervising partner described Ms. Culver's speech to her colleagues as one that had "addressed a controversial issue"—a content-based characterization that reveals EY's real objection was to what Ms. Culver said, not to any procedural deviation in how she said it. It is further reinforced by EY's deliberate information blackout—its refusal to identify any policy violation, provide any documentation, conduct any investigation, or offer any substantive explanation, even to internal colleagues with an operational need for that information—which is consistent with a termination decision that had already been made on impermissible grounds and could not survive scrutiny on legitimate ones.

## O. DISPARATE TREATMENT AND COMPARATOR EVIDENCE DEMONSTRATING PATTERN OF DISCRIMINATORY ANIMUS

139. EY's adverse action against Ms. Culver was not the product of any neutral or evenhanded application of its Global Code of Conduct or any other employment policy. The following paragraphs identify EY employees who, during periods of active EY employment, made public statements expressing political and moral views about the war in Gaza on publicly accessible social media platforms—statements that, in specificity, volume, and professional visibility, equal or exceed the expression for which EY terminated Ms. Culver. Not one of those employees was placed on administrative leave, terminated, or subjected to

any adverse employment action in connection with that expression. The only distinction between their treatment and Ms. Culver's is the direction of the association their expression represented: theirs aligned them with the Zionists; hers aligned her with Palestinians, Arabs, and Muslims. That distinction is not a legitimate employment criterion. It is discrimination, and it is the discrimination this action seeks to remedy.

### *William Jegher, Partner, EY-Parthenon (Montreal, Canada)*

140.   EY employs William Jegher as a Partner at EY-Parthenon—EY's strategy consulting practice—specializing in Real Estate and Sports and Entertainment, based in Montreal, Canada. Jegher holds EY's highest professional rank. His LinkedIn profile, his Twitter/X biography, and his public social media presence have consistently and prominently identified him as a "Partner at EY," the professional identity under which he publishes and reposts content and under which he is known to clients, counterparties, and professional contacts.

141.   In October 2023, Jegher published an extended personal statement on his professional LinkedIn profile—under the EY Partner identity through which he holds himself out to the professional world—in which he described Hamas's.actions on October 7, 2023, as "the equivalent of twelve 9-11's in one day," explicitly invoked the Holocaust and the mass murder of Jewish people, stated "We are being killed simply because we are Jews," called upon his professional network to "lock arms" with the Jewish people in confronting "evil head-on," and closed with the phrase "Am Yisrael Chai" accompanied by the Zionist flag emoji.[35]

---

[35] https://www.linkedin.com/posts/wjegher_i-dont-normally-post-personal-stuff-here-activity-7116927932274458624-7ryz/

142.    The statement was not abstract or institutional. It was a personal declaration of political solidarity with the Zionist occupation, apartheid, and genocide in Palestine. All made under a professional identity that identified him as a Partner at EY and published to an audience of nearly 4,000 professional followers.

143.    Over the following twenty months—a period encompassing the entirety of Ms. Culver's EY employment and extending beyond it—Jegher continued, under that same EY Partner identity, to repost and publish political content about the genocide in Gaza on LinkedIn and Twitter/X. That content included: reports from a Zionist propaganda outlet disputing international reports of famine conditions in Gaza;[36] reposts of political commentary asserting that Hamas bears exclusive moral and legal responsibility for all Palestinian civilian deaths in Gaza;[37] reposts characterizing support for Palestinians as an expression of antisemitism;[38] reposts calling a Palestinian state and the two-state solution as a mistake;[39] reposts equating opposition to Zionism in Canada with antisemitism;[40] reposts of political commentary characterizing the Zionist genocide in Palestine as justified;[41] and reposts attacking a Pulitzer Prize-winning Palestinian journalist as a Holocaust denier.[42]

144.    Each of these posts and reposts was made publicly, under a professional identity that identified Jegher as a Partner at EY. At no point during this period did EY place Jegher on administrative leave, terminate his employment, disavow his expression, or take any adverse employment action in connection with his public political advocacy. EY's Global

---

[36] https://x.com/Olivia_Reingold/status/1960099046477197576
[37] https://x.com/KonstantinKisin/status/1843352287525384452
[38] https://x.com/TheFP/status/1920489304763064591;
https://x.com/bariweiss/status/1866896925523615801
[39] https://x.com/mdubowitz/status/1892736560056901726
[40] https://x.com/TheFP/status/1920489304763064591
[41] https://x.com/GadSaad/status/189296542516131 0296
[42] https://x.com/EmilyDamari1/status/1920367667115958319

Code of Conduct—the same instrument EY invoked, without identifying any specific provision, as the justification for Ms. Culver's termination—applied to Jegher throughout. EY chose not to apply it.

***Denis Laskov, Head of Offensive Security Group, EY (Occupied Palestine)***

145.    From April 2024 through September 2025—a period that directly encompasses Ms. Culver's full-time employment at EY—Denis Laskov served as Senior Manager and Head of EY's Offensive Security Group, a leadership position within EY's technology risk advisory practice, based in Tel Aviv. Laskov's LinkedIn profile identified his title as "Head of Offensive Security Group" at EY, with responsibility for leading and developing multidisciplinary teams within EY's cybersecurity practice. Laskov's role was thus not that of an entry-level or junior employee; he was a Senior Manager in a group leadership position, with a seniority level well above that of Ms. Culver as a Staff Assistant.

146.    During this period of concurrent EY employment, Laskov maintained an active and publicly accessible Twitter/X presence under the handle @it4sec. His public Twitter activity throughout his EY employment included: reposting official Israeli Defense Forces announcements on genocidal operations in Gaza;[43] reposting political commentary asserting that Hamas bears exclusive moral and legal responsibility for all Palestinian civilian deaths in Gaza;[44] reposting content describing Palestinians who resist the Zionist occupation, apartheid, and genocide in Palestine as "depraved and evil" and declaring that those unwilling

---

[43] https://x.com/IDF/status/1801661651273306448;
https://x.com/IDF/status/1799392501586952256;
https://x.com/it4sec/status/1828421270884491693;
https://x.com/IDF/status/1850016881924526179;
https://x.com/IDF/status/1872301407052718151;
https://x.com/IDF/status/1899779795392573540;
https://x.com/IDF/status/1927697213251068126
[44] https://x.com/IDF/status/1927697213251068126

to adopt that characterization without qualification are "complicit" in terrorism;[45] reposting a report denying the scale of loss of human life in Gaza;[46] reposts of content from The Free Press disputing international reports of famine conditions in Gaza;[47] displaying the Zionist flag emoji prominently in support of the Zionist genocide in Palestine in his public Twitter display name throughout the entirety of his EY employment;[48] posting the Zionist national anthem, Hatikva, to his public Twitter timeline;[49] and posting commemorative content on October 7 anniversaries using the phrase "7.10 We will remember."[50]

147.    This activity was continuous, high-volume, publicly accessible, and made by a Senior Manager in a group leadership position during active EY employment. At no point did EY place Laskov on administrative leave, terminate his employment, publicly disavow his expression, or take any adverse employment action in connection with his political advocacy. EY's Global Code of Conduct applied to Laskov throughout his employment. EY chose not to apply it.

### *Maya Rinot, Senior U.S. Tax Advisor, EY (Occupied Palestine)*

148.    Maya Rinot has been employed as a Senior U.S. Tax Associate and Advisor at EY Israel's U.S. Tax division, within EY's International Taxation Department, since June 2025. Her LinkedIn profile identifies her current role as Senior U.S. Tax Advisor at EY.

149.    During her EY employment, Rinot's LinkedIn profile, which identifies her as Senior U.S. Tax Advisor at EY, remains publicly associated with a repost asserting that Hamas bears "sole responsibility" for all deaths in Gaza; opposing any ceasefire on the

---

[45] https://x.com/Erin_Molan/status/1893112292469776452
[46] https://x.com/HJS_Org/status/1868214089207480471?s=20
[47] https://x.com/IsraelMFA/status/1950482319380512780?s=20
[48] https://x.com/it4sec
[49] https://x.com/it4sec/status/1982518776156618799?s=20
[50] https://x.com/it4sec/status/1975496560789356821?s=20

ground that it would incentivize "future atrocities"; and using the hashtags #hamasisisis and #neveragainisnow.[51] Rinot has also maintained a public Twitter presence, under the handle @mayarinot6, on which she has posted content using the hashtags #prayforisrael, #IsraelUnderFire,[52] #ILoveIsrael, and #ProudToBeIsraeli[53] in support of the Zionist genocide in Palestine—posts that remain publicly accessible and associated with her name and professional identity as a current EY employee.

150. These expressions are public, politically explicit, and made under the professional identity of a current EY employee. At no point did EY place Rinot on administrative leave, terminate her employment, or take any adverse employment action in connection with her public political expression. EY's Global Code of Conduct applied to Rinot. EY chose not to apply it.

### *Lee Zarug Galron, Senior Assurance Associate, EY (Occupied Palestine)*

151. Lee Zarug Galron has been employed by EY as a Senior Assurance Associate and Certified Public Accountant for over five years—a tenure that substantially predates, and extends well beyond, Ms. Culver's employment at EY. Her LinkedIn profile identifies her current role as Senior Assurance Associate at EY, and her five-year tenure at the firm reflects a long-standing employment relationship well within EY's awareness and oversight.

152. During her EY employment, Galron reposted content on LinkedIn—under her EY-identified professional profile—from StandWithUs, a Zionist propaganda operation that

---

[51] https://www.linkedin.com/posts/odelia-minnes-33590519_how-hamas-frames-the-civilian-casualties-activity-7127563595768356864-_3i9
[52] https://x.com/mayarinot6/status/493176688453238785
[53] https://x.com/mayarinot6/status/493176200731168769

dehumanizes Palestinians, expressing political support for the Zionist genocide in Palestine, and using the phrase "Am Yisrael Chai."[54]

153.    These reposts were made publicly, under a professional identity that identified her as an EY employee in good standing, and remained on her public LinkedIn profile without adverse consequence. At no point did EY place Galron on administrative leave, terminate her employment, or take any adverse employment action in connection with her public expression. EY's Global Code of Conduct applied to Galron. EY chose not to apply it.

*Liat Twizer, Hi-Tech Assurance Intern, EY (Occupied Palestine)*

154.    Liat Twizer has been employed as a Hi-Tech Assurance Intern at EY in Tel Aviv since July 2024—a period that directly overlaps with Ms. Culver's full-time employment at EY. Her LinkedIn profile identifies her role as Hi-Tech Assurance Intern at EY.

155.    During her EY employment, Twizer publicly commented, under her own name on a publicly accessible social media platform, on a Facebook post expressing humanitarian alarm for Palestinian civilians in Gaza—a post bearing the hashtags #GazaGenocide, #prayforgaza, #humanrights, and #HelpGaza. Twizer's comment dismissed the post's content as "fake," denied that Palestinian civilians were experiencing deprivation in Gaza, characterized the author's concern as "naivety [that] borders on stupidity," and directed the author to "[c]ome to Gaza and see how much food and drink they have at Israel's expense."[55]

156.    Twizer's comment directly contested the factual premise of Palestinian humanitarian suffering in Gaza—the precise premise that formed the moral and factual

---

[54] https://www.linkedin.com/posts/lee-zarug-galron-5a5704183_deesday-activity-7051515407416852482-rqRH
[55] https://www.facebook.com/share/p/1Hm9jLc9PC/

foundation of Ms. Culver's commencement address and that animated her call for GWU divestment. The comment was made publicly, under Twizer's own name and in connection with her identifiable professional profile, while she was employed as an EY intern. At no point did EY place Twizer on administrative leave, terminate her employment, or take any adverse employment action in connection with her public expression. EY's Global Code of Conduct applied to Twizer. EY chose not to apply it.

### *EY's Selective Application of Its Global Code of Conduct*

157.    That these comparators are employed by EY entities outside the United States does not diminish the probative force of their treatment. EY's Global Code of Conduct—the only policy instrument EY has identified, without citing any specific provision, as the basis for Ms. Culver's termination—applies, by its own express terms, to all EY personnel worldwide. EY cannot invoke a globally applicable code of conduct as the ground for terminating a U.S.-based employee for expression that associates her with Palestinians, Arabs, and Muslims, while simultaneously declining to apply that same instrument to employees in other EY member firm jurisdictions whose expression associates them with Zionism, unequivocal support for genocide, or denial of Palestinian humanity and suffering.

158.    The selective enforcement of a nominally global policy, on the basis of which protected association the employee's expression represents, is itself evidence of discriminatory animus under Title VII and the DCHRA. On information and belief, EY's U.S. leadership—including Defendants Morrissey, Phillips, Carroll, Jordan, and Stempel, each of whom participated in Ms. Culver's adverse employment action—was aware, or could readily have become aware through the exercise of basic diligence, of the public expression described above, and took no action consistent with the rationale it offered for Ms. Culver's termination.

The unavoidable inference is that EY's objection was not to "controversial" public expression by EY employees, but to the specific protected association that Ms. Culver's expression represented. Discovery will further establish the scope of EY's U.S. leadership's awareness and EY's institutional decisions about when and against whom to apply the Global Code of Conduct.

*EY's Institutional Alignment and the Pattern of Selective Enforcement*

159.    The disparate treatment of individual EY employees described above is corroborated by EY's institutional conduct during the same period. On information and belief, EY or its affiliated entities co-sponsored financial relief initiatives for Zionist businesses and communities after October 7, 2023, channeling resources to Zionist small businesses in partnership with other institutional sponsors—institutional conduct that EY did not characterize as a violation of its Global Code of Conduct or as an impermissible expression of a political position.

160.    On information and belief, EY partners and senior professionals—including U.S.-based EY Tax Partner Mark Persoff, whose LinkedIn profile identifies him as a Tax Partner at EY—organized and participated in firm-wide gatherings observing Zionist political affirmations, posted about those events on LinkedIn under their EY-affiliated identities, and experienced no adverse consequence. Those firm-wide gatherings, as described in posts visible to EY colleagues across the United States, the United Kingdom, Argentina, Canada, Occupied Palestine, and New Zealand, reflected EY's institutional comfort with expression of Zionist solidarity by EY employees in their professional capacity.

161.    EY's institutional tolerance of that expression—combined with its institutional tolerance of the individual political expression described above and its swift and unilateral

termination of Ms. Culver—establishes a firm-wide pattern: expression that associates an EY employee with the Zionist occupation, apartheid, and genocide in Palestine, and opposition to Palestinian humanity and suffering is treated as permissible and unremarkable; expression that associates an EY employee with Palestinians, Arabs, or Muslims is treated as a terminable offense. That pattern is discrimination. It is the discrimination that Ms. Culver experienced, and it is what this action seeks to remedy.

### P. Ms. Culver Continues to Suffer Harm

162. As a direct and proximate result of Defendants' unlawful conduct, Ms. Culver has suffered and continues to suffer: loss of income, benefits, and compensation she would have earned but for her wrongful termination; damage to her professional reputation in the economics, policy, and professional services communities; impairment of her ability to obtain employment commensurate with her qualifications; severe emotional distress, anxiety, humiliation, and reputational injury flowing from the public characterization of her as dishonest and as having disrupted her own graduation ceremony; and the costs and burdens of the EEOC administrative process and of this litigation.

163. Ms. Culver seeks all remedies available to her under federal and District of Columbia law, including but not limited to compensatory damages, punitive damages, injunctive relief, back pay and front pay, reinstatement or its equivalent, correction of the public record, and attorneys' fees and costs.

## VII.    CAUSES OF ACTION

**COUNT I**
**42 U.S.C. § 2000e et seq.**
**(Discrimination Based on Race, Religion, and National Origin)**
Against EY Defendants

164.   Ms. Culver realleges and incorporates by reference the allegations contained in Paragraphs 1 through 163 above.

165.   At all times relevant to this Complaint, EY was an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), employing fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

166.   At all times relevant to this Complaint, Ms. Culver was an employee within the meaning of 42 U.S.C. § 2000e(f).

167.   Title VII prohibits an employer from discriminating against an employee in the terms, conditions, or privileges of employment because of the employee's race, religion, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). That prohibition encompasses discrimination based on an employee's known or perceived association with individuals or groups defined by a protected characteristic—including discrimination against an employee because she publicly aligned herself with persons who are, or are perceived to be, Palestinian, Arab, or Muslim. Ms. Culver's commencement address publicly and unmistakably associated her with Palestinians (national origin), Arabs (race and national origin), and Muslims (religion) as a class. It was that association, and not any policy violation, act of dishonesty, or breach of professional obligation, that EY made the basis for the adverse employment actions described below.

168.   EY subjected Ms. Culver to the following adverse employment actions: placing her on administrative leave effective May 18, 2025, locking her out of her EY accounts without notice, announcing that leave to her professional colleagues before conducting any investigation and before affording her any process, and terminating her employment on May

22, 2025—within four hours and twelve minutes of her filing a formal internal complaint of discrimination.

169.   EY's own written notice of administrative leave admitted the causal basis for its action in unambiguous terms: EY was placing Ms. Culver on leave "in connection with your speech at the George Washington University commencement." EY never identified a specific provision of its Global Code of Conduct or any other policy that Ms. Culver had violated, despite Ms. Culver's explicit written request on May 19, 2025, that it do so. EY conducted no investigation. EY afforded Ms. Culver no pre-termination hearing. EY's termination letter identified no factual basis for termination beyond the circumstances already recited in the leave notice. The causal nexus between Ms. Culver's protected expression and EY's adverse action is thus not a matter of inference; EY admitted it in writing.

170.   The discriminatory character of EY's action is confirmed by the disparate treatment of similarly situated EY employees, described in Paragraphs 138 through 160. Multiple EY employees—including an EY Partner and a Senior Manager—made extensive, publicly visible, and politically explicit statements about the Israel-Gaza conflict on publicly accessible social media platforms, under their EY-affiliated professional identities, during periods of active EY employment, without any adverse employment consequence. EY's Global Code of Conduct applied to each of them. EY declined to apply it. The only material distinction between those employees and Ms. Culver is the direction of the association their expression represented: theirs aligned them with Israel and with opposition to Palestinian claims; hers aligned her with Palestinians, Arabs, and Muslims. That distinction is not a legitimate employment criterion. It is discrimination.

171. To the extent EY has advanced a post-hoc rationale characterizing Ms. Culver's termination as a response to dishonesty or a material departure from her submitted draft, that rationale is pretextual for the reasons set forth in Paragraphs 119 through 124 and incorporated herein. EY's leave notice identified no such basis. EY's termination letter identified no such basis. EY never identified any policy prohibiting departure from a submitted speech draft. EY never conducted an investigation sufficient to evaluate any such basis before terminating Ms. Culver. And EY advanced the "dishonesty" characterization only after—and only because—it had already committed to a termination decision made in accession to an organized external pressure campaign, the content and volume of which EY tracked in real time and which EY itself characterized internally as the context for its action.

172. EY's discriminatory conduct was willful, deliberate, and made with knowledge that it violated federal law. Ms. Culver is therefore entitled to punitive damages pursuant to 42 U.S.C. § 1981a(b)(1).

173. As a direct and proximate result of EY's unlawful discrimination, Ms. Culver has suffered and continues to suffer: loss of wages, salary, employee benefits, and other compensation she would have earned but for her unlawful termination; loss of future earning capacity and professional opportunity; damage to her professional reputation in the economics, policy, and professional services communities; and emotional distress, anxiety, and humiliation, all in amounts to be determined at trial.

174. Ms. Culver is entitled to all relief available under Title VII, including back pay and front pay, reinstatement or its equivalent, compensatory damages, punitive damages, injunctive relief requiring EY to correct the false public record it has disseminated regarding

the basis for her termination, and attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT II
### 42 U.S.C. § 2000e-3(a)
### (Retaliation)
Against EY Defendants

175.    Ms. Culver realleges and incorporates by reference the allegations contained in Paragraphs 1 through 163 above.

176.    Section 704(a) of Title VII makes it unlawful for an employer to discriminate against an employee because she has opposed any practice made unlawful by Title VII or because she has made a charge, testified, assisted, or participated in any investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a).

177.    Ms. Culver engaged in the following protected activities:

178.    (a) On May 18, 2025, Ms. Culver contacted EY to request a meeting and to ask EY in writing to identify the specific policy she had allegedly violated—a direct opposition to the facially unlawful adverse action EY had taken against her the same day;

179.    (b) On May 19, 2025, Ms. Culver renewed her written request that EY identify any policy violation and provide copies of applicable guidelines—conduct constituting continued opposition to EY's discriminatory treatment;

180.    (c) On May 22, 2025, at 3:43 p.m. Eastern, Ms. Culver filed a formal internal complaint of discrimination with Defendant Andrea Stempel, EY's Associate General Counsel and Head of Employment Law, alleging that her placement on administrative leave and the anticipated termination of her employment constituted discrimination on the basis of race, national origin, and religion in violation of Title VII and the D.C. Human Rights Act.

181.   Each of these activities constitutes protected activity within the meaning of 42 U.S.C. § 2000e-3(a). The formal internal complaint filed on May 22, 2025, constitutes protected activity under both the opposition clause and the participation clause of that section.

182.   EY terminated Ms. Culver's employment at 7:55 p.m. on May 22, 2025—four hours and twelve minutes after receiving her formal internal discrimination complaint. That termination constitutes an adverse employment action within the meaning of Title VII. The administrative leave imposed on May 18, 2025, and the public announcement of that leave to Ms. Culver's professional colleagues on May 19, 2025, constitute additional adverse employment actions materially harmful to Ms. Culver's employment status, professional relationships, and compensation.

183.   The causal connection between Ms. Culver's protected activity and EY's adverse action is established, at minimum, by the extraordinary temporal proximity between the filing of her discrimination complaint at 3:43 p.m. and the transmission of her termination letter at 7:55 p.m. the same day. No investigative process occurred during that interval. No policy review was conducted. No procedural step was taken that could have independently generated a termination decision in the four hours and twelve minutes following receipt of Ms. Culver's complaint. The only event of consequence that occurred in that window was the filing of the complaint itself.

184.   Defendant Stempel, as EY's Head of Employment Law, received Ms. Culver's formal discrimination complaint at 3:43 p.m. and possessed both the authority and the professional obligation to halt any pending adverse action pending its review. She did neither. Defendant Jordan, as Chief Ethics and Compliance Officer, had supervisory authority over EY's compliance with its anti-retaliation obligations and personal involvement in the events

of May 22, 2025. He exercised that authority in no way that protected Ms. Culver. Their inaction was not inadvertent. It was part of a coordinated process by which EY's senior personnel routed the termination decision around the procedural safeguards that EY's own policies required—completing the termination before any investigation could occur, and ensuring that the complaint Ms. Culver filed would have no effect.

185.    EY's post-hoc "dishonesty" rationale does not sever the causal connection between the discrimination complaint and the termination. The decision to terminate Ms. Culver had been operationally predetermined before her complaint was filed: EY locked her out of her accounts on May 18, announced her leave publicly on May 19, and—as Defendant Phillips's pre-scripted announcement to the QUEST team confirms—had aligned internally on its decision and its messaging before Ms. Culver had been asked a single substantive question. The termination letter delivered on May 22 advanced no new factual basis. The complaint did not cause EY to reconsider. It caused EY to accelerate.

186.    EY's retaliatory conduct was willful, deliberate, and made with knowledge that it violated federal law. Ms. Culver is therefore entitled to punitive damages pursuant to 42 U.S.C. § 1981a(b)(1).

187.    As a direct and proximate result of EY's unlawful retaliation, Ms. Culver has suffered the damages described in Paragraph 172, incorporated herein by reference, in amounts to be determined at trial.

188.    Ms. Culver is entitled to all relief available under Title VII.

## COUNT III
### 42 U.S.C. § 1981
### (Racial Discrimination in Contractual Rights)
Against EY Defendants Jason P. Morrissey; Andrew D. Phillips; Andrea Stempel; Tony Jordan; Robert Carroll; George Washington University; Rachel Riedner; Kathy Fackelmann; and Does 1–20

189.   Ms. Culver realleges and incorporates by reference the allegations contained in Paragraphs 1 through 163 above.

190.   42 U.S.C. § 1981 guarantees to all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens. The statute's protections extend to the making, performance, modification, and termination of contracts, and to the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b). Section 1981 reaches both discriminatory conduct by parties to the contractual relationship and intentional interference with contractual rights by third parties acting with discriminatory intent. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006).

191.   Section 1981's protection encompasses discrimination based on ancestry and ethnic characteristics, including discrimination targeting persons of Arab descent or Palestinian national origin. *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987). Ms. Culver's commencement address publicly aligned her with Palestinians and Arabs as a class. It is that association—her public expression of solidarity with persons of Arab descent and Palestinian national origin—that each Defendant made a but-for cause of the contractual harm described below.

192.   At all times relevant to this Complaint, Ms. Culver was a party to an enforceable employment contract with EY, arising from EY's offer letter of August 23, 2024, Ms. Culver's acceptance, and the terms and conditions of employment incorporated therein, including EY's Global Code of Conduct, its anti-discrimination commitments, and its ADR Program. Ms. Culver commenced performance of that contract on January 13, 2025, and

performed her obligations under it without deficiency at all times through the date of her termination.

## A. EY Entity and Individual Defendants

193.    Defendants Ernst & Young LLP and Ernst & Young U.S. LLP violated § 1981 by terminating Ms. Culver's employment contract on the basis of her known association with persons of Arab descent and Palestinian national origin—impermissible racial and ethnic grounds under § 1981. The discriminatory basis for that termination, the absence of any legitimate contractual justification, and the pretext of EY's post-hoc "dishonesty" rationale are established by the allegations in Paragraphs 95 through 137 and incorporated herein.

194.    Defendant Jason P. Morrissey personally violated § 1981 by transmitting EY's administrative leave notice on May 18, 2025—the instrument by which EY first deprived Ms. Culver of the benefits of her employment contract—and by transmitting EY's termination letter on May 22, 2025, four hours and twelve minutes after receiving Ms. Culver's formal discrimination complaint. Morrissey's personal execution of both adverse actions places him within § 1981's reach as an individual who intentionally deprived Ms. Culver of her contractual rights on impermissible racial grounds. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008).

195.    Defendant Andrew D. Phillips personally violated § 1981 by participating in the decision to place Ms. Culver on administrative leave, by receiving and failing to contest EY's leave notice, by convening and delivering a pre-scripted announcement of Ms. Culver's leave to her professional colleagues on May 19, 2025—without investigation, without affording Ms. Culver process, and in advance of any factual basis—and by failing to exercise his authority as QUEST principal to halt or seek review of the termination decision. Phillips's

conduct deprived Ms. Culver of the terms, conditions, and benefits of her employment contract on grounds she was entitled to have protected.

196.    Defendant Andrea Stempel personally violated § 1981 by receiving Ms. Culver's formal internal discrimination complaint at 3:43 p.m. on May 22, 2025, and taking no action sufficient to prevent the transmission of Ms. Culver's termination letter at 7:55 p.m. the same day. As EY's Head of Employment Law, Stempel possessed both the authority and the institutional responsibility to halt the pending adverse action pending investigation of the discrimination complaint she had just received. Her failure to exercise that authority was not inadvertent; it was the conduct of an officer who made a deliberate choice to allow the termination to proceed notwithstanding direct, contemporaneous written notice that it violated federal civil rights law.

197.    Defendant Tony Jordan personally violated § 1981 by actively managing the pre-termination process on May 22, 2025—personally contacting Ms. Culver to request a same-day meeting, refusing to provide her with the subjects to be addressed, the relevant policies, or the identity of attendees when asked, and declining to respond to her written request for documentation and a reasonable opportunity to consult counsel—in a manner calculated to deprive Ms. Culver of any meaningful opportunity to contest the impending termination of her contractual rights. Jordan's conduct was the active exercise of institutional authority in furtherance of the discriminatory termination, not mere passive inaction.

198.    Defendant Robert Carroll personally violated § 1981 by jointly convening and participating in the May 19, 2025 QUEST team meeting at which Ms. Culver's leave was announced to her professional colleagues, by failing to exercise his authority as a QUEST principal to object to or seek review of the adverse action, and by lending his supervisory

authority to EY's institutional alignment on the termination decision before any investigation had been conducted.

**B. GWU Entity and Individual Defendants**

199.    Section 1981 reaches third parties who intentionally interfere with a plaintiff's contractual rights on racial grounds. *See Faraca v. Clements*, 506 F.2d 956 (5th Cir. 1975); *Al-Khazraji*, 481 U.S. at 613. Defendants George Washington University, Rachel Riedner, Kathy Fackelmann, and Does 11–20 each intentionally interfered with Ms. Culver's employment contract with EY by generating, disseminating, and amplifying false public characterizations of Ms. Culver's commencement address—characterizations that were foreseeably communicated to EY, that EY relied upon in constructing its post-hoc termination rationale, and that were made because Ms. Culver's address publicly associated her with persons of Arab descent and Palestinian national origin.

200.    Defendant George Washington University violated § 1981 through the conduct of its agents described below, and independently through its own institutional response: removing the video record of Ms. Culver's address, issuing public statements characterizing her speech as "materially different" from her submission, and announcing a formal investigation—each of which provided EY with the pretextual cover necessary to justify a termination decision that had already been made in response to discriminatory external pressure.

201.    Defendant Rachel Riedner personally violated § 1981 by making, from a position of institutional authority during the ceremony itself, a false public statement that Ms. Culver had "strayed from her prepared remarks" and that her remarks "do not reflect" GWU's views—a statement that was false, that was made because the content of Ms. Culver's

remarks associated her with Palestinians and Arabs, and that was foreseeably transmitted to EY and to the national media within hours, providing the initial pretextual basis for EY's adverse action.

202.    Defendant Kathy Fackelmann personally violated § 1981 by issuing, in her capacity as GWU's official spokesperson, written institutional statements to the media characterizing Ms. Culver's address as "materially different" from her submission—a characterization that was false, that was disseminated nationally, and that was communicated directly or indirectly to EY leadership. Fackelmann's statements gave institutional credibility to the discriminatory campaign's false antisemitism characterization and foreseeably caused or contributed to EY's termination of Ms. Culver's employment contract.

203.    With respect to the GWU defendants, the required intent under § 1981—that the interference be motivated by racial animus or by awareness that the plaintiff's protected association was the reason for the adverse action they were facilitating—is established by the circumstances of each defendant's knowledge: each acted with full awareness that Ms. Culver's commencement address had generated institutional and external pressure precisely because it publicly associated her with Palestinians, Arabs, and Muslims, and each took actions that foreseeably reinforced and extended that pressure onto EY.

204.    As a direct and proximate result of the violations described in this Count, Ms. Culver has suffered the damages described in Paragraph 172, incorporated herein by reference, in amounts to be determined at trial. Each Defendant named in this Count is jointly and severally liable for those damages to the extent their conduct was a but-for cause of the termination of Ms. Culver's employment contract.

205.    Because the conduct of each named Defendant was willful and was undertaken with knowledge that it violated Ms. Culver's federally protected rights, Ms. Culver is entitled to punitive damages against each individual Defendant and against the EY entity Defendants pursuant to 42 U.S.C. § 1981a.

206.    Ms. Culver is entitled to all relief available under § 1981 as well as any additional equitable relief the Court deems just and proper.

**COUNT IV**
**D.C. Code § 2-1402.11**
**(Discrimination Based on Race, Religion, and National Origin)**
Against EY Defendants; Jason P. Morrissey; Andrew D. Phillips; Andrea Stempel; Tony
Jordan; Robert Carroll; and Does 1–10

207.    Ms. Culver realleges and incorporates by reference the allegations contained in Paragraphs 1 through 163 above.

208.    The District of Columbia Human Rights Act makes it unlawful for an employer to fail or refuse to hire, to discharge, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment because of that individual's race, color, religion, or national origin. D.C. Code § 2-1402.11(a)(1). The DCHRA's protections extend to discrimination based on an employee's association with or advocacy on behalf of persons identified by a protected characteristic. At all times relevant to this Complaint, EY was an employer within the meaning of D.C. Code § 2-1401.02(10).

209.    Unlike Title VII, the DCHRA imposes personal liability on individual supervisory employees who directly participate in discriminatory employment decisions. *See Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 887 (D.C. 2003). Each individual Defendant named in this Count—Morrissey, Phillips, Stempel, Jordan, Carroll, and Does 1–10—personally participated in the discriminatory adverse actions taken against Ms. Culver, as

described in the Parties section and Sections H through J of the Factual Allegations, and is individually liable under the DCHRA for that participation.

210.    The conduct constituting discrimination under this Count is the same conduct pleaded in Count I. Ms. Culver incorporates those allegations—including the basis for EY's adverse actions, the absence of any legitimate non-discriminatory rationale, the comparator evidence in Section O, and the pretext established in Section L—in their entirety. Count IV is brought separately because the DCHRA provides remedies and a damages framework that supplement, and in certain respects exceed, those available under Title VII, including broader coverage of the individual defendants named herein.

211.    The individual Defendants' liability under this Count arises from the following personal conduct:

(a) **Defendant Morrissey** personally transmitted both the administrative leave notice on May 18, 2025, and the termination letter on May 22, 2025—the operative instruments of discriminatory adverse action—and participated in the QUEST team meeting at which Ms. Culver's leave was publicly announced to her colleagues before any investigation was conducted;

(b) **Defendant Phillips** jointly directed and co-led the decision to place Ms. Culver on administrative leave, delivered a pre-scripted announcement of that leave to the QUEST team on May 19, 2025, and failed to exercise his authority as QUEST principal to halt or seek review of the termination decision;

(c) **Defendant Stempel** received Ms. Culver's formal internal discrimination complaint at 3:43 p.m. on May 22, 2025, and failed to exercise her authority as EY's Head of Employment Law to halt the termination transmitted at 7:55 p.m. the same

day—allowing the retaliatory termination to proceed with contemporaneous written notice that it violated applicable civil rights law;

(d) **Defendant Jordan** personally managed the pre-termination process on May 22, 2025—contacting Ms. Culver to request a same-day meeting, refusing to disclose the subjects, applicable policies, or attendees when requested, and declining to respond to Ms. Culver's written request for basic procedural information—in a manner that deprived Ms. Culver of any meaningful opportunity to contest the impending discriminatory termination of her employment;

(e) **Defendant Carroll** jointly convened and participated in the May 19, 2025 QUEST team meeting broadcasting Ms. Culver's leave to her professional peers, and failed to exercise his authority as a QUEST principal to challenge or seek review of the adverse action; and

(f) **Defendants Does 1–10**, whose identities are presently unknown, participated in the deliberations, communications, and execution of EY's decision to place Ms. Culver on administrative leave and to terminate her employment, on the discriminatory basis described herein.

212.    Each individual Defendant's personal participation was a direct, proximate, and but-for cause of the discriminatory adverse actions taken against Ms. Culver. Each acted with knowledge—actual or constructive—that the adverse action was premised on the identity-based content of Ms. Culver's commencement address rather than any legitimate policy violation.

213. As a direct and proximate result of the violations described in this Count, Ms. Culver has suffered the damages described in Paragraph 172, incorporated herein by reference, in amounts to be determined at trial.

214. Ms. Culver is entitled to all relief available under the DCHRA, D.C. Code § 2-1403.16, including back pay, front pay, compensatory damages for emotional distress and reputational harm, punitive damages, injunctive relief, and attorneys' fees and costs.

**COUNT V**
**D.C. Code § 2–1402.61**
**(Retaliation)**
Against EY Defendants, Jason P. Morrissey, Andrew D. Phillips

215. Ms. Culver realleges and incorporates by reference the allegations contained in Paragraphs 1 through 163 above.

216. The District of Columbia Human Rights Act makes it unlawful for any person to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of any right granted or protected under the DCHRA, or to retaliate against any person who has opposed any practice made unlawful by the DCHRA or who has filed a complaint, testified, or participated in any proceeding under it. D.C. Code § 2-1402.61(a). The DCHRA's retaliation provision reaches individual supervisory employees who personally participate in retaliatory adverse action. *See Lively*, 830 A.2d at 887.

217. The protected activities constituting the predicate for this Count are the same activities identified in Paragraph 176—Ms. Culver's written opposition to EY's discriminatory adverse action on May 18 and 19, 2025, and her formal internal discrimination complaint filed on May 22, 2025, at 3:43 p.m. Eastern. Those activities constituted opposition to practices made unlawful by the DCHRA and, as to the formal complaint, participation in a proceeding cognizable under D.C. Code § 2-1402.61(a).

218.    The adverse employment actions constituting retaliation under this Count are the same actions identified in Paragraph 178: the administrative leave imposed on May 18, 2025; the public announcement of that leave to Ms. Culver's professional colleagues on May 19, 2025; and the termination of Ms. Culver's employment at 7:55 p.m. on May 22, 2025. Each constitutes an adverse action within the meaning of the DCHRA. The termination is separately actionable as retaliation because it followed Ms. Culver's formal discrimination complaint by four hours and twelve minutes—an interval in which no investigation occurred, no policy was identified, and no factual basis for termination was developed that did not already exist before the complaint was filed.

219.    The individual Defendants' liability under this Count arises from the following personal conduct:

(a) **Defendant Morrissey** transmitted EY's administrative leave notice on May 18, 2025; participated in the QUEST team meeting on May 19, 2025, at which that leave was publicly broadcast to Ms. Culver's colleagues; and transmitted EY's termination letter at 7:55 p.m. on May 22, 2025—four hours and twelve minutes after receiving Ms. Culver's formal internal discrimination complaint. Morrissey was the direct and personal instrument of both the intermediate and terminal adverse actions in this retaliation sequence;

(b) **Defendant Phillips** jointly directed the decision to place Ms. Culver on administrative leave, delivered a pre-scripted public announcement of that leave to the QUEST team on May 19, 2025—before any investigation and without affording Ms. Culver any process—and failed to exercise his authority as QUEST principal to halt, delay, or seek review of the termination decision after Ms. Culver's discrimination

complaint was filed. Phillips's pre-scripted announcement on May 19 itself constitutes an adverse action under the DCHRA, as the unnecessary public disclosure of Ms. Culver's employment status to her professional peers caused material harm to her professional relationships and reputation within EY.

220.    Causation is established by the temporal proximity described in Paragraph 179 and incorporated herein, by the absence of any intervening investigation or independent basis for the termination decision, by the pre-scripted character of EY's internal messaging—demonstrating a decision made before, and independent of, any review of Ms. Culver's opposition—and by the direct personal involvement of both individual Defendants in the execution of each stage of the retaliatory sequence.

221.    As a direct and proximate result of the violations described in this Count, Ms. Culver has suffered the damages described in Paragraph 172, incorporated herein by reference, in amounts to be determined at trial.

222.    Ms. Culver is entitled to all relief available under D.C. Code § 2-1402.61 and § 2-1403.16, including back pay, front pay, compensatory damages, punitive damages, injunctive relief, and attorneys' fees and costs.

**COUNT VI**
**D.C. Code § 2–1402.62**
**(Aiding and Abetting Discrimination)**
Against Defendants George Washington University, Jason P. Morrissey, Andrew D. Phillips, Rachel Riedner; Kathy Fackelmann; Ellen Granberg; Chris Bracey; Paul Wahlbeck; Kim Gross; Grace E. Speights; and Does 11–20

223.    Ms. Culver realleges and incorporates by reference the allegations contained in Paragraphs 1 through 163 above.

224.    The District of Columbia Human Rights Act makes it unlawful for any person to aid, abet, invite, compel, or coerce the doing of any act made unlawful by the DCHRA, or

to attempt to do so. D.C. Code § 2-1402.62. Unlike the employment discrimination provision of D.C. Code § 2-1402.11, the aiding and abetting provision imposes liability on persons who are not themselves the primary employer—including third parties outside the employment relationship who knowingly assist a primary violator in the commission of an unlawful discriminatory act, and individuals within an employer organization who facilitate the discriminatory conduct of their employer without themselves holding ultimate decision-making authority. *See Compton v. Dist. of Columbia*, 272 F. Supp. 3d 142, 155 (D.D.C. 2017).

225.   The primary violations underlying this Count are the discriminatory termination of Ms. Culver's employment by EY, pleaded in Count I, and the discriminatory adverse actions taken against her during the period of administrative leave, pleaded in Count IV. Each constitutes an unlawful practice under D.C. Code § 2-1402.11. The following Defendants aided, abetted, and facilitated those primary violations through the conduct described below.

## A. EY Individual Aiders and Abettors

226.   Defendant Jason P. Morrissey aided and abetted EY's discriminatory adverse action by personally executing each stage of it—transmitting the leave notice, broadcasting the leave to Ms. Culver's colleagues, and transmitting the termination letter—with actual knowledge that the adverse action was premised on the content of Ms. Culver's commencement address and without identifying any legitimate policy violation at any stage. Morrissey's personal execution of EY's discriminatory decisions made him an indispensable instrument of the primary violation, not merely a bystander.

227.   Defendant Andrew D. Phillips aided and abetted EY's discriminatory adverse action by jointly directing the decision to place Ms. Culver on leave, delivering a pre-scripted

public announcement of that leave to the QUEST team before any investigation had been conducted, and declining to exercise his authority as a QUEST principal to halt, delay, or challenge the termination. Phillips's conduct lent supervisory authority and institutional legitimacy to each step of the discriminatory process and materially facilitated its completion.

**B. GWU Entity and Individual Aiders and Abettors**

228.   Defendants George Washington University, Rachel Riedner, Kathy Fackelmann, Ellen Granberg, Chris Bracey, Paul Wahlbeck, Kim Gross, Grace E. Speights, and Does 11–20 aided and abetted EY's discriminatory termination of Ms. Culver's employment by generating, disseminating, and sustaining a false institutional narrative about Ms. Culver's commencement address—a narrative that provided EY with the pretextual basis for its termination decision and that each of these Defendants knew, or had every reason to know, was being transmitted to and relied upon by EY in making its employment decision.

229.   Defendant George Washington University institutionally aided and abetted EY's discrimination by: publicly characterizing Ms. Culver's address as "materially different" from her submitted draft—a characterization that was false; removing the video record of her address within hours of its delivery, depriving EY and the public of the means to evaluate it independently; announcing a formal investigation of Ms. Culver for unnamed policy violations, which communicated to EY that GWU had made a threshold determination that Ms. Culver's conduct was subject to institutional sanction; and failing at any point to correct the public record, retract its investigation, or communicate to EY that its public statements were inaccurate and should not form the basis for adverse employment action. Each of these acts was a foreseeable and proximate cause of EY's termination of Ms. Culver's employment contract.

230.    Defendant Rachel Riedner aided and abetted EY's discrimination by making, from the podium and in her capacity as GWU's Associate Dean for Undergraduate Studies, a false real-time public statement characterizing Ms. Culver's address as a departure from her approved remarks—a statement broadcast to the live audience, to media, and through social media within minutes, which reached EY leadership before EY took any adverse action, and which provided the first institutional imprimatur for the discriminatory pressure campaign's false characterization of Ms. Culver's conduct.

231.    Defendant Kathy Fackelmann aided and abetted EY's discrimination by issuing, in her capacity as GWU's official spokesperson, written statements to the national media characterizing Ms. Culver's address as "materially different" from her submission and announcing GWU's formal investigation—statements that were false, that were published nationally, and that were transmitted directly or indirectly to EY leadership, reinforcing and extending the pretextual basis on which EY acted.

232.    Defendants Ellen Granberg, Chris Bracey, Paul Wahlbeck, Kim Gross, and Grace E. Speights aided and abetted EY's discrimination by failing to exercise their respective institutional authority to retract GWU's false public statements, halt GWU's investigation of Ms. Culver, or communicate to EY that the discriminatory pressure campaign lacked any factual foundation—despite each having received direct, written, and public notice no later than May 27, 2025, that GWU's institutional conduct was causing ongoing harm to Ms. Culver and facilitating an unlawful employment action. Their deliberate inaction preserved and prolonged the pretextual narrative on which EY's termination decision rested, and constitutes knowing failure to disassociate from conduct they were individually positioned to remedy.

233. Each GWU Defendant acted with knowledge—actual or constructive—that EY had taken or was expected to take adverse employment action against Ms. Culver in reliance on GWU's public characterizations of her address, and that those characterizations were false. The required knowledge element for aiding and abetting liability under D.C. Code § 2-1402.62 is satisfied because each GWU Defendant was aware that GWU's institutional response was the proximate factual predicate for EY's adverse action, and each possessed the authority and information necessary to correct it.

234. As a direct and proximate result of the conduct described in this Count, Ms. Culver has suffered the damages described in Paragraph 172, incorporated herein by reference, in amounts to be determined at trial.

235. Ms. Culver is entitled to all relief available under D.C. Code §§ 2-1402.62 and 2-1403.16 against each Defendant named in this Count, including compensatory damages, punitive damages, injunctive relief requiring correction of the public record, and attorneys' fees and costs.

## COUNT VII
### 42 U.S.C. § 1985(3)
### (Civil Rights Conspiracy – Deprivation Clause)
Against all Defendants

236. Ms. Culver realleges and incorporates by reference the allegations contained in Paragraphs 1 through 125 above.

## COUNT VIII
### 42 U.S.C. § 1985(3)
### (Civil Rights Conspiracy – Hindrance Clause)
Against all Defendants

237. Ms. Culver realleges and incorporates by reference the allegations contained in Paragraphs 1 through 125 above.

## COUNT IX
### 42 U.S.C. § 1985(2)
### (Conspiracy to Deter Ms. Culver from Federal Proceedings)
EY Defendants and any coordinating third-party actors

238.    Ms. Culver realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 125 above.

## COUNT X
### 42 U.S.C. § 1986
### (Failure to Prevent Civil Rights Conspiracy)
Against Defendants, Jason P. Morrissey, Andrew D. Phillips, and Does 1-25

239.    Ms. Culver realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 125 above.

## COUNT XI
### D.C. Common Law
### (Breach of Contract)
Against Defendant George Washington University

240.    Ms. Culver realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 125 above.

## COUNT XII
### D.C. Common Law
### (Promissory Estoppel)
Against Defendant George Washington University

241.    Ms. Culver realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 125 above.

## COUNT XIII
### D.C. Common Law
### (Breach of Confidential Relationship)
Against Defendant George Washington University

242.    Ms. Culver realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 125 above.

## COUNT XIV
### D.C. Common Law
### (Tortious Interreference with Contract)
Against Defendants George Washington University and Any Non-EY Interfering
Defendants

243.   Ms. Culver realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 125 above.

## COUNT XV
### D.C. Common Law
### (Defamation)
Against EY Defendants and GW Defendants

244.   Ms. Culver realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 125 above.

## COUNT XVI
### D.C. Common Law
### (Intentional Infliction of Emotional Distress)
Against EY Defendants and Any Participating Defendants

245.   Ms. Culver realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 125 above.

## COUNT XVII
### D.C. Common Law
### (False Light Invasion of Privacy)
Against EY Defendants and Any Third-Party Actors Who Participated in the Public
Dissemination

246.   Ms. Culver realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 125 above.

## VIII.   PRAYER FOR RELIEF

Plaintiff Cecilia Culver respectfully requests that this Court enter judgment in her

favor and against all Defendants, and:

(a)   Compensatory Damages

- Award full back pay from [DATE], including raises, bonuses, retirement contributions, and benefits under 42 U.S.C. § 2000e-5(g) (Title VII) and D.C. Code § 2-1403.13.

- Front pay for 10+ years reflecting Ms. Culver's career trajectory as an economist, calculated using U.S. Bureau of Labor Statistics data for higher education administrators.

- Award compensatory damages for breach of employment contract under District of Columbia common law.

- $5,000,000 for emotional distress and professional ostracization under DCHRA and 42 U.S.C. § 1981.

(b)    Grant such other relief as this Court deems just and proper.


## JURY DEMAND

Ms. Culver demands a trial by jury on all triable claims.

Respectfully submitted,

_____/s/Abdel-Rahman Hamed_____
ABDEL-RAHMAN HAMED, ESQ.
DC Bar No. 1632130
**Hamed Law**
P.O. Box 25085
Washington, D.C. 20027

(202) 888-8846

Advocates@HamedLaw.com

*Attorney for Plaintiff Cecilia Culver*