**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| Cecilia Culver<br><br>                         *Plaintiff,*<br><br>     v.<br><br>Ernst & Young LLP, *et al.*,<br><br>                         *Defendants.* | Case No.     1:26-cv-1290-CKK |

**PLAINTIFF'S OPPOSITION TO ERNST & YOUNG DEFENDANTS'
MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II. FACTS...................................................................................................................4

   A.  MS. CULVER WAS HIRED TO WORK IN WASHINGTON, D.C., AND EVERY ACT EY TOOK AGAINST HER WAS AIMED THERE ...................................................................4

   B.  WITHIN TWENTY-FOUR HOURS OF HER COMMENCEMENT ADDRESS, EY LOCKED HER OUT.........................................................................................................6

   C.  FOR FOUR DAYS MS. CULVER ASKED WHAT SHE HAD DONE WRONG. EY REFUSED TO TELL HER ....................................................................................................7

   D.  MS. CULVER INVOKED EY'S OWN DISPUTE RESOLUTION PROGRAM. EY FIRED HER THREE HOURS LATER ..........................................................................................8

   E.  THE PROGRAM PLACED ONE AFFIRMATIVE DUTY ON EY. EY NEVER PERFORMED IT 9

   F.  EY'S OWN EXHIBITS DEFEAT ITS CLAIM THAT THE 2025 AMENDMENT REACHED MS. CULVER.........................................................................................................10

   G.  MS. CULVER SOUGHT MEDIATION A SECOND TIME. EY DECLINED THAT TOO—THEN DEMANDED ARBITRATION ..................................................................................12

   H.  THE SILENCES IN EY'S RECORD ..........................................................................14

III. ARGUMENT ..................................................................................... 14

   A.  THIS COURT HAS PERSONAL JURISDICTION OVER EACH INDIVIDUAL EY DEFENDANT 14

     1.  Specific Jurisdiction Exists over Defendant Carroll Because He Worked Out of EY's D.C. Office ..................................................................................................16

     2.  Specific Jurisdiction Exists Over Defendant Phillips Because He Regularly Worked Out of the D.C. Office ............................................................................20

     3.  Specific Jurisdiction Exists Over All Individual EY Defendants Under the Conspiracy Theory .............................................................................................22

     4.  Overt acts by co-conspirators within the forum ...................................................24

     5.  Each Individual EY Defendant's participation .....................................................25

Case No. 1:26-cv-1290-CKK

6.    Due Process is Satisfied.................................................................................27

7.    If the Court Has Doubts About Its Jurisdiction, It Should Authorize Jurisdictional Discovery.................................................................................29

B.    THE MOTION TO COMPEL ARBITRATION MUST BE DENIED...................................32

1.    EY Bears the Burden, and Every Inference Runs to Ms. Culver...........................32

2.    Formation is for This Court, Not an Arbitrator to Decide ..................................33

C.    EY HAS NOT ESTABLISHED ASSENT TO THE 2025 PROGRAM...................................34

1.    The 2025 version did not exist when Ms. Culver signed .....................................34

2.    EY's notice evidence does not establish notice ....................................................34

3.    EY closed the only channel its own Program authorizes.....................................35

4.    There is a genuine dispute about what Ms. Culver was shown at signing .............36

5.    The Operative Program Is the Document EY Incorporated by Number ...............37

6.    EY Repudiated the Only Affirmative Duty the Program Assigned It ...................38

7.    The Non-Signatory Defendants Concede They Gave No Consideration ..............40

8.    In the Alternative, Rule 56(d) Discovery is Required..........................................40

IV.  CONCLUSION.................................................................................... 42

# TABLE OF AUTHORITIES

**CASES**

*2200 M St. LLC v. Mackell*,
  940 A.2d 143 (D.C. 2007) ..................................................................................32

*Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*,
  531 F.3d 863 (D.C. Cir. 2008) ...........................................................................32

*Alkanani v. Aegis Def. Servs., LLC*,
  976 F. Supp. 2d 13 (D.D.C. 2014) .....................................................................15

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...........................................................................................32

*Azamar v. Stern*,
  662 F. Supp. 2d 166 (D.D.C. 2009) ............................................................. 16, 22

*Bank, N.A. v. Tauber*,
  347 F. Supp. 511 (D.D.C. 1972) ........................................................................19

*Brit UW, Ltd. v. Manhattan Beachwear, LLC*,
  235 F. Supp. 3d 48 (D.D.C. 2017) .....................................................................28

*Bronner v. Duggan*,
  249 F. Supp. 3d 27 (D.D.C. 2017) .....................................................................16

*Bulnes v. Suez WTS Serv. USA, Inc.*,
  No. 22-cv-1154-BAS-AHG, 2023 WL 3262938,(S.D. Cal. May 4, 2023).........................37

*Calder v. Jones*,
  465 U.S. 783 (1984) ...........................................................................................28

*Crane v. Carr*,
  814 F.2d 758 (D.C. Cir. 1987) ...................................................................... 19, 21

*Crane v. N.Y. Zoological Soc'y*,
  894 F.2d 454 (D.C. Cir. 1990) ...........................................................................18

*EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*,
  246 F. Supp. 3d 52 (D.D.C. 2017) .....................................................................24

*EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*,
   894 F.3d 339 (D.C. Cir. 2018) ...................................................................................24

*Erwin-Simpson v. AirAsia Berhad*,
   985 F.3d 883 (D.C. Cir. 2021) ............................................................................ 15, 22

*FC Inv. Grp. LC v. IFX Mkts., Ltd.*,
   529 F.3d 1087 (D.C. Cir. 2008) .......................................................................... 15, 22

*Gibbs v. Stinson*,
   421 F. Supp. 3d 267 (E.D. Va. 2019) .......................................................................34

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
   561 U.S. 287 (2010) ............................................................................................ 32, 33

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
   199 F.3d 1343 (D.C. Cir. 2000) ................................................................................29

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ..................................................................................23

*Helmer v. Doletskaya*,
   393 F.3d 201 (D.C. Cir. 2004) ..................................................................................16

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   586 U.S. 63 (2019) ............................................................................................... 3, 33

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002) ....................................................................................................32

*Jones v. Castro*,
   168 F. Supp. 3d 169 (D.D.C. 2016) ..........................................................................20

*Jung v. Ass'n of American Medical Colleges*,
   300 F. Supp. 2d 119 (D.D.C. 2004) ..........................................................................16

*Kalipeni v. Fam. Values at Work*,
   No. 25-CV-3470 (GMH), 2026 WL 1943315 (D.D.C. July 6, 2026) .........................17

*Kopff v. Battaglia*,
   425 F. Supp. 2d 76 (D.D.C. 2006) ............................................................................22

*Lane v. Lucent Techs., Inc.*,
   388 F. Supp. 2d 590 (M.D.N.C. 2005) .....................................................................28

*Manifold v. Wolf Coach, Inc.*,
231 F. Supp. 2d 58 (D.D.C. 2002) ....................................................................................29

*Mitchell v. Valley Fin. Credit Union*,
No. CV 25-52-BLG-DLC, 2026 WL 1194752 (D. Mont. May 1, 2026),.........................35

*Mwani v. bin Laden*,
417 F.3d 1 (D.C. Cir. 2005)..................................................................................... 16, 27

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019) ............................................................................................... 3, 33

*Norcia v. Samsung Telecomms. Am., LLC*,
845 F.3d 1279 (9th Cir. 2017).........................................................................................32

*Parkcrest Builders, LLC v. Liberty Mut. Ins. Co.*,
26 F.4th 691 (5th Cir. 2022) .........................................................................................38

*Reeve v. Monex Inc.*,
No. CV 24-408 (TJK), 2024 WL 3566133 (D.D.C. July 29, 2024) ........................... 15, 29

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010) .........................................................................................................33

*Sakyi v. Estée Lauder Cos.*,
308 F. Supp. 3d 366 (D.D.C. 2018) ...............................................................................32

*Second Amend. Found. v. U.S. Conf. of Mayors*,
274 F.3d 521 (D.C. Cir. 2001)................................................................................ 22, 23

*Steelworkers v. Warrior & Gulf Nav. Co.*,
363 U.S. 574 (1960) .......................................................................................................32

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
925 F.2d 1136 (9th Cir. 1991)........................................................................................34

*United House of Prayer for All People v. Therrien Waddell, Inc.*,
112 A.3d 330 (D.C. 2015) .............................................................................................38

*Urquhart-Bradley v. Mobley*,
964 F.3d 36 (D.C. Cir. 2020).................................................................................. 17, 29

*W & T Travel Servs., LLC v. Priority One Servs., Inc.*,
69 F. Supp. 3d 158 (D.D.C. 2014)..................................................................................38

*Walden v. Fiore*,
  571 U.S. 277 (2014) ....................................................................................................28

*Winmar Constr., Inc. v. ESF, Inc.*,
  No. CV 22-1829 (JDB), 2023 WL 1778201, (D.D.C. Feb. 6, 2023)...............................28

*World Wide Mins., Ltd. v. Republic of Kazakhstan*,
  296 F.3d 1154 (D.C. Cir. 2002) ...................................................................................23

## STATUTES

42 U.S.C. § 1981 ..................................................................................................................17

42 U.S.C. § 1985(3)..............................................................................................................23

42 U.S.C. § 1986..................................................................................................................23

D.C. Code § 13-423(a)(1) ............................................................................ 2, 16, 22

D.C. Code § 13-423(a)(3) ........................................................................2, 19, 20, 22

D.C. Code § 13-423(a)(4) .................................................................................... passim

D.C. Code § 13-423(b) .....................................................................................................19

District of Columbia Human Rights Act .........................................................................17

## RULES

Fed. R. Civ. P. 12(b)(2) ..........................................................................................14, 16, 20

Fed. R. Civ. P. 56(c) ...........................................................................................................40

Fed. R. Civ. P. 56(d) ..................................................................................................... 40, 42

## TREATISES

Corbin on Contracts § 3.18.................................................................................................35

Restatement (Second) of Contracts § 69 ............................................................................35

## I.    INTRODUCTION

The Ernst & Young Defendants ("EY Defendants") unlawfully placed Plaintiff Cecilia Culver on administrative leave then terminated her employment because of remarks she made during her commencement address at the George Washington University. Doc. 2-1, Complaint ("Compl.") ¶ 5. "Ms. Culver dedicated a portion of her speech about the humanitarian catastrophe unraveling as the world witnessed the ongoing genocide in Gaza, Palestine. She humanized the Palestinian people, advocated for the rights of Palestinian students who had been displaced, killed, or prevented from continuing their education, and called upon GWU to disclose its financial investments and divest from corporations profiting from genocide." *Id.* ¶ 3. Within 24 hours, Ernst & Young—where Ms. Culver was then-employed—had locked her out of her accounts and placed her on administrative leave "in connection with" her speech. *Id.* ¶ 4. At no point did anyone at EY explain what policy Ms. Culver had violated by speaking truth to power about the plight of the Palestinian people and the Zionist genocide. *Id.* ¶ 5. Within a week, EY had fired her. *Id.* EY did so unlawfully, and "in response to an organized external Zionist pressure campaign triggered by an online doxing platform led by an infamous hate merchant, Liora Reznichenko (a/k/a Liora Rez), who affixed a false antisemitism label to Ms. Culver." *Id.* ¶ 8. In so doing, EY violated a host of federal and state civil rights and torts law.

Each of the EY Defendants played a role in the unlawful conduct Ms. Culver challenges. Each did so in a way that subjects them to jurisdiction in this forum. Still, EY Defendants have moved to dismiss Plaintiff Cecilia Culver's Complaint for lack of personal jurisdiction and simultaneously move to compel arbitration. Doc. 20. On both fronts, the Court should deny their motion.

Defendants Jason P. Morrissey, Andrew D. Phillips, Andrea Stempel, Anthony Jordan, and Robert J. Carroll (the "Individual EY Defendants") are subject to this Court's jurisdiction. Defendant Carroll, who works out of Ernst & Young's D.C. office, was transacting business in D.C. and caused tortious injuries by acts or omissions in D.C. *See* D.C. Code § 13-423(a)(1), (3). So was Defendant Phillips, who co-led the same Washington-based practice, sat in the same Washington office roughly every other week, and attended that practice's Washington retreat weeks before he read a prepared statement about Ms. Culver to her Washington colleagues. And even though the remaining Defendants are not geographically tied to the District, they fall within the ambit of D.C.'s long-arm statute because they participated in a conspiracy that violated Ms. Culver's rights—a conspiracy whose overt acts were committed in this District, against a District resident, at a District workplace. They are independently reachable under § 13-423(a)(3) and (a)(4): each deliberately reached into Washington to revoke a Washington employee's access to a Washington building, to sever her from her Washington colleagues, and to end her Washington employment.

EY Defendants are also wrong that Ms. Culver needs to resolve her claims through Ernst & Young's dispute resolution process—one that Defendants refused to let Ms. Culver participate in, despite several requests to mediate this dispute. Four points defeat the motion to compel.

First, the Program EY asks this Court to enforce did not exist when Ms. Culver signed. EY's memorandum quotes the 2025 version throughout—its definitions, its delegation clause, its choice-of-law provision. Doc. 20-1, at 3–5, 23. That version bears an issue date of February 20, 2025 and an effective date of April 14, 2025. Doc. 20-5, at 1 (§ II.A.4). Ms. Culver signed

her offer letters on October 23, 2023 and August 23, 2024. Culver Exs. 1, 2. A signature cannot manifest assent to terms not yet written.

Second, EY's fallback—that Ms. Culver assented by continuing to work after a March 4, 2025 intranet announcement—fails on EY's own exhibits. The announcement, Doc. 20-6, bears no addressee and no transmission data. The distribution list, Doc. 20-7, is a single spreadsheet row stripped of every other recipient, with no delivery, open, or click field and no custodian foundation. And the Program permits amendment only by intranet posting, Doc. 20-5, at 7 (§ V.E.1)—the very channel EY closed on the morning of May 18, 2025, before Ms. Culver knew a dispute existed. Culver Decl. ¶¶ 36–38.

Third, the document EY's offer letters actually incorporated—by SCORE number, twice—placed exactly one affirmative operational duty on anyone, and that duty was EY's: "the Firm will contact the Provider on behalf of the parties for the purpose of initiating mediation." Culver Ex. 9, at 3 (§ III.C). Ms. Culver initiated Phase I, selected JAMS, proposed a date, and asked for confirmation. Doc. 20-14, at 3–4. EY never contacted JAMS, never named a mediator, never sent the representation letter its own text requires, and never held a mediation. Culver Decl. ¶¶ 68–74. Then it fired her three hours later.

Fourth, the delegation clause cannot rescue the motion, because it appears in the same 2025 document whose formation is disputed. A delegation clause is "merely a specialized type of arbitration agreement." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 112 (2019). And "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). Which instrument governs—and whether any instrument was formed—is this Court's question.

Because EY invokes the Rule 56(c) standard, Doc. 20-1, at 22, it must show the *absence* of a genuine dispute of material fact. Ms. Culver's sworn declaration creates that dispute many times over. Should the Court find the record incomplete on either motion, the remedy is discovery of the evidence EY holds exclusively—the DocuSign audit trails, the March 4 transmission data, the link-resolution history, and the decisional records—not dismissal.

## II.    FACTS

### A. Ms. Culver Was Hired to Work in Washington, D.C., and Every Act EY Took Against Her Was Aimed There

Ernst & Young hired Cecilia Culver twice, and both times it hired her into Washington, D.C. Her October 23, 2023 internship letter and her August 23, 2024 full-time letter each specify the same duty station: "Washington - 1101 New York Ave." Culver Exs. 1, 2. Robert Carroll signed the first one on EY's behalf. Culver Ex. 1, at 5; Culver Decl. ¶ 95. Ms. Culver interned in that office from June 10 to August 2, 2024, and began full-time work there on January 13, 2025. Culver Decl. ¶¶ 3, 5.

What followed was not a remote relationship. Ms. Culver held a badge for the 1101 New York Avenue building and worked there in person two to three days in a typical week. Culver Decl. ¶ 7. The QUEST practice occupied a dedicated area on one floor of that office, used only by QUEST personnel, and that is where Ms. Culver worked. Culver Decl. ¶ 8. She lived in the District under a District lease, was paid on a District payroll, and paid District income tax on her EY earnings. Culver Decl. ¶¶ 10–11. Of the roughly sixty members of the QUEST practice, at least half were based in that Washington office. Culver Decl. ¶ 94.

So were the two men who ran it. Andrew Phillips and Robert Carroll led QUEST during Ms. Culver's employment. Culver Decl. ¶ 87. Defendant Phillips was in the Washington office roughly every other week; Defendant Carroll was there at least once a

week; both were often physically present at the practice's in-person weekly team meetings; and both attended the QUEST retreat held in Washington in January or early February 2025. Culver Decl. ¶¶ 88–91. Defendant Carroll's own declaration confirms the point: he was a Principal in QUEST "based in Washington, D.C." from June 2010 until June 2025. Doc. 20-27, Declaration of Robert Carroll ("Carroll Decl.") ¶ 2.

Ms. Culver received every communication described below—the lockout, the leave notice, the interrogation demands, the termination—while she was physically in Washington, D.C. Culver Decl. ¶¶ 41, 46, 62, 65, 97.

The Individual EY Defendants' declarations do not engage with any of this. They recite where each declarant sat. They say nothing about where the consequences of their conduct landed. Ms. Stempel goes so far as to characterize her own failure to act as having "occurred in New York." Doc. 20-13, Declaration of Andrea Stempel ("Stempel Decl.") ¶ 6. Defendant Jordan swears that "[a]ll of my email communications with Plaintiff detailed herein were sent from Massachusetts," and then executes his declaration in New York. Doc. 20-11, Declaration of Anthony Jordan ("Jordan Decl.") ¶ 3 & signature block. Defendant Morrissey volunteers that he attended the May 19 QUEST meeting from Kansas. Doc. 20-2, Declaration of Jason Morrissey ("Morrissey Decl.") ¶ 9.

And on the question that actually matters—who decided to suspend and fire a Washington-based employee, and where—the record is silent by design. Defendant Carroll says only that he "did not make the decision." Carroll Decl. ¶ 4. No other declarant says who did. The travel records, calendars, badge data, office-assignment records, and decisional documents that would answer the question are in EY's exclusive possession. Culver Decl. ¶ 100.

### B.  WITHIN TWENTY-FOUR HOURS OF HER COMMENCEMENT ADDRESS, EY LOCKED HER OUT

On May 17, 2025, Ms. Culver delivered the student commencement address at George Washington University's Columbian College of Arts and Sciences ceremony in Washington, D.C. Doc. 2-1, ¶¶ 2–3.

By approximately 11:00 a.m. the next morning—a Sunday—her EY password no longer worked. Culver Decl. ¶ 33. She called the EY help desk, which could not tell her what was happening. Culver Decl. ¶ 34. She could not open her EY email. Culver Decl. ¶ 35. She never reached EY's internal network again. Culver Decl. ¶ 36.

At 1:59 p.m. that afternoon, Defendant Morrissey sent the notice that explains everything. EY was placing Ms. Culver on administrative leave "in connection with your speech at the George Washington University commencement," and, it added, "[w]e will be deactivating your systems and premises access during this time." Doc. 20-8, at 1; Culver Decl. ¶¶ 39–41. EY identified no policy. It described no investigation. It offered no hearing. Weeks earlier, Ms. Culver's FY25 LEAD review had rated her "Significantly exceeded expectations" on every one of the four dimensions EY evaluates—including the dimension that measures whether an employee "[u]pholds the principles of the global Code of Conduct." Culver Ex. 3. She had never been placed on a performance plan, warned, or told she had violated any EY policy. Culver Decl. ¶ 13.

The lockout was not incidental. EY's Program permits amendment only by electronic notice, and the only channel it authorizes is a posting on the Firm's intranet. Doc. 20-5, at 7 (§ V.E.1). On the morning of May 18, EY closed that channel. Culver Decl. ¶¶ 36–38.

### C. FOR FOUR DAYS MS. CULVER ASKED WHAT SHE HAD DONE WRONG. EY REFUSED TO TELL HER

On May 19, Ms. Culver wrote to Defendant Morrissey and Defendant Phillips asking for a meeting time, a format, the identity of the attendees, the topics, the questions EY had for her, and copies of any policy or guideline EY believed she had violated. Culver Ex. 6; Doc. 20-8, at 2–3. Defendant Morrissey answered with a mental-health hotline, an instruction not to speak with clients, and an instruction to use email going forward. Doc. 20-8, at 3. He answered none of her questions. Culver Decl. ¶ 44. On May 21 she asked him to confirm receipt. Culver Ex. 7. No one replied.

That same week, on May 19, Defendant Phillips and Defendant Carroll convened the full QUEST team and announced Ms. Culver's leave to her colleagues. Doc. 2-1, ¶ 102. Defendant Phillips concedes he "read a prepared statement." Doc. 20-25, Declaration of Andrew Phillips ("Phillips Decl.") ¶ 4. EY's management had thus settled on both the action and the messaging before it had asked Ms. Culver a single question.

On May 22, EY's Chief Ethics and Compliance Officer, Anthony Jordan, demanded a same-day call. When Ms. Culver asked what would be discussed, Defendant Jordan wrote: "I don't intend to provide specific questions in advance, nor is this a discussion where we will be providing and discussing specific EY policies." Doc. 20-12, at 2. At 3:26 p.m. Ms. Culver made a written request for the nature of the allegations, the relevant policies, the underlying complaints and documentation, a reasonable opportunity to consult counsel, and written confirmation of her leave terms. Culver Ex. 8; Doc. 20-12, at 2–3. Defendant Jordan never answered it. Doc. 20-11, ¶ 3. To this day, no EY document identifies a single provision Ms. Culver is supposed to have violated.

### D. Ms. Culver Invoked EY's Own Dispute Resolution Program. EY Fired Her Three Hours Later

At 4:43 p.m. on May 22, 2025, Ms. Culver emailed Andrea Stempel a formal internal complaint of discrimination that doubled as written notice initiating Phase I Mediation under EY's Common Ground Dispute Resolution Program. Culver Ex. 10; Doc. 20-14, at 2–4. She addressed it to the precise officer the Program designates to receive notice to the Firm. Culver Ex. 9, at 6 (§ V.C). She identified the Program by SCORE number. She selected JAMS as the provider. She requested four categories of documents, proposed a mediation date of June 18 by Zoom, and asked for confirmation of receipt by May 25. Doc. 20-14, at 3–4. When she sent it, no one had told her that her employment was ending. Culver Decl. ¶ 59.

EY does not dispute that Phase I was initiated. Ms. Stempel swears the email "also served as a notice initiating Phase I Mediation under the EY Common Ground Dispute Resolution Program . . . and selecting JAMS as the mediation provider." Stempel Decl. ¶ 3. Ms. Swanson swears the same. Doc. 20-17, Declaration of Lisa Swanson, ¶ 2.

At 7:55 p.m.—three hours and twelve minutes after Ms. Culver invoked EY's contractual grievance process—Defendant Morrissey emailed her termination. Morrissey Decl. ¶ 8; Doc. 20-10 at 1. The notice declared her conduct "inappropriate, dishonest, and deceitful," announced that her employment "is being terminated for Cause effective today, May 22, 2025," and invoked the EY Global Code of Conduct without identifying any provision of it. Doc. 20-10 at 1–2; Culver Ex. 11. There had been no investigation, no hearing, and no answer to any question Ms. Culver had asked over the preceding four days.

### E. THE PROGRAM PLACED ONE AFFIRMATIVE DUTY ON EY. EY NEVER PERFORMED IT

Both offer letters incorporate a single document by number: SCORE No. 08363-201US. Culver Exs. 1, 2. That is the number on the version Ms. Culver obtained, read, relied upon, and cited—the Program bearing an issue date of March 1, 2020. Culver Ex. 9 at 1; Culver Decl. ¶¶ 49, 53–54. Its terms are not ambiguous.

Mediation is mandatory: the parties "are required to try to resolve the Covered Dispute through mediation." Culver Ex. 9, at 3 (§ III.A). The initiating party picks the provider: "The Party initiating Phase I shall choose one of the following dispute resolution organizations as the Provider for Phase I." *Id.* (§ III.B). Ms. Culver chose JAMS. And then the Program assigns the next step—the only affirmative operational step it assigns to anyone—to EY: "If contemplated by the mediation procedures of the Provider, *the Firm* will contact the Provider on behalf of the parties for the purpose of initiating mediation." *Id.* (§ III.C) (emphasis added).

JAMS' procedures plainly contemplate that contact. A JAMS mediation is opened by submitting a case form: "Please submit this form to your local JAMS Resolution Center along with a caption page, if available," after which "[a] JAMS professional will contact all parties to coordinate the ADR process." Culver Ex. B (JAMS Case Submission Form at 1. The condition was satisfied. The duty was EY's.

The contrast with Phase II is deliberate and dispositive. When the Program means to place an initiating burden on the employee, it says so—and in the operative version it does not: "A party may start Phase II by giving the other party notice in writing in accordance with Section V.C. of the Program." Culver Ex. 9 at 4 (§ IV.E). Nothing in the version EY incorporated by number requires a claimant to file anything with any provider.

EY did nothing. Ms. Stempel's sole response, three days later, was to ask whether Ms. Culver had a lawyer. Culver Ex. 13; Doc. 20-15 at 1. On May 28, Ms. Culver's counsel confirmed he was "prepared to proceed with the JAMS-administered mediation" and asked for the mediator-selection timeline. Doc. 20-16 at 1. On May 30, EY's in-house counsel replied that she "understand[s] you are in the process of filing a case at JAMS," offered to "review any neutrals you wish to propose in the interim," and attached—for the first time—the 2025 version of the Program. Doc. 20-17, Ex. B at 2. Then EY went silent for nearly eight months. Doc. 20-17, Ex. E, at 1; Culver Decl. ¶ 73.

EY never contacted JAMS. It never proposed a mediator, by name or otherwise. It never provided the mediator representation letter its own 2025 text requires the Firm to supply. It never told Ms. Culver what any fee would be. It never asked her to extend any deadline, and she never agreed to extend one. Culver Decl. ¶¶ 69–72. Ms. Culver never received a single communication from JAMS. Culver Decl. ¶ 68. No mediation was ever held. Culver Decl. ¶ 74. Phase I expired by its own terms ninety days after it was initiated. Culver Ex. 9 at 4 (§ III.J).

EY's explanation is that "the mediation did not proceed because Plaintiff's counsel never filed the matter with JAMS." Doc. 20-17 ¶ 5. That explanation invokes an obligation that does not exist in the version EY's own offer letters incorporated—and it silently omits the obligation that does.

### F. EY's Own Exhibits Defeat Its Claim That the 2025 Amendment Reached Ms. Culver

EY's memorandum rests on a version of the Program issued in February 2025 and made effective April 14, 2025. Doc. 20-5 at 1 (§ II.A.4). Its evidence that this version binds Ms. Culver consists of two documents and one unsupported assertion.

Begin with what EY concedes. Defendant Morrissey swears that Ms. Culver's offer letter "contained a hyperlink to the full text of the then-current 2022 version of the Program." Morrissey Decl. ¶ 4. But the exhibit he authenticates as that 2022 version is an intranet page printed on October 29, 2024—two months after Ms. Culver signed—and its own text states that "[t]his program amendment amends and supersedes all prior versions of the Program and is effective April 1, 2020." Doc. 20-4 at 2 (§ II.A.3). That is the identical amendment date carried by the March 1, 2020 document Ms. Culver actually had. Culver Ex. 9 at 2 (§ II.A.3). The two are materially identical in every provision this motion touches—the definition of "Firm," the mandatory-mediation clause, the Firm's provider-contact duty, the notice-only Phase II trigger, the arbitrator-jurisdiction clause, and the amendment provisions. *Compare* Culver Ex. 9 *with* Doc. 20-4. There is, in short, one pre-2025 Program, and Ms. Culver read it.

Next, notice. Defendant Morrissey asserts that "[p]laintiff received this announcement; her name appears on row 50,079 of the distribution list." Morrissey Decl. ¶ 6. He does not say how he knows she received it, and his exhibits do not show it. The announcement, Doc. 20-6, is a partial intranet page print bearing no addressee, no recipient field, and no transmission data of any kind; it merely invites readers to "[t]ake time to review the updated program here." Doc. 20-6 at 2. The distribution list, Doc. 20-7, is a single spreadsheet row from which every other recipient has been deleted, containing no delivery field, no open field, no click field, and no custodian foundation. Whether the March 4, 2025 announcement was transmitted to Ms. Culver, delivered, opened, or clicked is a question only EY's systems can answer, and EY has produced nothing from them. Culver Decl. ¶ 100.

Ms. Culver has no recollection of receiving or opening any such communication, no memory of clicking any link in one, and obtained no Program document as a result of one. Culver Decl. ¶¶ 30–31. She had never seen or heard of a 2022 or 2025 version of the Program before this litigation. Culver Decl. ¶ 32. And she could not have found one where EY says it was posted: the intranet was the only place she was ever told EY's policies lived, and after the morning of May 18, 2025 she could not reach it. Culver Decl. ¶¶ 29, 36–38. The first time the 2025 text reached Ms. Culver's side of this dispute was May 30, 2025, when EY's counsel attached it to an email. Doc. 20-17, Ex. B, at 2.

Finally, the link itself. Both offer letters point to the same static web address: http://www.ey.com/us/common-ground. Culver Decl. ¶ 21. That address today redirects to a PDF of the 2025 Program—a document that did not exist on October 23, 2023, or August 23, 2024, and that the address therefore cannot have returned on either date. Culver Decl. ¶¶ 56–58. EY incorporated a moving target by reference, EY alone controls where it points, and EY alone holds the records of where it pointed. Culver Decl. ¶ 100.

The Program supplies its own answer to a failed amendment. If a proposed amendment "is determined not to be effective in whole or part for any reason, including lack of sufficient notice, lack of agreement, [or] invalidity of a Program provision," then "the Program as it existed at the time of the proposed termination or amendment shall remain in effect." Culver Ex. 9 at 7 (§ V.E.3).

### G. Ms. Culver Sought Mediation a Second Time. EY Declined That Too— Then Demanded Arbitration

On November 18, 2025, Ms. Culver filed a charge of discrimination with the EEOC's Washington Field Office. Doc. 20-17, Ex. C, at 3. The attorney filing record documents two elections. Under "Requested Mediation," it reads: "Yes." Under "Requested Immediate

Notice of Right to Sue," it reads: "No." Culver Ex. 14, at 2–3. Ms. Culver wanted to mediate. Again.

The EEOC's mediation program is consensual and its consequence is published: "Shortly after a charge is filed, we may contact both the employee and employer to ask if they are interested in participating in mediation. The decision to mediate is completely voluntary. If either party turns down mediation, the charge will be forwarded to an investigator." Culver Ex. D (EEOC, *Mediation*), at 2. Ms. Culver never received an invitation to mediate, never received an agreement to mediate, and heard nothing at all from the agency between November 18, 2025 and January 2, 2026. Culver Decl. ¶¶ 79–81. No mediation occurred.

Rather than a mediator, Ms. Culver's charge went to an investigator. On January 2, 2026, a Supervisory Equal Opportunity Investigator in the Washington Field Office wrote to Ms. Culver's counsel regarding the charge and the pending investigation. Culver Ex. 15. Under the agency's published procedure, that referral is what happens when a party turns mediation down. Culver Ex. D, at 2.

On January 15, 2026, the EEOC dismissed the charge and issued a Notice of Right to Sue, stating expressly that its closure "does not mean the claims have no merit." Doc. 20-17, Ex. D, at 2. One day later, EY's in-house counsel forwarded her eight-month-old May 30 email, "[b]ringing this to the top of your inbox in light of yesterday's dismissal." Doc. 20-17, Ex. E, at 1. That is the entirety of EY's engagement with the process it now asks this Court to compel.

Ms. Culver filed this action on April 15, 2026. Doc. 2-1. On May 15, 2026, EY's counsel wrote demanding that she "voluntarily dismiss the claims against the EY Defendants

and proceed with the contractually mandated dispute resolution process." Doc. 20-24 at 2. On June 26, 2026, EY moved to compel the very process it had declined to initiate. Doc. 20.

### H. THE SILENCES IN EY'S RECORD

EY has submitted seven declarations and more than two dozen exhibits. Not one of them identifies who decided to place Ms. Culver on administrative leave, who decided to terminate her, when either decision was made, or where. Not one attaches a delivery, open, or click record for the March 4, 2025 announcement. Not one authenticates the distribution-list extract through a records custodian. Not one discloses what EY's hyperlink returned in 2023, in 2024, or in May 2025. Not one attaches a JAMS case file, or any confirmation from JAMS that no file exists. Not one produces the prepared statement Defendant Phillips read to Ms. Culver's colleagues.

What EY did volunteer is telling. Defendant Morrissey swears that Ernst & Young LLP, Defendant Phillips, Ms. Stempel, Defendant Jordan, Defendant Carroll, and he himself "did not pay for the benefit of having claims against them or me heard in arbitration." Morrissey Decl. ¶ 12.

## III. ARGUMENT

### A. THIS COURT HAS PERSONAL JURISDICTION OVER EACH INDIVIDUAL EY DEFENDANT

The only argument that EY Defendants raise in their motion to dismiss is that the Individual EY Defendants are not subject to this Court's personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). They are wrong.

When a defendant challenges personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing that jurisdiction exists. While general jurisdiction does not exist over the Individual EY Defendants, specific jurisdiction

does. Specific jurisdiction requires a nexus between a foreign defendant's particular contact with the District of Columbia and the plaintiff's claims. *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 21 (D.D.C. 2014). As Defendants concede, Doc. 20-1 at 24, the crux of Ms. Culver's allegations against EY Defendants is that they unlawfully placed her on administrative leave and terminated her within hours of her commencement address at the George Washington University where she "highlight[ed] the humanitarian catastrophe resulting from the ongoing genocide in Gaza, advocated for the rights of Palestinian students, and called upon GWU to disclose its financial investments and divest from corporations profiting from genocide." Compl. ¶ 11. Each of the Individual EY Defendants engaged in conduct that facilitated EY's unlawful termination of Ms. Culver such that they fall within this Court's reach under D.C.'s long arm statute and the federal due process clause, either because they have sufficient connect, through their employment duties, to Washington, D.C. (Defendants Carroll and Phillips) or under the conspiracy theory of personal jurisdiction (all Individual EY Defendants).

Two preliminary points dispose of EY's framing.

First, EY's threshold contention is that the Complaint "fails to identify which prong" of the long-arm statute Ms. Culver relies upon, and that this failure is "independently fatal." Doc. 20-1 at 23. True, a plaintiff does bear "the burden to identify which prong of the long-arm statute she is relying on as the basis for jurisdiction." *Reeve v. Monex Inc.*, No. CV 24-408 (TJK), 2024 WL 3566133, at *3 (D.D.C. July 29, 2024) (cleaned up). But the purpose of that rule is to give the court "fair notice thereof so that the court could rule on it." *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1095–96 (D.C. Cir. 2008), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021). Ms. Culver gives that notice here.

She relies on D.C. Code § 13-423(a)(1) as to Defendants Carroll and Phillips directly and as to all Individual EY Defendants under the conspiracy theory, and § 13-423(a)(4) as to Defendants Carroll and Phillips based on their persistent contacts with Washington D.C.

Second, on a Rule 12(b)(2) motion the Court "may consider evidence outside of the pleadings to resolve questions of personal jurisdiction," *Bronner v. Duggan*, 249 F. Supp. 3d 27, 36 (D.D.C. 2017), and "must resolve factual disputes in favor of the plaintiff," *Helmer v. Doletskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004). A plaintiff "may rest [her] argument on [her] pleadings, bolstered by such affidavits and other written materials as [she] can otherwise obtain." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). That standard is decisive here, because EY's declarations are silent on the facts that count. Where a defendant "has not provided an affidavit or other information to refute plaintiffs' allegations regarding the nature of his [] business in the District of Columbia, the Court accepts plaintiffs' factual allegations related to this business activity as true." *Azamar v. Stern*, 662 F. Supp. 2d 166, 174 (D.D.C. 2009).

The Individual EY Defendants also suggest the Court must resolve jurisdiction before reaching arbitration, citing *Jung v. Ass'n of American Medical Colleges*, 300 F. Supp. 2d 119 (D.D.C. 2004). Doc. 20-1 at 21. *Jung* declined to reach a motion to compel *after* finding no jurisdiction; it imposes no sequencing requirement where, as here, the arbitration motion fails independently as to Ernst & Young LLP and Ernst & Young U.S. LLP, who do not contest jurisdiction.

### 1. Specific Jurisdiction Exists over Defendant Carroll Because He Worked Out of EY's D.C. Office

Specific jurisdiction exists over Defendant Carroll under D.C. Code § 13-423(a)(1) because he transacted business in the District of Columbia. "To satisfy the 'transacting

business' prong of the long-arm statute, a plaintiff must prove: 'First, that the defendant transacted business in the District of Columbia; second, that the claim arose from the business transacted in D.C.; and third, that the defendant had minimum contacts with the District of Columbia.'" *Kalipeni v. Fam. Values at Work*, No. 25-CV-3470 (GMH), 2026 WL 1943315, at *6 (D.D.C. July 6, 2026).

Each of these requirements is met. Defendant Carroll worked out of EY's Washington, D.C. office. *See* Compl. ¶ 18; Carroll Decl. ¶ 2; Culver Decl. ¶ 90 ("During my employment, Mr. Carroll was present in the Washington, D.C. office at least once a week, as best I recall. I saw him there in person."). And the claims in this case arise out of his role as "Partner and Principal in EY's QUEST practice, based in Washington, D.C." Compl. ¶ 18. "Those contacts are the sort that local and federal courts have recognized as 'transacting business' in the District." *Kalipeni*, 2026 WL 1943315, at *7.

That Defendant Carroll's District activity was undertaken in his capacity as an EY principal is no answer. The transacting-business prong "reaches as far as the [Due Process Clause allows;] [i]t has no room for the fiduciary shield doctrine, which would shorten the District of Columbia's jurisdictional hand," and the minimum-contacts analysis "considers actions taken by individuals in their role as corporate employees or officers." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 45, 47 (D.C. Cir. 2020). Minimum contacts exist where a defendant takes "intentional, and allegedly tortious, actions expressly aimed at a jurisdiction." *Id.* at 48. *Urquhart-Bradley* was itself a suit by a former employee against a nonresident corporate officer under 42 U.S.C. § 1981, the DCHRA, and § 13-423(a)(1), and the D.C. Circuit remanded so that the officer's suit-related contacts could be weighed without the fiduciary shield. *Id.*

The record goes further still. Defendant Carroll attended the QUEST practice retreat held in Washington in January or early February 2025, where Ms. Culver saw him in person. Culver Decl. ¶ 88. He was often physically present at the practice's in-person Washington meetings, including a weekly team meeting. Culver Decl. ¶ 91. And he personally signed, on EY's behalf, the offer letter that brought Ms. Culver into the District—a letter designating her duty station as "Washington - 1101 New York Ave" and containing the very arbitration clause EY now asks this Court to enforce. Culver Ex. 1, at 5; Culver Decl. ¶ 95.

And while Ms. Culver has no way of knowing, without jurisdictional discovery, whether Defendant Carroll was physically present in D.C. when he participated in her unlawful suspension and termination, he does not dispute that he was. His declaration swears that he "reside[s] and [is] domiciled at" an address in Virginia without addressing where he was working during the events at issue. Carroll Decl. ¶ 2. To the extent the parties' submissions conflict, "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).

And if Defendant Carroll contends that there is no personal jurisdiction because he lives in Arlington, Virginia, not Washington, D.C., he is wrong. Personal jurisdiction also exists over individuals who cause "tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." D.C. Code § 13-423(a)(4). The injuries here occurred in the District: Ms. Culver was working and living in D.C. Compl. ¶ 11; Culver Decl. ¶¶ 6–11, 78. And having been "based in Washington, D.C." for fifteen years, Carroll Decl. ¶ 2, Defendant Carroll regularly does business, engages in a persistent course of

conduct, and derives substantial revenue from services rendered in D.C. That is precisely the "plus factor" § 13-423(a)(4) demands: a showing of "some other reasonable connection between the state and the defendant" sufficient "to filter out cases in which the in-forum impact is an isolated event." *Crane v. Carr*, 814 F.2d 758, 762–63 (D.C. Cir. 1987). Subsection (b) does not confine (a)(4) to the particular business giving rise to the claim. *Sec. Bank, N.A. v. Tauber*, 347 F. Supp. 511, 515 (D.D.C. 1972).

Defendant Carroll instead argues that Ms. Culver's "allegations that Carroll served as co-leader of the QUEST practice, had supervisory authority over Plaintiff's team and work, and convened a team meeting are insufficient because her claims do not arise out of these allegations." Doc. 20-1 at 26. That objection misapprehends both the statute and the pleading.

Section 13-423(a)(3) reaches tortious injury in the District caused "by an act *or omission* in the District of Columbia." D.C. Code § 13-423(a)(3) (emphasis added). The Complaint pleads such an act. On May 19, 2025, Carroll and Phillips jointly convened the QUEST team meeting at which Ms. Culver's administrative leave was announced to the District-based practice group in which she worked. Compl. ¶¶ 18, 134. The meeting was scheduled in advance by both principals; Phillips opened it by stating, "Bob and I wanted to schedule this meeting to discuss an important update related to Cecilia Culver;" and he delivered a prepared statement. *Id.* Convening and participating in that meeting was conduct directed at a District-based practice group and a District-based employee, causing injury in the District. In the alternative, Carroll possessed authority as a QUEST principal "to object to, delay, or seek review of the decision to place Plaintiff on leave and to terminate her employment, and did not do so." *Id.* ¶ 18.

Carroll's declaration does not contest any of this. It denies only that he "make[] the decision" to place Ms. Culver on administrative leave or to terminate her employment. Carroll Decl. ¶ 4. It does not deny that he held supervisory authority over her team, that he co-convened the May 19 meeting, that he participated in announcing the action to her professional peers, or that he was in the District when he did so. A denial of ultimate decisional authority is not a denial of participation, and § 13-423(a)(3) does not require that a defendant be the final decisionmaker.

Despite Carroll's assertion otherwise, Doc. 20-1 at 27, Ms. Culver has brought claims against him for failure to prevent discrimination. *See* Counts VII & VIII, ¶ 258 (participation in a civil rights conspiracy); Count IX, ¶¶ 275, 283 (participation in a conspiracy to deter Ms. Culver from federal proceedings); Count X, ¶ 295 (failure to prevent a civil rights conspiracy). Whether those allegations are ultimately borne out is a question of liability, not jurisdiction.

EY's remaining objection is that placing an employee on paid administrative leave is not a materially adverse action. Doc. 20-1 at 25–26 (citing *Jones v. Castro*, 168 F. Supp. 3d 169 (D.D.C. 2016)). That is a Rule 12(b)(6) merits argument raised inside a Rule 12(b)(2) motion, and EY has not moved under Rule 12(b)(6). It is also inapt: the leave stripped Ms. Culver of systems and premises access at 1101 New York Avenue, barred her from client contact, and was followed four days later by retaliatory termination for filing an internal complaint for discrimination. Doc. 20-8, at 1, 3; Doc. 20-10, at 1. Whether conduct is ultimately actionable is not the measure of whether it was forum-directed.

### 2. Specific Jurisdiction Exists Over Defendant Phillips Because He Regularly Worked Out of the D.C. Office

Though Defendant Phillips resides in New York and was not assigned to EY's D.C. office, he "was present in the Washington, D.C. office approximately every other week" and

Ms. Culver "saw him there in person." Culver Decl. ¶ 89. Additionally, "[t]here were many in-person meetings at the Washington, D.C. office during [Ms. Culver's] employment, including a weekly team meeting, at which both Mr. Phillips and Mr. Carroll were often physically present." *Id.* ¶ 91. He also attended the QUEST retreat held in Washington in January or early February 2025. *Id.* ¶ 88. And he co-led the Washington-based QUEST practice and served as Ms. Culver's supervising team leader throughout her full-time employment. *Id.* ¶ 87; Compl. ¶ 15.

These facts establish jurisdiction over Defendant Phillips under § 13-423(a)(4), which reaches tortious injury caused in the District "by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from . . . services rendered, in the District of Columbia." The injury was suffered in the District, where Ms. Culver lived, worked, and lost her job. Culver Decl. ¶¶ 6–11, 78. The acts were taken outside it, accepting Defendant Phillips' attestation as true. Phillips Decl. ¶¶ 4–5. And the "plus factor" is Phillips's biweekly physical presence in the Washington office, his attendance at the Washington retreat, and his recurring attendance at in-person Washington team meetings. Culver Decl. ¶¶ 88–91.

Critically, the plus factors needed to establish jurisdiction under subsection (a)(4) "may be unrelated to the claim in suit" and a defendant's contacts need not be great to satisfy subsection (a)(4), provided they are "persistent." *Crane*, 814 F.2d at 762–63. Presence every other week for the duration of Ms. Culver's employment is continuing in character. Subsection (a)(4) therefore supplies jurisdiction over Defendant Phillips whether or not the May 19 videoconference originated in New York.

Ms. Culver also invokes § 13-423(a)(1), on which Defendant Phillips's regular transaction of QUEST business in the Washington office is sufficient. But the Court need not reach it, because (a)(4) is independently satisfied.

Notably, Defendant Phillips's declaration denies none of the underlying facts. It says only that he is domiciled in New York and attended the May 19 meeting from a New York home office. Phillips Decl. ¶¶ 2, 4–5. It does not deny the retreat, the biweekly presence, or the weekly in-person meetings. Those unrebutted facts are taken as true. *Azamar*, 662 F. Supp. 2d at 171.

### 3. Specific Jurisdiction Exists Over All Individual EY Defendants Under the Conspiracy Theory

All the Individual EY Defendants are subject to this Court's jurisdiction under the conspiracy theory of personal jurisdiction—"an application of long-arm jurisdiction pursuant to which a defendant's contacts with the forum consist of the defendant's conspiratorial activities." *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 523 (D.C. Cir. 2001). Section 13-423(a)(1) reaches conspirators directly and by agency: "Persons who enter the forum and engage in conspiratorial acts are deemed to 'transact business' there 'directly'; coconspirators who never enter the forum are deemed to 'transact business' there 'by an agent.'" *Id.* And for conspiracy jurisdiction under § 13-423(a)(3), a plaintiff must allege "(1) the existence of a civil conspiracy . . . , (2) the defendant's participation in the conspiracy, and (3) an overt act by a co-conspirator within the forum, subject to the long-arm statute, and in furtherance of the conspiracy." *FC Inv. Grp. LC*, 529 F.3d at 1096 (quoting *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 81 n.4 (D.D.C. 2006)), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021).

Ms. Culver does not understate the showing required. She must make a prima facie showing of civil conspiracy—"(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme", *Second Amend. Found.*, 274 F.3d at 524 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)), and must "plead with particularity overt acts within the forum taken in furtherance of the conspiracy," *World Wide Mins., Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1168 (D.C. Cir. 2002). The Complaint accomplishes both.

There is no doubt that this case involves in-state Defendants (and co-conspirators) subject to this Court's jurisdiction. Indeed, EY Defendants only dispute jurisdiction over the Individual EY Defendants, not Ernst & Young. *See* Doc. 20-1 at 20. And, obviously, Defendant George Washington University is likewise subject to general jurisdiction in D.C.—it is chartered under the laws of the District with its principal place of business at 1918 F Street, N.W. Compl. ¶ 13. Ms. Culver also alleges repeatedly that the Defendants worked together—i.e., conspired—to unlawfully place her on administrative leave and ultimately terminate her. *See, e.g.*, Compl. § J ("External Pressure, Coordination, and the Conspiracy"). In fact, she brings two standalone conspiracy claims against all Defendants, *see* Count VII (civil rights conspiracy under the deprivation clause of 42 U.S.C. § 1985(3)); Count VIII (civil rights conspiracy under the hindrance clause of 42 U.S.C. § 1985(3)); *see also* Count X (failure to prevent civil rights conspiracy under 42 U.S.C. § 1986).

#### 4. Overt acts by co-conspirators within the forum

The overt acts pleaded in furtherance of the conspiracy were committed in Washington, D.C.:

- Defendant Riedner made a false public statement repudiating Ms. Culver from the podium at the Smith Center in Washington, D.C., minutes after the address and while Ms. Culver was still on the stage. Compl. ¶¶ 93, 258(a).

- Defendant Fackelmann issued institutional statements to the national media from GWU's principal place of business in Washington, D.C., falsely characterizing the address as "materially different" from Ms. Culver's submission and announcing a formal investigation. Compl. ¶¶ 95, 258(b).

- GWU removed the video record of the address from its platforms—an act by a District-domiciled institution that eliminated the evidence most favorable to Ms. Culver. Compl. ¶¶ 94, 258(c).

- EY deactivated Ms. Culver's premises access at 1101 New York Avenue NW, Washington, D.C., an act whose situs is the District whatever the location of the person who ordered it. Doc. 20-8, at 1.

- Defendants Phillips and Carroll convened the QUEST team and broadcast Ms. Culver's leave to her Washington-based colleagues. Compl. ¶ 102; Doc. Phillips Decl. ¶ 4.

Because the conduct of Ms. Culver's alleged co-conspirators "supplies the necessary contacts with the District of Columbia," *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 90 (D.D.C. 2017), *aff'd*, 894 F.3d 339 (D.C. Cir. 2018), the in-forum element is satisfied as to each Individual EY Defendant.

### 5.  Each Individual EY Defendant's participation

The final question, then, is whether the Complaint establishes that each of the Individual EY Defendants took some overt act in furtherance of the conspiracy. It does. These allegations are scattered throughout the Complaint but also organized under the specific conspiracy claims.

#### (a) Jason Morrissey

The Complaint alleges that Defendant Morrissey played a central role in unlawfully placing Ms. Culver on administrative leave and terminating her: on May 18, 2025, he emailed Ms. Culver a "formal written notification" that EY was placing her "on leave 'in connection with [her] speech at the George Washington University commencement'" and told her he and Defendant Phillips would call her the next day to discuss. Compl. ¶¶ 100–01. Defendant Morrissey is also the one who ultimately terminated Ms. Culver. *Id.* ¶ 109; *see also id.* ¶ 130 ("Defendant Morrissey personally drafted and transmitted the leave notice and the termination letter, in each case identifying the commencement address as the basis for EY's action."); *see also id.* ¶¶ 258(d), 275, 279.

#### (b) Andrew Phillips and Robert Carroll

The Complaint alleges that Defendants Phillips and Carroll, who were Ms. Culver's "supervising team leader and principal supervisor within the QUEST practice," "co-directed" the unlawful administrative leave decision. Compl. ¶¶ 15, 17, 280. At a QUEST team meeting that Defendants Phillips and Carroll convened, Defendant Phillips "delivered a prepared statement—demonstrating that EY's management had aligned on both the decision and its internal messaging before a single question had been posed to Ms. Culver" and announced to the team that Ms. Culver was on administrative leave because of her commencement address.

*Id.* ¶¶ 18, 102. "Carroll shared co-equal responsibility for the decision." *Id.* ¶ 134; *see also id.* ¶¶ 258(e), (g), 275(e), 292, 295.

(c) Andrea Stempel

The Complaint alleges that Defendant Stempel, the Associate General Counsel and Head of Employment Law at EY, received Ms. Culver's internal discrimination complaint. Compl. ¶ 16. "Despite her authority and professional responsibility as EY's Head of Employment Law to ensure compliance with Title VII's anti-retaliation provisions and to halt pending adverse employment action pending investigation of Ms. Culver's complaint, Stempel took no action sufficient to prevent the termination." *Id.*; *see also id.* ¶ 111. Defendant Stempel's failure to "take any step to remedy or acknowledge the discriminatory nature of the termination" is an omission that directly contributed to the execution of the conspiracy. *Id.* ¶ 111; *see also id.* ¶¶ 132, 200, 275(d), 281, 293. Because Defendant Stempel's failure to act was part of a conspiracy directed at D.C., it does not matter that she did so while based in New York. *See* Doc. 20-1 at 26. That is doubly so here, where the Program EY drafted identifies Ms. Stempel by name as the officer to whom every employee in every office—including this District—must direct notice to the Firm. Culver Ex. 9, at 6 (§ V.C).

(d) Anthony Jordan

The Complaint alleges that Defendant Jordan, who is EY's Chief Ethics and Compliance Officer, "held supervisory authority over EY's compliance with its Global Code of Conduct, its ADR Program, and applicable federal and District of Columbia civil rights laws, including EY's express prohibitions on discrimination based on race, national origin, and religion and on retaliation for protected activity." Compl. ¶ 17. He "possessed authority to direct investigation, corrective action, and policy enforcement sufficient to have prevented

or remedied the discriminatory termination of Ms. Culver's employment." *Id.* Instead, he refused to give Ms. Culver basic information necessary for her to prepare for the meeting at which she was terminated. *Id.* ¶¶ 17, 53, 107. "Defendant Jordan, as Chief Ethics and Compliance Officer, was responsible for ensuring EY's compliance with its own Code of Conduct and applicable civil rights law, had authority to intervene [in Ms. Culver's unlawful suspension and termination] at any point, and did not do so." *Id.* ¶ 133; *see also id.* ¶¶ 200, 227(d), 258(f), 266(e), 275(c). Defendant Jordan attempts to minimize his role to that of an "alleged failure to provide documentation or respond to [Ms. Culver's] various requests," Doc. 20-1 at 26, but Ms. Culver alleges that these actions and omissions were part of a broader conspiracy to deprive her of her rights and unlawfully terminate her because of her commencement address.

### 6. Due Process is Satisfied

Not only does the Complaint allege enough facts to satisfy D.C.'s long-arm statute (directly for some of the Individual EY Defendants and under the conspiracy theory of personal jurisdiction for all), due process is also satisfied. The question is whether EY Defendants "purposefully directed" their actions at Ms. Culver (in D.C.), and whether the litigation results from injuries that "arise out of or relate to" those activities. *Mwani*, 417 F.3d at 13. To both, the answer is yes.

Ms. Culver alleges in detail that the Defendants coordinated with each other to unlawfully place her on administrative leave and then terminate her. The emails and other actions they took in furtherance of this shared scheme were not simply "incidental" to the business relationship—they were designed to deprive Ms. Culver of her rights and are core to her allegations. *Cf. Winmar Constr., Inc. v. ESF, Inc.*, No. CV 22-1829 (JDB), 2023 WL

1778201, at *4 (D.D.C. Feb. 6, 2023); *Brit UW, Ltd. v. Manhattan Beachwear, LLC*, 235 F. Supp. 3d 48, 57 n.11 (D.D.C. 2017). Notably, *Winmar* and *Brit UW* (on which Defendants rely, Doc. 20-1 at 28) do not discuss email and phone communications in the context of due process but rather whether, in those cases, such communications sufficed to establish minimum contacts. Here, though, minimum contacts are established under the conspiracy theory of jurisdiction or otherwise, as discussed above. *See also Lane v. Lucent Techs., Inc.*, 388 F. Supp. 2d 590, 594 (M.D.N.C. 2005) (finding due process not satisfied over an HR employee who responded to the plaintiff's discrimination claims where the defendant's "interaction with Plaintiff does not give rise to specific jurisdiction").

EY Defendants argue that Plaintiff has "failed to articulate how those alleged contacts or failures to act caused her injury—Plaintiff's alleged injury resulted from being placed on administrative leave and then terminated by EY." Doc. 20-1 at 28. This makes no sense. The contacts Ms. Culver describes—including the emails and the meetings—are the very mechanism by which her injury occurred. The May 18 email *is* the instrument that imposed the leave and revoked her access to a District building. Doc. 20-8, at 1. The May 22 email *is* the instrument that ended her District employment. Doc. 20-10, at 1. EY cannot maintain that the adverse actions are the operative injury while the documents effecting those actions are jurisdictionally inert. Ms. Culver was an employee of EY's D.C. office and Defendants' conduct impacted her employment in D.C. The coordination Defendants engaged in was therefore directed at D.C., in a manner sufficient to satisfy due process. *See Walden v. Fiore*, 571 U.S. 277, 289–90 (2014); *Calder v. Jones*, 465 U.S. 783, 788–89 (1984).

### 7. If the Court Has Doubts About Its Jurisdiction, It Should Authorize Jurisdictional Discovery

If the Court is not persuaded that the Complaint sufficiently pleads facts giving rise to conspiracy jurisdiction, it should authorize jurisdictional discovery. Where a plaintiff "demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." *Urquhart-Bradley*, 964 F.3d at 48 (quoting *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351–52 (D.C. Cir. 2000)); *cf. Reeve*, 2024 WL 3566133, at *4 n.5 (denying jurisdictional discovery where the plaintiff had "provided no allegations that the claims in this suit arose out of those connections to this jurisdiction").

Ms. Culver has adequately established a nexus between the Individual EY Defendants and the District of Columbia: EY hired Ms. Culver into the Washington office, Culver Exs. 1, 2; she worked there on a badge, Culver Decl. ¶ 7; EY revoked her access to that building, Doc. 20-8, at 1; and it terminated her Washington employment, Doc. 20-10, at 1. What Ms. Culver lacks is not a theory connecting these Defendants' conduct to the District—it is EY's records showing the frequency of their District contacts and the identity and location of the decisionmakers. Those records exist, they are discrete, and they are in EY's sole possession. Through jurisdictional discovery, Ms. Culver could probe EY's organizational structure through discovery, which would shed light on each Individual EY Defendant's relationship and consistency of interaction with EY's D.C. office—contacts that may be "qualitatively significant" and give rise to specific jurisdiction. *See Manifold v. Wolf Coach, Inc.*, 231 F. Supp. 2d 58, 62 (D.D.C. 2002); D.C. Code § 13-423(a)(4); *see also, e.g.*, Culver Decl. ¶¶ 88–91 (establishing that Defendant Phillips frequently worked out of EY's D.C. office). Discovery would likewise establish the scope of each Individual EY Defendant's decisional authority over District personnel and whether any of them made or ratified the decisions to suspend

and terminate Ms. Culver—a question EY's seven declarations conspicuously leave unanswered. *See* Carroll Decl. ¶ 4.

Jurisdictional discovery will also enable Ms. Culver to explore her contentions that, on information and belief, (a) "EY leadership, including the named EY Defendants, was fully aware of the organized nature of the external pressure campaign of hate, knew that the campaign was directed at Ms. Culver because of her public association with Palestinians, Arabs, and Muslims as a class, and chose to accede to the demands of discrimination rather than exercise its legal and ethical obligation to protect Ms. Culver from discrimination and retaliation"; (b) "EY and GWU were in communication with each other regarding Ms. Culver's address and the institutional response to it in the period between May 17, 2025 and May 23, 2025"; and (c) "Defendants were also aware of and influenced by the public statement of 'GW for Israel.'" Compl. ¶¶ 113–15. Internal EY communications, as well as communications between EY, GWU, and third parties exerting pressure on both, can substantiate these allegations. And if Ms. Culver succeeds in proving these facts, she will have demonstrated an actionable conspiracy that also vests this Court with personal jurisdiction over the Individual EY Defendants.

Specifically, Plaintiff requests leave to take the following on an expedited schedule:

(a) Documents sufficient to show each Individual EY Defendant's business travel to and physical presence in the District from January 1, 2023 to the present, including travel and expense records, badge and building-access logs for 1101 New York Avenue NW, and calendar entries reflecting District meetings.

(b) Documents sufficient to identify the personnel assigned to the 1101 New York Avenue NW office during Ms. Culver's employment and the QUEST practice's District-based headcount.

(c) Documents sufficient to show the scope of each Individual EY Defendant's responsibilities and decisional authority as to District-based personnel, including organizational charts and role descriptions.

(d) Documents concerning the January/February 2025 QUEST retreat held in the District, including attendee lists, agendas, and expense records.

(e) Documents and communications identifying who decided to place Ms. Culver on administrative leave and to terminate her employment, when those decisions were made, and where—including the prepared statement Defendant Phillips read on May 19, 2025.

(f) Communications between or among EY personnel, GWU personnel, and third parties concerning Ms. Culver's commencement address, between May 17 and May 23, 2025.

(g) One deposition of no more than three hours of each Individual EY Defendant, limited to jurisdictional facts, or in the alternative targeted interrogatories in lieu of deposition.

If the Court authorizes jurisdictional discovery, Ms. Culver will confer with counsel for the EY Defendants on a proposed schedule under Local Civil Rule 7(m) and this Court's April 20, 2026 Order ¶ 8.

### B. THE MOTION TO COMPEL ARBITRATION MUST BE DENIED

#### 1. EY Bears the Burden, and Every Inference Runs to Ms. Culver

On a motion to compel arbitration, courts in this Circuit apply the summary judgment standard of Rule 56(c). Doc. 20-1 at 22; *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008). That standard decides a great deal, because EY must establish the absence of a genuine dispute of material fact, , with the record read in the light most favorable to Ms. Culver. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The "party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Sakyi v. Estée Lauder Cos.*, 308 F. Supp. 3d 366, 375 (D.D.C. 2018). The movant must prove the agreement's existence by a preponderance of the evidence. *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017).

The federal policy favoring arbitration does not lighten that burden. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). Arbitration therefore remains a creature of contract and "becomes mandatory only by mutual consent of the parties." *2200 M St. LLC v. Mackell*, 940 A.2d 143, 150 (D.C. 2007).

Formation is not a question the presumption of arbitrability reaches. "[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide," and a court "must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296–97 (2010). The presumption applies "only where a

validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand," *id.* at 301, and the Supreme Court "has never held that the presumption overrides the principle that a court may submit to arbitration 'only those disputes . . . the parties have agreed to submit,' nor that courts may use policy considerations as a substitute for party agreement," *id.* (citations omitted).

*Granite Rock* also disposes of any suggestion that the timing of formation is somehow different. "For purposes of determining arbitrability, *when* a contract is formed can be as critical as *whether* it was formed"—including where a document's effective date "determines whether its provisions were enforceable during the period relevant to the parties' dispute." *Id.* at 296–97 (sending the question to a jury to decide).

### 2. Formation is for This Court, Not an Arbitrator to Decide

EY argues the Program's delegation clause routes everything, including Ms. Culver's objections, to an arbitrator. Doc. 20-1 at 28–29. That inverts the sequence the Supreme Court prescribes.

"A delegation clause is merely a specialized type of arbitration agreement." *New Prime Inc.*, 586 U.S. at 112. Ordinary contract principles govern it. A delegation clause therefore controls "only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock*, 561 U.S. at 297. And *Henry Schein*—the case EY's theory depends on—reaffirmed the predicate expressly: "to be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein,* 586 U.S. at 69.

*Rent-A-Center* does not assist EY either. Doc. 20-1, at 30. There, the party conceded formation and attacked enforceability as unconscionable; the Court held a challenge to delegation must target the delegation clause specifically. *Rent-A-Ctr., W., Inc. v. Jackson*, 561

U.S. 63, 72–75 (2010). Ms. Culver raises no unconscionability argument. Rather, she contends no agreement containing that delegation clause was ever formed with her. "A party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the existence of an agreement to arbitrate." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991).

The circularity is acute here. EY's delegation clause appears in the *2025* version of the Program. Doc. 20-5 (§ IV.H); Doc. 20-1 at 5. EY thus asks the Court to send the formation question to an arbitrator on the authority of a clause in the very document whose formation is disputed. Determining which instrument governs "is a question for the court to resolve, not an arbitrator." *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 290 (E.D. Va. 2019).

## C. EY HAS NOT ESTABLISHED ASSENT TO THE 2025 PROGRAM

### 1. The 2025 version did not exist when Ms. Culver signed

The dispositive fact is chronological. The 2025 version bears SCORE Number 25747-251US, and an issue date of February 20, 2025, and an effective date of April 14, 2025. Doc. 20-5, at 1 (§ II.A.4); Culver Decl. ¶ 57. But Ms. Culver signed on October 23, 2023, and August 23, 2024. Culver Decl. ¶¶ 2, 4. She did not sign the 2025 version, and her 2023 and 2024 signatures do not manifest assent to terms that did not exist for another six to sixteen months. *See* Culver Decl. ¶ 58.

### 2. EY's notice evidence does not establish notice

EY's continued-employment theory rests on authorities that presuppose that the employee received notice. See Doc. 20-1 at 33-34. EY has not shown that Ms. Culver received notice.

Defendant Morrissey asserts Ms. Culver "received this announcement" and points to "row 50,079 of the distribution list." Morrissey Decl. ¶ 6. He does not explain the basis for

that assertion, and his exhibits do not supply one. The announcement, Doc. 20-6, has no addressee, no recipient field, and no transmission data. The distribution list, Doc. 20-7, is one spreadsheet row scrubbed of all other recipients, with no delivery, open, or click field and no custodian foundation. Appearance on a fifty-thousand-line list establishes, at most, that a name was on a list.

Ms. Culver has sworn she has no recollection of receiving or opening any such communication, no memory of clicking any link in one, and obtained no Program document as a result of one—and that she cannot check, because EY holds the account. Culver Decl. ¶¶ 30–31. Silence is not acceptance. An offeror "cannot force the offeree to take pen in hand . . . under penalty of being bound by a contract by not expressing a rejection." *Mitchell v. Valley Fin. Credit Union*, No. CV 25-52-BLG-DLC, 2026 WL 1194752, at *3-4 (D. Mont. May 1, 2026), quoting Corbin on Contracts § 3.18; *see* Restatement (Second) of Contracts § 69.

### 3. EY closed the only channel its own Program authorizes

The Program permits amendment "by providing electronic notice to you, including by posting changes on the Firm's intranet or through MyPeopleLink," and provides that assent is manifested "by commencing employment or, if currently employed, continuing your employment with the Firm for a period of *30 days after notice is provided*." Culver Ex. 9, at 7 (§ V.E.1) (emphasis added); *accord* Doc. 20-5, at 7. It further provides that "[t]ermination or amendment will not affect a Covered Dispute as to which either Phase I or Phase II had already been initiated when the termination or amendment was proposed." Culver Ex. 9, at 7 (§ V.E.2). EY's memorandum engages neither provision.

It cannot. The predicate of an intranet-notice theory is that the employee can reach the intranet. EY revoked Ms. Culver's access on the morning of May 18, 2025—before she knew

a dispute existed, before any policy was identified to her, and before she was terminated. Culver Decl. ¶¶ 33–36. The intranet was "[t]he only place I was ever told EY's policy and onboarding materials could be found," and after that morning she "could not have located, opened, or read any version of the Program posted there." Culver Decl. ¶ 38. She asked EY in writing, twice, for the policies EY believed she had violated. Culver Ex. 6; Culver Ex. 7. EY refused, and Defendant Jordan told her expressly that policies would not be provided or discussed. Doc. 20-12, at 2. In so refusing, EY also failed to give her notice about the Program.

An employer cannot ground assent in constructive notice of an intranet document, disable the employee's access to that intranet, refuse her written requests for the document, terminate her, and then bind her to terms she was structurally prevented from reading.

### 4. There is a genuine dispute about what Ms. Culver was shown at signing

EY's assent theory ultimately rests on a hyperlink in an enclosure list. The record of what Ms. Culver was actually shown is sworn, specific, and unrebutted: the DocuSign session displayed "a single letter," which she scrolled end to end, Culver Decl. ¶ 15; "[n]o separate document was attached to that letter," *id.* ¶ 16; "[n]o text of any document titled EY Common Ground Dispute Resolution Program was displayed on my screen during that session," *id.* ¶ 19; the enclosure links appeared as "small print of the kind I associated with a form letter," *id.* ¶ 17; she did not click them and does not know what they resolved to or whether they functioned, *id.* ¶ 18; the sessions are gone and cannot be reconstructed, *id.* ¶ 22; and on neither signing date did she hold EY network credentials, *id.* ¶¶ 23–24.

Against this, EY offers a declarant who does not claim to have observed either signing session. Morrissey Decl. ¶¶ 2–4. EY attaches no DocuSign audit trail, no certificate of completion, no link-resolution log, and no evidence of what

http://www.ey.com/us/common-ground returned in October 2023 or August 2024. Where an employer's assent theory rests on an electronic process, courts look for evidence of that process—secure credentials, sequential prompts, affirmative acceptance, and audit records showing what the signer saw. *See Bulnes v. Suez WTS Serv. USA, Inc.*, No. 22-cv-1154-BAS-AHG, 2023 WL 3262938, at *4 (S.D. Cal. May 4, 2023) (describing the Talent'Up interface, unique username and passcode, "accept"/"reject" prompt, and automated offer-response record). EY has produced none of it.

### 5. The Operative Program Is the Document EY Incorporated by Number

Both offer letters identify the Program by one SCORE number, twice: 08363-201US. Culver Exs. 1, 2. Neither mentions a 2022 version. Neither mentions a 2025 version. The document bearing that number in this record is the March 1, 2020 Program—the one Ms. Culver found, read, relied on, and cited. Culver Ex. 9, at 1; Culver Decl. ¶¶ 49, 53–54. EY's own 2025 cover page confirms the lineage: "Supersede(s) 08363-201US." Doc. 20-5 at 1.

EY's fallback to a "2022 version" collapses on inspection, for the reasons set out in Part I.F: the exhibit Defendant Morrissey authenticates as that version was printed on October 29, 2024—after Ms. Culver signed—and recites the same April 1, 2020 amendment date as the document Ms. Culver had. Doc. 20-4, at 2 (§ II.A.3); Culver Ex. 9, at 2 (§ II.A.3). The two are materially identical in every provision this motion touches. There is one pre-2025 Program, and Ms. Culver read it.

That disposes of EY's rhetorical centerpiece—that Ms. Culver "herself initiated Phase I Mediation . . . thereby acknowledging the Program's applicability." Doc. 20-1 at 2. What she invoked was the pre-2025 Program: her notice cites "Score No. 08363-201US" and "Section III.C," and she has sworn that the sections she cited "are the section numbers that

appear in Exhibit 9." Doc. 20-14, at 3; Culver Decl. ¶ 54. Her conduct is evidence that she assented to the document she had—not to the different document EY now asks this Court to enforce. And should the 2025 amendment fail, the Program supplies its own consequence: "the Program as it existed at the time of the proposed . . . amendment shall remain in effect." Culver Ex. 9 at 7 (§ V.E.3).

Under either body of law EY invokes, the result is the same. Delaware law gives effect to an integrated writing's specific identification of an incorporated document. D.C. law requires "agreement as to all material terms," most clearly evidenced by "the terms of a signed written agreement." *United House of Prayer for All People v. Therrien Waddell, Inc.*, 112 A.3d 330, 337–38 (D.C. 2015).

### 6.  EY Repudiated the Only Affirmative Duty the Program Assigned It

EY argues that Ms. Culver's breach, repudiation, and prevention arguments belong to the arbitrator. *See* Doc. 20-1 at 30–31. But the cases on which EY relies hold that breach of a *substantive* contract obligation does not excuse compliance with a dispute-resolution clause. *See W & T Travel Servs., LLC v. Priority One Servs., Inc.*, 69 F. Supp. 3d 158, 168 (D.D.C. 2014); *Parkcrest Builders, LLC v. Liberty Mut. Ins. Co.*, 26 F.4th 691, 697 (5th Cir. 2022). That is not Ms. Culver's argument though. Ms. Culver's argument is that EY's conduct bears on whether the mediation-then-arbitration mechanism was ever formed as a mutual, enforceable bargain—a formation question reserved to this Court.

The record on EY's performance is one-sided, and Part I.E sets it out. Mediation is mandatory. Culver Ex. 9 at 3 (§ III.A). The initiating party selects the provider, and Ms. Culver selected JAMS. *Id.* (§ III.B); Doc. 20-14 at 4. The Program then assigns the sole affirmative operational step to EY: "the Firm will contact the Provider on behalf of the parties

for the purpose of initiating mediation." *Id.* (§ III.C). JAMS's procedures contemplate exactly that contact. Culver Ex. B at 1. The 2025 text EY prefers goes further, requiring that "[t]he Firm will provide a form of representation letter" for the mediator's independence certification. Doc. 20-5 (§ III.C).

EY performed none of it. It did not propose a mediator Culver Decl. ¶ 69. It never sent a representation letter. *Id.* ¶ 70. It never identified or requested a fee. *Id.* ¶ 71. It never sought an extension. *Id.* ¶ 72. It communicated nothing between May 25, 2025 and January 2026. *Id.* ¶ 73. No mediation occurred, because of EY's failings. *Id.* ¶ 74. Phase I terminated by its own terms ninety days after initiation—on or about August 20, 2025—"whether or not the Covered Dispute has been resolved." Culver Ex. 9 at 4 (§ III.J).

EY relegates its response to this quandary to a footnote: "it was Plaintiff's responsibility to file with JAMS." Doc. 20-1 at 8 n.3. That assertion invokes a duty absent from the version EY's offer letters incorporated and omits the duty that version imposes on EY. It also asks this Court to hold that a drafting employer, having reserved the provider-contact and mediator-vetting functions to itself, discharged its obligations by sending two emails eight months apart while the ninety-day Phase I window opened and closed.

The timing frames the rest. Ms. Culver invoked EY's grievance process at 4:43 p.m. on May 22, 2025. EY terminated her at 7:55 p.m. Doc. 20-14, at 2; Morrissey Decl. ¶ 8. Whatever the Court makes of that sequence on the merits, it is not the conduct of a party honoring a dispute-resolution agreement—and EY should not be heard, fourteen months later, to demand specific performance of a process it extinguished.

### 7.  The Non-Signatory Defendants Concede They Gave No Consideration

Even if a valid agreement bound Ms. Culver and Ernst & Young U.S. LLP, the five Individual EY Defendants and Ernst & Young LLP have not shown they may enforce it.

None of them signed anything. The offer letters run between Ms. Culver and Ernst & Young U.S. LLP. Culver Exs. 1, 2. EY's theory is that the Program's definition of "Firm" sweeps them in. Doc. 20-1, at 26–27. Two problems. First, that definition lives in the documents whose formation is disputed; it cannot bootstrap non-signatories into an agreement not yet found to exist. Second, and more striking, Defendant Morrissey's declaration disclaims the consideration that non-signatory enforcement doctrines ordinarily require: "Ernst & Young LLP, Andrew D. Phillips, Andrea Stempel, Anthony Jordan, Robert Carroll and I *did not pay for the benefit* of having claims against them or me heard in arbitration." Morrissey Decl. ¶ 12 (emphasis added).

EY volunteered that statement. Paired with the paragraph immediately preceding it—explaining that EY's interest is in avoiding having "some [claims] resolved in court and some in arbitration, which is inefficient and more expensive," Morrissey Decl. ¶ 11—EY has characterized its own motion as a matter of administrative preference rather than contractual right. Six of the seven movants seek to enforce a benefit they swear they never purchased.

### 8.  In the Alternative, Rule 56(d) Discovery is Required

Because EY invokes Rule 56(c) Rule 56(d) applies. If the Court concludes Ms. Culver "cannot present facts essential to justify [her] opposition," it may deny the motion or defer ruling and permit discovery. Fed. R. Civ. P. 56(d).

Nearly all evidence bearing on formation is in EY's exclusive possession. The DocuSign sessions are closed. Culver Decl. ¶ 22. Ms. Culver has no EY email account and

cannot check what she received on March 4, 2025. *Id.* ¶ 30. She could not reach the intranet after May 18, 2025. *Id.* ¶ 36. Ms. Culver accordingly requests, in the alternative, leave to obtain:

(a) Complete DocuSign records for both envelopes—Envelope ID F22F86A0-0489-40B0-9CA1-7BE5C1F656C4 (October 23, 2023) and Envelope ID 36BADFFE-1C35-49BA-853C-BBF61C02771A (August 23, 2024)—including certificates of completion, audit trails, and every document transmitted within each envelope, sufficient to establish what was displayed to the signer and in what sequence.

(b) The historical resolution record for http://www.ey.com/us/common-ground on October 23, 2023, August 23, 2024, and May 18–30, 2025, including the document served at that address on each date and any redirect configuration.

(c) The March 4, 2025 announcement as transmitted, with delivery, open, and click-through records for Ms. Culver's EY email account, and sufficient unredacted portions of the distribution list, authenticated by a records custodian, to establish transmission to her address.

(d) All versions of the EY Common Ground Dispute Resolution Program in effect from October 2023 to the present, with SCORE numbers, issue dates, and intranet posting histories.

(e) Documents reflecting whether EY contacted JAMS, AAA, or CPR in connection with Ms. Culver's May 22, 2025 Phase I notice, and internal communications concerning mediator vetting or the preparation of a mediator representation letter.

(f) Documents and communications concerning the decision to suspend Ms. Culver's network and premises access on or about May 18, 2025, including the timing of that suspension relative to the leave notice.

(g) Internal communications from May 17 through May 23, 2025 concerning the decisions to place Ms. Culver on leave and to terminate her, including communications referencing external correspondence about her commencement address.

## IV.  CONCLUSION

EY's motions rest on arguments that strain credulity. It asks this Court to hold that fifteen years running a Washington practice group is not transacting business in Washington, and that a twenty-two-year-old assented in 2023 and 2024 to terms EY did not write until 2025. It asks the Court to compel a mediation process that EY alone was obligated to initiate, that EY never initiated, and that expired by its own terms in August 2025. The record—much of it EY's own—will not bear any of it.

For the reasons detailed above, Ms. Culver respectfully requests that the Court: (a) deny the Individual EY Defendants' motion to dismiss for lack of personal jurisdiction; or in the alternative, defer ruling and permit the limited jurisdictional discovery described in Part II.A.5; (b) deny the EY Defendants' motion to compel arbitration and to stay this action; or in the alternative, defer ruling under Rule 56(d) and permit the discovery described in Part II.B.6; and (c) grant such other and further relief as the Court deems just and proper.

Ms. Culver respectfully requests a hearing.

Respectfully submitted,


_____/s/Abdel-Rahman Hamed_____

ABDEL-RAHMAN HAMED, ESQ.
DC Bar No. 1632130
**Hamed Law**
P.O. Box 25085
Washington, D.C. 20027

(202) 888-8846

Advocates@HamedLaw.com


*Attorney for Plaintiff Cecilia Culver*